**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**GEORGE M. CHAVIS, 91-A-3261,**

                                    **Plaintiff,**               **02-CV-0119(Sr)**

**v.**

**S. VONHAGN, et al.,**

                                    **Defendants.**

---

### DECISION AND ORDER

         Pursuant to 28 U.S.C. § 636(c), the parties have consented to have the

undersigned conduct any and all further proceedings in this case, including entry of final

judgment.  Dkt. #42.


         Plaintiff filed this *pro se* action seeking relief pursuant to 42 U.S.C.

§ 1983.  Dkt. ##1 and 9.  Plaintiff alleges that while an inmate at the Southport

Correctional Facility, his rights pursuant to the First, Eighth, and Fourteenth

Amendments to the United States Constitution were violated.  *Id*.  Currently before the

Court is defendants' motion for summary judgment.  Dkt. #79.  For the following

reasons, defendants' motion for summary judgment is granted in its entirety.

         .

### BACKGROUND

         Plaintiff, proceeding *pro se*, filed this action on or about February 11,

2002, seeking "dismissal" (expungement) of each "disciplinary ticket" (hereinafter

referred to as "Misbehavior Report") addressed in the amended complaint, termination

of each defendant's employment with the New York Department of Correctional

Services, and compensatory and punitive damages for violations of his rights under the

First, Eighth and Fourteenth Amendments to the United States Constitution.[1]  *Id*.  The

following claims remain and are presently before this Court on defendants' motion for

summary judgment:  (1) in or about December 1999, defendants Brandt and vonHagn

denied plaintiff emergency medical care and defendant Brandt denied plaintiff

medication in or about January 2001; (2) defendants Brandt and vonHagn retaliated

against plaintiff because plaintiff had filed grievances against defendants Brandt and

vonHagn; (3) defendants Donahue, Gilmore, Irizarry, Quinn, Ryan, Selsky, Sheahan

and Wilcox violated plaintiff's due process rights under the Fourteenth Amendment in

connection with disciplinary hearings and appeals handled by each of the defendants;

(4) defendant Gardner interfered with plaintiff's legal mail and denied plaintiff

permission to take a religious correspondence course in violation of the First

Amendment; and (5)  defendants Corcoran and Weingartner violated plaintiff's First

Amendment right of access to the New York Court of Claims.

---

[1] Plaintiff filed his original complaint together with a motion to proceed *in forma pauperis* on or about February 11, 2002.  Dkt. ##1 and 2.  By Order filed March 7, 2002, United States District Judge Charles J. Siragusa granted plaintiff permission to proceed *in forma pauperis* and dismissed all but two of plaintiff's original claims.  Dkt. #3.  Plaintiff was granted leave to amend his complaint with respect to certain of his dismissed claims.  *Id*.  Plaintiff filed an amended complaint on or about May 31, 2002. Dkt. #9.  Thereafter, by Order filed July 1, 2002, United States District Judge David G. Larimer dismissed certain of plaintiff's claims and terminated certain of the defendants. Dkt. #10.  Specifically, Judge Larimer dismissed plaintiff's official capacity claims against all defendants, plaintiff's interference with non-legal mail claim against defendant Gardner and all claims against defendant Hazelton.  *Id*.

**A.      Deliberate Indifference Claim**

At all times relevant to the allegations in the amended complaint,

defendants Sabrina vonHagn, R.N. and Robert Brandt, R.N. were employed by the New

York State Department of Correctional Services ("DOCS") at the Southport Correctional

Facility ("Southport").   Dkt. #82, ¶ 1; Dkt. #83, ¶ 1.   Plaintiff's deliberate indifference

claim against defendant vonHagn states, in part:

> On the date [sic] of 12-16-99 to 12-22-99, S. VonHagan
> [sic], inside of this Southport Prison, while acting under State
> color [sic], in her individual and official[2] capacities, had [sic]
> knowingly, intentionally, and wilfully denied me 'emergency'
> medical care for a serious - extremely painful ear infection
> resulting in my total loss of hearing ability in my ear for a
> time period of two weeks.

Dkt. #9, p.5.   Similarly, plaintiff's deliberate indifference claim against defendant Brandt

states, in part:

> Additionally, on the date [sic] of 12-16-99 to 12-22-99, this
> same defendant [Brandt], who is the medical staff co-worker
> <u>and</u> morning partner of defendant S. VonHagan [sic] (para
> #1), had done [sic] SHU-AM cell visits on these dates above
> and knowingly, wilfully, and intentionally 'aided' in the <u>denial</u>
> of my receiving [sic] 'emergency' medical care for my ear
> infection resulting in extreme pain and loss in hearing ability
> for a two week time period.

*Id*. at p.5-B (emphasis in original).   Plaintiff also alleges (as part of his retaliation claim)

that defendant Brandt "violated my right to proper medication" in January 2001.   Dkt.

#9, p.5-A.

---

[2] As noted in footnote 1 *supra*, Judge Larimer dismissed plaintiff's official
capacity claims against all defendants.

In or about December 2004, defendant vonHagn had been a licensed registered nurse for approximately 28 years and had been employed as a registered nurse at Southport since 1994.  Dkt. #83, ¶ 1.  Also in or about December 2004, Defendant Brandt had been a licensed registered nurse for approximately 25 years and had been employed as a registered nurse at Southport since 1992.  Dkt. #82, ¶ 1.  At all times relevant to the claims alleged in the amended complaint, John Alves, M.D. was the Facility Health Services Director of the Medical Services Unit at Southport and held that position since 1995.  Dkt. #81, ¶ 1.  As of December 2004, Dr. Alves had been licensed to practice medicine for approximately 25 years.  *Id*.

### 1.     December 1999

Plaintiff was transferred to Southport on or about March 24, 1999.  Dkt. #81, ¶ 6.  During December 1999, plaintiff's ambulatory health records reveal that he had eighteen encounters with medical staff.  Dkt. #81, ¶ 7.  Indeed, prior to December 16, 1999, plaintiff was seen by medical staff on the following nine occasions, December 2 (Brandt), December 3 (vonHagn), December 4 (vonHagn), December 7 (vonHagn - twice), December 10 (vonHagn), December 13 (Brandt), and December 14 (Brandt and Hearn).  Dkt. #81, ¶¶ 7-11; Dkt. #82, ¶ 9; Dkt. #83, ¶¶ 8-9.  On December 16, 1999, plaintiff was seen by defendant Brandt during morning sick call.  Dkt. #81, ¶ 12; Dkt. #82, ¶ 10.  During this sick call, plaintiff requested an ear check and stated that he could not hear.  *Id*.  On or about December 16, 1999, defendant Brandt made the following notations in plaintiff's medical records, "ear √ some wax noted drum visible

canal mildly irritated from inmate using pen cap paper [sic] for cleaning ear." *Id.*; Dkt. #70, p.0843. Defendant Brandt advised plaintiff of his findings and plaintiff demanded ear drops. *Id.* Defendant Brandt further advised plaintiff that ear drops were not indicated and defendant Brandt noted that plaintiff was "very verbal, screaming, banging on cell bars." *Id.* Defendant Brandt again saw plaintiff on December 17, 1999, wherein plaintiff again demanded ear drops and complained of a headache. *Id.* Defendant Brandt again advised plaintiff against cleaning his ears with foreign objects and provided plaintiff with Advil. *Id.*

Plaintiff was seen by defendant vonHagn on December 18, 1999, during morning sick call. Dkt. #70, p.0843; Dkt. #81, ¶ 13; Dkt. #83, ¶ 10. At that time, plaintiff demanded a second ear check and stated that he could not hear out of both ears. *Id.* Defendant vonHagn advised plaintiff that she would schedule an ear examination with Dr. Alves, if possible, and noted in plaintiff's medical records for plaintiff to follow up with the block RN. *Id.* Defendant vonHagn further noted that, despite complaints that he could not hear, plaintiff heard her statements. *Id.* Plaintiff began demanding an ear examination immediately. *Id.* Defendant vonHagn also saw plaintiff during morning sick call on December 19 and 20, 1999. Dkt. #70, p.0842; Dkt. #81, ¶ 14; Dkt. #83, ¶ 11. On December 19, 1999, plaintiff requested Advil, however, defendant vonHagn noted that plaintiff had received Advil on December 17, 1999 and it could not be refilled until December 20, 1999. *Id.* Notwithstanding the foregoing, defendant vonHagn

provided plaintiff with Advil and as reflected in plaintiff's medical records, advised plaintiff that he was on the MD list for an ear examination.  *Id*.

On December 20, 1999, plaintiff continued to complain of ear blockage and an infection.  Dkt. #70, p.0842; Dkt. #81, ¶ 15; Dkt. #83, ¶ 12.  In plaintiff's medical records, defendant vonHagn noted that plaintiff's ear examination was rescheduled, and that an ear examination was conducted in the office.  *Id*.  Defendant vonHagn also made the following notes in plaintiff's medical records: "ear √ in office left ear cereum [sic] impaction seen, right ear some impaction seen, no visualization of tm (tampanic[3] [sic] membrane) seen in either ear."  *Id*.  According to both Dr. Alves and defendant vonHagn, "visualization" is a sign of an ear infection and as noted, defendant vonHagn did not observe any visualization.  Dkt. #81, ¶ 15; Dkt. #83, ¶ 12.  Defendant vonHagn further noted that she provided plaintiff with debrox (ear drops) daily for seven days and ear wash and noted to schedule a follow up.  Dkt. #70, p.0842; Dkt. #81, ¶ 15; Dkt. #83, ¶ 12.

It was not until December 23, 1999, that plaintiff again requested morning sick call.  Dkt. #70, p.0842; Dkt. #81, ¶ 16; Dkt. #82, ¶ 11.  Plaintiff was seen by defendant Brandt and requested over-the-counter medication for general use and defendant Brandt provided him with skin cream, lip balm and Sudafed.  Dkt. #70, p.0842; Dkt. #81, ¶ 16; Dkt. #82, ¶ 11.  Notably, plaintiff made no complaint of ear pain

---

[3] Tympanic membrane.

on December 23, 1999.  *Id*.  Plaintiff next requested a morning sick call on December 27, 1999, at which time he was seen by defendant Brandt.  Dkt. #70, p.0841; Dkt. #81, ¶ 17; Dkt. #82, ¶ 12.  Defendant Brandt noted in plaintiff's medical records that plaintiff wrote the following on his sick call request, "c/o [complains of] ears and ear drops."  *Id*.  Defendant Brandt further noted that he stopped at plaintiff's cell to do an ear check and plaintiff refused an ear examination, was extremely verbal, nasty and confrontational and stated, "get the fuck away from me white boy you fucking piece of racist homo shit.  Leave me alone and stick those [ear drops] up your white homo asshole."  *Id*.  Thereafter, defendant Brandt terminated plaintiff's sick call, provided ear drops to plaintiff and made a note in plaintiff's medical records to follow up by afternoon sick call, if plaintiff was more compliant and less confrontational.  *Id*.

Two days later on December 29, 1999, plaintiff again requested morning sick call and plaintiff was seen by defendant Brandt.  Dkt. #70, p.0841; Dkt. #81, ¶ 18; Dkt. #82, ¶ 13.  Plaintiff complained of his ears and requested over-the-counter medications.  *Id*.  Defendant Brandt attempted to check plaintiff's ears but plaintiff refused, stating, "fuck you white homoboy."  *Id*.  Defendant Brandt made the following additional notations in plaintiff's medical records, "balm, AF, MD callout."  *Id*.  Nurse vonHagn next saw plaintiff on December 31, 1999, during morning sick call.  Dkt. #70, p.0841; Dkt. #81, ¶ 19; Dkt. #83, ¶ 13.  At that time, plaintiff requested Eucerin cream and when asked to show defendant vonHagn his dry skin, plaintiff refused and became verbally abusive.  *Id*.  In addition, plaintiff requested and was provided with Sudafed.  *Id*.

On January 4, 2000, plaintiff refused to see Dr. Alves during the MD callout and Dr. Alves noted plaintiff's refusal in plaintiff's medical records.  Dkt. #70, p.0840; Dkt. #81, ¶ 20.  Defendant Brandt also noted plaintiff's refusal to see Dr. Alves in plaintiff's medical records and further noted that when he tried to speak to plaintiff, plaintiff stated "F you + your Dr to check my ear assholes."  Dkt. #70, p.0840; Dkt. #81, ¶ 21; Dkt. #82, ¶ 15.

### 2.    January and February 2000[4]

Plaintiff was next seen at morning sick call on January 8, 2000 by Nurse Whedon who noted that plaintiff requested refills of certain medications, however, Nurse Whedon noted that plaintiff did not have any symptoms of a cold, cough or congestion.  Dkt. #70, p.0840; Dkt. #81, ¶ 22.  Plaintiff made no complaint on January 8, 2000 about his ears.  *Id*.  On January 12, 2000, plaintiff was seen during morning sick call by defendant Brandt wherein plaintiff complained of a cold and a sore throat.  Dkt. #70, p.0839; Dkt. #81, ¶ 23; Dkt. #82, ¶ 16.  Plaintiff requested hydrocortisone cream and Eucerin, but plaintiff refused to show a need for the cream and became verbally abusive.  *Id*.  Plaintiff did not make any complaints about his ears on January 12, 2000.  *Id*.

---

[4] As noted elsewhere, although plaintiff's deliberate indifference claims against defendants vonHagn and Brandt allege wrongdoing in December 1999 and January 2001, plaintiff's amended complaint also alleges retaliation claims against these same defendants.  Accordingly, a further discussion of plaintiff's medical care for the period January 2000 through February 2001 is appropriate for the purpose of demonstrating that at no time relevant to the allegations in the amended complaint were defendants vonHagn and Brandt deliberately indifferent to plaintiff's medical needs and to address plaintiff's claims that defendants refused or failed to provide plaintiff with medical care.

Defendant vonHagn next saw plaintiff on January 14, 2000 during morning sick call, wherein plaintiff signed for his eyeglasses and became verbally abusive to defendant vonHagn.[5]  Dkt. #70, p.0839; Dkt. #81, ¶ 24; Dkt. #83, ¶ 15. Plaintiff did not make any complaints about his ears on January 14, 2000.  *Id*.  On January 18, 2000, plaintiff requested morning sick call and was seen by defendant Brandt.  Dkt. #70, p.0839; Dkt. #81, ¶ 25; Dkt. #82, ¶ 17.  At that time, plaintiff refused his tuberculosis test and became verbally abusive; plaintiff did not, however, complain about his ears.  *Id*.  According to plaintiff's medical records, plaintiff requested morning sick call on January 24, 25, and 29, 2000 and February 6, 2000.  Dkt. #70, pp.0838-0837.  Plaintiff was not seen by either defendant Brandt or defendant vonHagn on the three remaining dates in January 2000 or on February 6, 2000 and according to plaintiff's medical records, plaintiff did not complain about his ears during any of those visits.  *Id*.; Dkt. #81, ¶ 26.  Thereafter, plaintiff was transferred from Southport to Coxsackie Correctional Facility ("Coxsackie") on or about February 7, 2000.  Dkt. #81, ¶ 27.  Plaintiff remained at Coxsackie until in or about May 2000 at which time he was returned to Southport.  *Id*.

---

[5] A discussion of the verbal abuse endured by defendant vonHagn on January 14, 2000 and the resulting Misbehavior Report issued by defendant vonHagn against plaintiff is discussed in detail in the section entitled Retaliation Claim.  *See* pp.19-21 *infra*.

###     3.     May - December 2000

For the period May 2000 through December 2000, plaintiff had thirty-eight encounters with medical staff.[6]  Dkt. #70, pp.0754-0763 and pp.0815-0817; Dkt. #81, ¶¶ 28-49.  Plaintiff was seen by defendant Brandt on May 25, 2000, at which time plaintiff demanded Eucerin cream.  Dkt. #70, p.0817; Dkt. #81, ¶ 28.  Because no need for the cream was demonstrated, defendant Brandt denied plaintiff's request.  *Id*. Plaintiff was seen by defendant vonHagn on July 6, 2000, at which time plaintiff requested a plastic basin and Epsom salts to soak his feet because his toes were bothering him.  Dkt. #70, p.0763; Dkt. #81, ¶ 30.  Plaintiff did not show defendant vonHagn his toe nails and defendant vonHagn noted in plaintiff's medical records that there should be follow up with the block nurse to cut plaintiff's toe nails.  *Id*.  When plaintiff was seen by defendant vonHagn on September 29, 2000, he again requested Epsom salts, Sudafed and athlete's foot cream.  Dkt. #70, p.0760; Dkt. #81, ¶ 32. Defendant vonHagn noted that because there was no order from the doctor for a foot soak, she only provided plaintiff with Sudafed and athlete's foot cream.  *Id.*  On October 10, 2000, plaintiff was seen by defendant Brandt wherein plaintiff requested over-the-counter skin cream and he was provided with athlete's foot cream and Eucerin.  Dkt. #70, p.0760; Dkt. #81, ¶ 34.  Plaintiff was also seen by defendant Brandt on October 23, 2000, wherein plaintiff requested a laxative; defendant Brandt provided plaintiff with Fleet enemas.  Dkt. #70, p.0759; Dkt. #81, ¶ 36.  During November 2000, plaintiff was seen by both defendant vonHagn and defendant Brandt.  Dkt. #70, p.0758; Dkt. #81,

---

[6] Only those instances where plaintiff was seen by either defendant Brandt or defendant vonHagn are described in greater detail below.

¶ 38-39.  On November 3, 2000, plaintiff was seen by defendant vonHagn and requested Epsom salt, Sudafed and Eucerin cream.  *Id*.  Defendant vonHagn provided plaintiff with Sudafed. *Id*.  Thereafter, plaintiff was seen by defendant Brandt on November 29, 2000 and requested Eucerin cream.  *Id*.  Defendant Brandt noted that plaintiff was provided with Eucerin cream on October 10, 2000 and was not due for a refill until January 10, 2001.  *Id*.  Defendant Brandt provided plaintiff with balm and Sudafed.  *Id*.

Plaintiff was seen by defendant vonHagn on December 13, 20, 24 and 26, 2000.  Dkt. #70, pp.0755-0757; Dkt. #81, ¶¶ 42-45.  On December 13, 2000, plaintiff again requested Eucerin and athlete's foot cream.  Dkt. #70, p.0757; Dkt. #81, ¶ 42. Plaintiff was provided with athlete's foot cream and balm and it was noted again in plaintiff's medical records that plaintiff was not due for more Eucerin until January 10, 2001.  *Id*.  On December 20, 2000, plaintiff requested and was provided with Sudafed. Dkt. #70, p.0756; Dkt. #81, ¶ 43.  Plaintiff requested Advil, a laxative and to have a toe nail removed on December 24, 2000 when he was seen by defendant vonHagn.  Dkt. #71, p.0756; Dkt. #81, ¶ 44.  Defendant vonHagn provided plaintiff with Advil and Fleet enemas.  *Id*.  Again on December 26, 2000, plaintiff requested Advil and laxative and defendant vonHagn provided both to plaintiff.  Dkt. #70, p.0755; Dkt. #81, ¶ 45. Defendant Brandt saw plaintiff on December 27 and 28, 2000.  Dkt. #70, p.0755; Dkt. #81, ¶¶ 46-47.  On December 27, 2000, plaintiff requested and was provided with Advil. *Id*.  On December 28, 2000, plaintiff complained of a rash and was provided with

hydrocortisone cream.  *Id*.  Plaintiff requested sick call on December 29, 2000 and when defendant vonHagn went to plaintiff's cell, plaintiff did not respond to defendant vonHagn's inquiries.  Dkt. #70, p.0754; Dkt. #81, ¶ 48.  Finally, on December 30, 2000, plaintiff was seen by defendant Brandt wherein plaintiff requested and was provided with laxative and Advil.  Dkt. #70, p.0754; Dkt. #81, ¶ 49.


### 4.    January 2001

Plaintiff had twelve encounters with medical staff during January 2001. Dkt. #70, pp.0750-0754; Dkt. #81, ¶ 50.  Plaintiff was seen by defendant Brandt on January 2, 9, 10, 22, 23 and 24, 2001.  Dkt. #70, pp.0752-0754; Dkt. #81, ¶¶ 51-56. On January 2, 2001, plaintiff complained of his sinuses and requested band-aids for his toes.  Dkt. #70, p.0754; Dkt. #81, ¶ 51.  Defendant Brandt provided plaintiff with Sudafed and band-aids.  *Id*.  On January 9, 2001, plaintiff complained of a sore throat and of his toes; defendant Brandt provided plaintiff with throat lozenges and band-aids. Dkt. #70, p.0753; Dkt. #81, ¶ 52.  Plaintiff complained of a headache and a sore throat on January 10, 2000 and defendant Brandt provided him with Advil and throat lozenges.  Dkt. #70, p.0753; Dkt. #81, ¶ 53.


On January 14, 2001, plaintiff was seen by Nurse Whedon during morning sick call and requested Sudafed for sinus congestion, hydrocortisone cream and "mom."  Dkt. #70, p.0753.  On January 22, 2001, plaintiff complained of a rash and defendant Brandt provided him with athlete's foot cream and hydrocortisone cream. Dkt. #70, p.0752; Dkt. #81, ¶ 54.  Plaintiff was seen by defendant Brandt on January

23, 2001 and defendant Brandt noted in plaintiff's medical records that plaintiff threw

hydrocortisone cream at defendant Brandt and stated, "next time I'll spit + shit on you."

Dkt. #70, p.0752; Dkt. #81, ¶ 55.  The sick call was terminated and defendant Brandt

issued a Misbehavior Report.[7]  *Id*.  The following day, on January 24, 2001, plaintiff was

again seen by defendant Brandt and plaintiff requested over-the-counter medication for

general use.  Dkt. #70, p.0752; Dkt. #81, ¶ 56.  Defendant Brandt provided plaintiff with

throat lozenges and Motrin.  *Id*.  On January 26, 2001, plaintiff was seen by defendant

vonHagn and plaintiff requested hydrocortisone cream and Sudafed.  Dkt. #70, p.0751;

Dkt. #81, ¶ 57.  Defendant vonHagn noted in plaintiff's medical records, "no ointment

while on level 1" and further noted that plaintiff had received hydrocortisone cream on

January 23, 2001.[8]  *Id*.  Accordingly, defendant vonHagn provided plaintiff with

Sudafed.  *Id*.


        Plaintiff was again seen by Nurse Whedon on January 27 and 28, 2001.

Dkt. #71, p.0751; Dkt. #81, ¶¶ 59-60.  On January 27, 2001, plaintiff requested

hydrocortisone ointment and laxative.  *Id*.  Nurse Whedon noted in plaintiff's medical

records "no ointment on level 1" and provided plaintiff with a laxative.  *Id*.  On January

---

        [7] The circumstances surrounding the issuance of the Misbehavior Report and
plaintiff's claim of retaliation are discussed in greater detail below at pp.27-28 *infra*.

        [8] New York State Department of Correctional Services Division of Health
Services Policy 3.03 provides that registered nurses may distribute non-prescription
medication under an established protocol to allow for distribution of limited supplies of
non-prescription or over-the-counter medications by nurses at sick call.  A list of the
medications for distribution is attached to the policy as Exhibit A and hydrocortisone
cream is not among the over-the-counter medications that may be distributed without
prescription authorization.  Dkt. #81, ¶ 58 and Exhibit A.

28, 2001, plaintiff requested analgesic balm for sore muscles and hydrocortisone

ointment.  *Id*.  Nurse Whedon provided plaintiff with analgesic balm.  *Id*.  Plaintiff

requested sick call on January 29 and 31, 2001 and defendant Brandt attempted to see

plaintiff on both days, however on January 29, 2001, plaintiff refused to get out of bed

and refused to answer defendant Brandt.  *Id*.  Similarly, on January 31, 2001, plaintiff

refused to acknowledge defendant Brandt.  *Id*.


### 5.      February 2001

During February 2001, plaintiff had fifteen encounters with medical staff.

Dkt. #70, pp.0745-0750; Dkt. #81, ¶ 63.  Plaintiff was seen by defendant vonHagn on

February 1, 4, 8, 9, and 13, 2001.  Dkt. #70, pp.0748-0750; Dkt. #81, ¶¶ 64 and 66-68.

On February 1, 2001, plaintiff requested hydrocortisone ointment on the call out slip,

however, plaintiff refused to answer defendant vonHagn and refused to get out of bed.

Dkt. #70, p.0750; Dkt. #81, ¶ 64.  On February 3, 2001, plaintiff was seen by Nurse

Whedon and requested hydrocortisone ointment and throat lozenges, plaintiff was

provided with only throat lozenges.  Dkt. #70, p.0749; Dkt. #81, ¶ 65.  Plaintiff

requested hydrocortisone ointment for his scalp from defendant vonHagn on February

4, 2001.  Dkt. #70, p.0749; Dkt. #81, ¶ 66.  Plaintiff's medical records reveal that

plaintiff refused to answer defendant vonHagn and refused to show any medical need

(by examination) for the ointment.  *Id*.  Plaintiff was again seen by defendant vonHagn

on February 8, 2001 and plaintiff refused to answer when he was called for sick call.

Dkt. #70, p.0749; Dkt. #80, ¶ 67.  According to the sick call request, plaintiff requested

Eucerin, Sudafed and hydrocortisone cream.  *Id*.  Defendant vonHagn provided plaintiff

with Sudafed and hydrocortisone cream.  *Id*.  According to plaintiff's medical records

plaintiff was not eligible to receive additional Eucerin until March 13, 2001.  *Id*.  Finally,

plaintiff was seen by defendant vonHagn on February 9, 2001 and requested

hydrocortisone ointment and Eucerin.  Dkt. #70, p.0748; Dkt. #81, ¶ 68.  Defendant

vonHagn once again noted that plaintiff was not due for Eucerin until March 13, 2001

and that plaintiff failed to respond to her requests to demonstrate a medical need for

hydrocortisone ointment.  *Id*.

On February 11, 2001, plaintiff was seen by Nurse Whedon who noted

that plaintiff submitted a sick call slip threatening to sue Nurse Whedon if he wasn't

provided with hydrocortisone ointment.  Dkt. #70, p.0748; Dkt. #81, ¶ 69.  Nurse

Whedon noted in plaintiff's medical records that there was no medical need shown for

hydrocortisone ointment and that plaintiff would not acknowledge the sick call and

remained in bed.  *Id*.  Plaintiff was seen by defendant vonHagn on February 13, 2001

and he requested balm, hydrocortisone ointment and Motrin.  Dkt. #70, p.0748; Dkt.

#81, ¶ 70.  Defendant vonHagn noted in plaintiff's medical records that no tubes or

envelopes were returned.[9]  Plaintiff requested morning sick call on February 14, 2001,

however, defendant Brandt noted in plaintiff's medical records that plaintiff refused to

get up for sick call.  Dkt. #70, p.0747; Dkt. #81, ¶ 71.

---

[9] "Inmates are required to return to medical staff [sic] tube or envelope in which
Motrin was originally provided to verify that inmate has completed [sic] dose of Motrin
previously provided."  Dkt. #81, ¶ 70.

Plaintiff was seen on February 18, 2001 by Nurse Brink at which time he requested and was provided with athlete's foot cream and analgesic balm for sore muscles.  Dkt. #70, p.0747; Dkt. #81, ¶ 72.  Plaintiff was seen by Nurse Whedon on February 19, 2001 and complained of chronic constipation and requested a high fiber diet; Nurse Whedon recommended a fiber laxative, plaintiff refused stating that they don't work.  Dkt. #70, p.0747; Dkt. #81, ¶ 73.  Nurse Whedon also noted in plaintiff's medical records that plaintiff continues to request hydrocortisone ointment and plaintiff showed Nurse Whedon scaly patches on his scalp.  *Id*.  On February 22, 2001, plaintiff was seen by Nurse DeMeritt and requested minor surgery for his right toenail and noted that plaintiff had a left toenail removed in December 2000.  Dkt. #70, p.0746; Dkt. #81, ¶ 74.  Nurse DeMeritt submitted a request for right toenail surgery.  *Id*.

Plaintiff was seen by Nurse Whedon on February 24, 2001, wherein plaintiff requested hydrocortisone ointment, Sudafed for congestion and a natural laxative.  Dkt. #70, p.0746; Dkt. #81, ¶ 75.  Nurse Whedon noted in plaintiff's medical records that his request for hydrocortisone ointment was denied, plaintiff refused a fiber laxative and plaintiff was provided with Sudafed.  *Id*.  Plaintiff was seen again by Nurse DeMeritt on February 26 and 28, 2001.  Dkt. #70, p.0745; Dkt. #81, ¶¶ 76-77.  On February 26, 2001, plaintiff requested foot cream and hydrocortisone cream and Nurse DeMeritt noted that plaintiff returned the empty tubes and also noted "tinea pedis/uticaria" (athlete's foot) to be treated with over-the-counter medication.  *Id*.  Plaintiff was provided with mycelex and hydrocortisone cream.  *Id*.  Plaintiff requested a laxative "to clean his system out" on February 28, 2001, however, Nurse DeMeritt did

-16-

not note any distress and recommended treatment with over-the-counter medication and fluids and provided plaintiff with Fleet enemas.  *Id*.

Dr. Alves, as the Facility Health Services Director of the Medical Services Unit at Southport, reviewed plaintiff's medical records and based upon his review, Dr. Alves concluded that defendants Brandt and vonHagn were not deliberately indifferent to plaintiff's medical complaints about ear pain in December 1999.  Dkt. #81, ¶ 78. Moreover, Dr. Alves concluded that neither defendant Brandt nor defendant vonHagn refused to treat plaintiff's complaints of ear pain.  *Id*.  Indeed, Dr. Alves further concluded that defendants Brandt and vonHagn treated plaintiff's complaints of ear pain, provided him with debrox, scheduled and performed ear examinations and referred plaintiff to the MD callout as necessary.  *Id*.  Although plaintiff at times refused the debrox, Dr. Alves found that plaintiff did not require any treatment other than debrox and that debrox was the appropriate medication to treat his complaints of ear pain.  *Id*. at ¶ 80.  Dr. Alves further opined that plaintiff did not suffer any hearing loss in December 1999 or at anytime related to his treatment of ear pain during December 1999.  *Id*. at ¶ 79.  Notably, Dr. Alves stated that plaintiff did not complain of ear pain at any time after January 2000.  *Id*. at ¶ 84.  Finally, Dr. Alves determined that nothing in plaintiff's medical records indicated that either defendant vonHagn or defendant Brandt, either prior to or after issuing a Misbehavior Report regarding plaintiff, refused or failed to provide plaintiff with medical care for the period December 1999 through February 2001.  *Id*. at ¶¶ 82-83.

**B.      Retaliation Claim**

The amended complaint alleges that on or about January 25, 2000 and on

or about December 13, 2000, defendant vonHagn issued Misbehavior Reports against

plaintiff in retaliation for his complaints about her.  Dkt. #9, pp.5 to 5-A.  Similarly,

plaintiff further alleges in the amended complaint that on or about January 23, 2001,

defendant Brandt issued a Misbehavior Report against plaintiff in retaliation for

plaintiff's complaints about him.  *Id*. at pp.5-A to 5-B.  With respect to the hearings held

on the allegedly retaliatory Misbehavior Reports issued by defendants vonHagn and

Brandt, plaintiff separately alleges that his due process rights were violated by the

hearing officers who presided over the hearings.  Dkt. #9.  Those claims of due process

violations will be separately addressed below.  *See generally* pp.30-65 *infra*.

Specifically, as against defendant vonHagn, plaintiff alleges:

> Additionally, on the date of 1-25-00, this defendant
> [vonHagn] 'retaliated' against me with a ticket after my <u>prior</u>
> inmate grievances against her on 'numerous' occasions for
> denying me proper medical care for many illness'es [sic] I
> suffered with/from.  Furthermore, on the date of 12-13-00
> (hearing date of 12-29-00), this same defendant [vonHagn]
> again retaliated upon [sic] me with a ticket <u>after</u> my inmate
> grievances against her.

Dkt. #9, pp. 5-5A (emphasis in original).  As against defendant Brandt, the amended

complaint states:

> This defendant [Brandt] on the date on 1-23-01, inside of
> this Southport Prison, while acting under state color, in his
> individual and official[10] capacities, had knowingly, wilfully,
> and intentionally retaliated against me with a ticket after my

---

[10] *See* footnote 2 *supra*.

-18-

inmate grievance against him on date of 1-22-01, after his
violation of my right to proper medication.

Dkt. #9, p. 5A.


### 1.    "January 25, 2000" Misbehavior Report - Defendant vonHagn

Defendant vonHagn did not file a Misbehavior Report against plaintiff on
January 25, 2000.  Dkt. #83, ¶ 19.  Defendant vonHagn did, however, issue a
Misbehavior Report against plaintiff on January 14, 2000 (Dkt. #44, p.0029) and the
hearing with respect to the January 14, 2000 Misbehavior Report was held on January
25, 2000 (Dkt. #44, p.0026).[11]  The January 14, 2000 Misbehavior Report charging
violations of rules 107.10 (verbal interference) and 107.11 (verbal harassment) states:

> At approx 7:35/am the writer of this report [defendant
> vonHagn] stopped at B-10-20 cell to deliver inmate Chavis,
> G 91A3261 glasses [sic] Before the writer of this report
> could say anything inmate Chavis G told the writer to move
> on.  The writer of this report was able to convince inmate
> Chavis to sign for glasses so they could be delivered.  He
> was asked not to tear copy away [sic] both needed to be
> returned to eye glass clinic coord. Patient asked if he wished
> a copy he could write the nurse adm.  Inmate Chavis
> 91A3261 B-10-20 then said, "you are a stupid asshole."
> "You want 25¢ to give me a fucking copy of my glasses
> receipt."  "I'll take your fucking money in court.  I'll tear you

---

[11] A review of defendant vonHagn's motion for summary judgment and
supporting documentation submitted therewith, reveals that for purposes of the motion
for summary judgment, defendant vonHagn has assumed that the Misbehavior Report
to which plaintiff is endeavoring to refer in the amended complaint is in fact the January
14, 2000 Misbehavior Report for which the hearing was held on January 25, 2000.
Nothing in plaintiff's opposition to defendants' motion for summary judgment suggests
that defendants' assumption was incorrect.  Accordingly, for purposes of deciding
defendant vonHagn's motion for summary judgment, this Court will make the same
assumption and treat plaintiff's allegation concerning a "January 25, 2000" Misbehavior
Report as a reference to the January 14, 2000 Misbehavior Report.

> apart in court" [sic] "I'm not as fucking stupid as you are."
> "You stupid fucking asshole."  "Get the fuck away from my
> cell you asshole."  This continued abuse made continuing
> [sic] sick call on B-10 gallery difficult to hear B-10-17 cell for
> sick call.

Dkt. #44, p.0029.  The Tier 2[12] disciplinary hearing was held on January 25, 2000 and

conducted by defendant Lieutenant ("Lt.") Ryan.[13]  During the disciplinary hearing,

plaintiff advised Lt. Ryan that he believed that the January 14, 2000 Misbehavior Report

was written by defendant vonHagn in retaliation for complaints plaintiff had previously

filed against defendant vonHagn.  Dkt. #44, pp.0032-0038; Dkt. #83, ¶ 23.  Specifically,

plaintiff stated, "I'm objecting to the ticket and I'm objecting to the hearing.  That ticket is

retaliatory and uh let the record also reflect that uh this here uh write up [sic], who

happens to be a medical female staff aid, uh has been violating my natural rights since

I've entered this here facility."  Dkt. #44, pp.0032-0038.  In the amended complaint,

plaintiff alleges that the January 14, 2000 Misbehavior Report issued by defendant

vonHagn was in retaliation for the prior grievances filed by plaintiff against defendant

vonHagn.  Dkt. #9, pp.5-5A.  On or about December 30, 1999, plaintiff filed a grievance

---

[12] New York conducts three types of disciplinary hearings for its inmates.  Tier 1 hearings address the least serious infractions and have as their maximum punishment loss of privileges such as recreation.  Tier 2 hearings address more serious infractions and may result in 30 days of confinement in a Special Housing Unit ("SHU").  Tier 3 hearings concern the most serious violations and may result in unlimited SHU confinement (up to the length of the sentence) and recommended loss of "good time" credits.  *Hynes v. Squillace*, 143 F.3d 653 (2d Cir. 1998), *cert. denied*, 525 U.S. 907 (1998).

[13] Lt. Ryan is a named defendant in this action and how Lt. Ryan conducted the January 25, 2000 disciplinary hearing is the subject of a separate due process claim.  The claims against defendant Ryan and defendant Ryan's motion for summary judgment will be separately discussed in greater detail below.  *See* pp.59-62 *infra*.

against unspecified persons, Grievance No. SPT-17707-99.  Dkt. #65, pp.0433-0444;

Dkt. #83, ¶ 36.  Grievance No. SPT-17707-99 is discussed in greater detail below.  *See*

pp.21-23 *infra*.  Correction Officer R. Martino testified at the hearing that he was

present on January 14, 2000 when defendant vonHagn attempted to give plaintiff his

eyeglasses and when plaintiff was verbally abusive toward defendant vonHagn.  Dkt.

#44, pp.0032-0038.  Notwithstanding plaintiff's claim of retaliation and relying upon the

testimony of Officer Martino, Lt. Ryan found plaintiff guilty of verbal interference and

verbal harassment.  *Id*.


### a.    Grievance No. SPT-17707-99

In Grievance No. SPT-17707-99, plaintiff asserts that:

(1) On this date above [Dec. 27, 1999] (after submitting a
sick call slip last night (12-26-99), the same old white ill-
minded white fool who denied me emergency ear
examination and ear drops for infection (12-14-99) had [sic]
done nothing for my continual inability to hear when he
visited my cell, and after I requested outside expert medical
attention, he put (wrote) down "refusal" on his sick call log
instead of provid [sic] me with proper medical help outside of
this place!!  (2) On that date of 12-25-99, the officer (KKK
racist), in the control room had deliberately turned off the
T.V. hole after that 10-g (illegible) had asked for NBA sports
station!

Dkt. #65, p.0438.  In support of defendants' motion for summary judgment, defendant

vonHagn, in her affidavit, summarized the assertions in Grievance No. SPT-17707-99

as follows,

In Grievance No. SPT-17707-99, plaintiff asserted that on or
about December 26, 1999, Nurse Brandt denied his request
for outside medical treatment for his complaints of ear pain;

that Nurse Brandt indicated that plaintiff refused treatment;
that on December 14, 1999, Nurse Brandt denied him an
emergency ear examination and ear drops; and that from
December 14, 1999 to December 21, 1999, Nurse Brandt
and I [defendant vonHagn] denied him medical treatment for
an ear infection.

Dkt. #83, ¶ 37.[14]

On December 13 and 14, 1999, plaintiff was seen by defendant Brandt during morning sick call. Dkt. #70, p.0844; Dkt. #80, ¶ 12. Defendant Brandt noted in plaintiff's medical records that plaintiff requested a refill of hydrocortisone cream for a rash and lip balm and further that plaintiff complained about his sinuses and refused a PPD test. *Id*. Defendant Brandt provided plaintiff with hydrocortisone cream and Sudafed. *Id*. For a complete discussion of the medical treatment provided to plaintiff by defendants Brandt and vonHagn for the period December 16-31, 1999, please refer to pp.4-8 *supra*, which is incorporated by reference herein.

In response to Grievance No. SPT-17707-99, Nurse Felker and defendant Brandt advised the Inmate Grievance Review Committee ("IGRC") that defendant Brant delivered ear medication to the plaintiff; that plaintiff began verbally harassing defendant Brandt and refused to accept the medication. Dkt. #65, p.0444. Accordingly, the Superintendent dismissed plaintiff's grievance, finding that the medical

---

[14] For purposes of deciding defendants' motion for summary judgment on plaintiff's retaliation claim, as it relates to grievances filed prior to the January 14, 2000 Misbehavior Report, the Court will rely on defendant vonHagn's summary of plaintiff's December 30, 1999 grievance, Grievance No. SPT-17707-99.

staff had stated that medication was delivered to plaintiff for ear pain, however, plaintiff began to verbally harass the nurse [defendant Brandt] and refused the medication.  The Central Office Review Committee ("CORC") upheld the Superintendent's determination. Dkt. #65, pp.0433-0434.  CORC advised plaintiff to follow the treatment plan outlined by health services staff and noted that there was no medical need for an outside consultant at that time.  *Id*.

Thus, defendant vonHagn submits that she did not file the January 14, 2000 Misbehavior Report in retaliation for Grievance No. SPT-17707-99 filed by plaintiff on or about December 30, 1999, or any other grievance filed by plaintiff.  Dkt. #83, ¶ 42.  Rather, defendant vonHagn submits she filed the January 14, 2000 Misbehavior Report because of plaintiff's harassing language on that date.  Dkt. #83, ¶ 43; *see* pp.19-21 *supra*.  Moreover, as discussed above, defendant vonHagn contends that notwithstanding plaintiff's claim of retaliation, which Lt. Ryan received, Lt. Ryan found plaintiff guilty of the violations (verbal interference and verbal harassment) based on the testimony of Officer Martino who was present during the January 14, 2000 incident.

### 2.        December 13, 2000 Misbehavior Report - Defendant vonHagn

Plaintiff further alleges in the amended complaint against defendant vonHagn that, "on the date of 12-13-00 (hearing date of 12-29-00), this defendant [vonHagn] again retaliated upon [sic] me with a ticket <u>after</u> my inmate grievances against her."  Dkt. #9, pp. 5-5A (emphasis in original).

a.      Grievance No. SPT-20137-00

Plaintiff filed a grievance, Grievance No. SPT-20137-00, against both

defendant Brandt and defendant vonHagn on or about December 11, 2000 alleging that

defendants Brandt and vonHagn failed to provide plaintiff with a refill of skin cream and

that defendants Brandt and vonHagn were racist and biased toward him.  Dkt. #44,

pp.0228-0239; Dkt. #83, ¶¶ 50-51.  Specifically, plaintiff alleged in Grievance No. SPT-

20137-00 that:

> On the prior date of 12-6-00 I submitted a sick call slip, and
> on the next am morning no [sic] medical staff PA visited my
> cell (S. VonHagn), to inquire about my illnesses!  This
> continual violation in total disregard by most medical staff of
> character vindictiveness [sic] and KKK corruption for forcing
> severe suffering on black SHU prisoner is still being allowed
> by Michael McGinnis, Dr. Alves, O'Bremski [sic], and you
> James Meck - and Sgt Decker in yourselves [sic] concealing
> inmate grievances of theft by officers/racism by medical staff
> (S. VonHagn [sic] Brandt and Ms. Peter).

Dkt. #44, p.0233.

In response to Grievance No. SPT-20137-00, Nurse Administrator

Obremski advised the IGRC that plaintiff's medical records do not indicate that a sick

call request was ever submitted by plaintiff on December 6, 2000.  Dkt. #83, ¶ 52.

Plaintiff's medical records do indicate, however, that on December 13, 2000, plaintiff

requested a skin cream refill but plaintiff was not due for a refill until January 1, 2001

and that plaintiff was advised of that fact.  *Id*.  Finally, Nurse Administrator Obremski

stated that, absent any evidence, plaintiff's allegations of racism and corruption were

unfounded.  *Id.*; Dkt. #44, p.0237.  The Superintendent denied plaintiff's grievance, and

-24-

the CORC upheld the Superintendent's determination that the Nurse Administrator

indicated that plaintiff received medication refills on the appropriate dates and received

proper medical care.  Dkt. #44, pp.0228-0229; Dkt. #83, ¶ 53.

After the filing of the aforementioned grievance, defendant vonHagn next

saw plaintiff on December 13, 2000, at which time she noted that plaintiff had received

a 90 day supply of Eucerin on October 10, 2000 which was not to be refilled until after

January 10, 2001.  Moreover, on December 13, 2000, defendant vonHagn provided

plaintiff with athlete's foot cream and balm.  Dkt. #83, ¶ 54.  On that same date,

defendant vonHagn issued a Misbehavior Report based on plaintiff's threats to her and

to the male assists.  Dkt. #83, ¶ 29.  The December 13, 2000 Misbehavior Report

states,

> While making rounds on B Block 3 Gallery this nurse
> [defendant vonHagn] stopped to see Inmate Chavis, G.
> 91A3261 B-3-19 for sick call.  He requested refills.  He was
> asked about old containers.  He immediately got an attitude
> and said, 'He wasn't every other inmate and just get him
> what he wanted.' As this nurse walked away from his cell,
> inmate Chavis, G. says [sic] 'I'm going to hit that white bitch
> in her head with a baseball bat.'  C.O. Stamp told inmate
> Chavis, G 91A3261 that statement was not necessary.
> Inmate Chavis, G. then said, shut up you fuck ass white
> mother fucker, I'll kill you too after I kill her.  Inmate Chavis,
> G. continued to threaten this nurse and Correctional Officer
> until we left gallery area.

Dkt. #44, p.0104; Dkt. #83, ¶ 31.

A Tier 3 disciplinary hearing was held on December 26, 2000 (and

continued on December 29, 2000) by Lt. Sheahan in relation to the December 13, 2000

Misbehavior Report.[15]  Dkt. #44, pp.0160-0199.  During the hearing, plaintiff advised Lt.

Sheahan that defendant vonHagn wrote the December 13, 2000 Misbehavior Report in

retaliation for grievances filed by plaintiff.  Dkt. #83, ¶ 32.  Lt. Sheahan received

plaintiff's evidence of complaints against defendant vonHagn, but nevertheless found

plaintiff guilty of making threats against defendant vonHagn and other staff.  *Id*.  Indeed,

Lt Sheahan found that the evidence submitted by plaintiff of past grievances against

defendant vonHagn and other medical staff did not establish that the December 13,

2000 Misbehavior Report was retaliatory.  *Id*. at ¶ 33.  Moreover, Lt. Sheahan indicated

that the disposition was given to plaintiff to impress upon him that threats to staff will not

be tolerated.  Dkt. #44, p.0102; Dkt. #83, ¶ 33.


        Following the December 13, 2000 Misbehavior Report, and during the

balance of December 2000, January and February 2001, defendant vonHagn saw

plaintiff a total of ten times, December 20, 24, 26, and 29, 2000, January 26, 2001,

February 1, 4, 8, 9, and 13, 2001.  Dkt. #81, ¶¶ 43-77.  For a complete discussion of

the medical treatment provided to plaintiff by defendant vonHagn on the preceding

dates, *see* pp.10-17 *supra*.  At each time after the December 13, 2000 Misbehavior

Report, defendant vonHagn continued to provide plaintiff with appropriate care and

treatment.  Dkt. #81, ¶ 82; Dkt. #83, ¶ 35.

_____

        [15] Lt. Sheahan is a named defendant in this action and how Lt. Sheahan
conducted the December 26, 2000 (December 29, 2000) disciplinary hearing is the
subject of a separate due process claim and will be separately discussed below.  *See*
pp.62-65 *infra*.

### 3.      January 23, 2001 Misbehavior Report - Defendant Brandt

In the amended complaint, plaintiff alleges that defendant Brandt, in retaliation for the grievances filed against him by plaintiff, issued a retaliatory Misbehavior Report on January 23, 2001.  Dkt. #9, p.5-A.  During the time period relevant to the allegations in the amended complaint, plaintiff filed three grievances against defendant Brandt, December 30, 1999 (Grievance No. SPT-17707-99), May 24, 2000 (Grievance No. SPT-18746-00) and December 11, 2000 (Grievance No. SPT-20137-00).  Plaintiff was seen by defendant Brandt on January 23, 2001 and defendant Brandt noted in plaintiff's medical records that plaintiff threw hydrocortisone cream at defendant Brandt and stated, "next time I'll spit + shit on you."  Dkt. #70, p.0752; Dkt. #81, ¶ 55.  The sick call was terminated and defendant Brandt issued a Misbehavior Report.  *Id*.


The Misbehavior Report charged plaintiff with violating rule 102.10 (threats) and states, "[w]hile conducting sick call rounds this writer [defendant Brandt] stopped at Inmate Chavis 91A3261 cell to deliver medication. He asked what it was I told him hydrocortisone cream.  He got up slid it back under the door and stated 'I want ointment and the next time you do this I'll spit on you + then throw shit on you.'"  Dkt. #44, p.0115.  A Tier 2 disciplinary hearing was held on January 29, 2001 and was conduced by Lt. Donahue.[16]

---

[16] Lt. Donahue is a named defendant in this action and the claims against defendant Donahue, including a due process claim relating to the January 29, 2001 disciplinary hearing, will be discussed in greater detail below.  *See* pp.30-44 *infra*.

During plaintiff's Tier 2 disciplinary hearing, plaintiff advised Lt. Donahue that he believed that the January 23, 2001 Misbehavior Report was written by defendant Brandt in retaliation for complaints which plaintiff filed against defendant Brandt and/or the medical staff at Southport.  Dkt. #44, pp.0124-0128; Dkt. #82, ¶ 27. Lt. Donahue received plaintiff's testimony and notwithstanding plaintiff's claim of retaliation, found plaintiff guilty of making threatening statements to defendant Brandt. *Id*.


### a.    Grievance No. SPT-17707-99

A thorough discussion of Grievance No. SPT-17707-99 is set forth in the preceding section at pp.21-23 and is incorporated by referenced herein.


### b.    Grievance No. SPT-18746-00

With respect to Grievance No. SPT-18746-00 filed on or about May 24, 2000, plaintiff claimed that on or about May 21, 2000:  (1) defendant Brandt refused to provide him with medical care; (2) defendants vonHagn and Brandt were racist; (3) defendant Brandt told other members of the nursing staff not to treat plaintiff; (4) plaintiff had previously grieved defendant Brandt's and defendant vonHagn's failure to treat his ear infection in December 1999; and, (5) defendant Brandt refused to provide plaintiff with skin cream. Dkt. #82, ¶ 36; Dkt. #83, ¶ 46.

With respect to Grievance No. SPT-18746-00, Nurse Felker advised the IGRC that plaintiff had been seen several times for his skin condition, that plaintiff does not have a skin condition that required the skin cream requested and that the medical staff advised that plaintiff is verbally abusive on a regular basis, *to wit*, whenever he is seen by the medical staff.  Dkt. #65, p.0419; Dkt. #83, ¶ 47.  On or about May 26, 2000, the IGRC recommended that plaintiff's grievance be dismissed and on or about June 12, 2000, the Superintendent agreed.  Dkt. #65, p.0414 and 0417; Dkt. #83; ¶ 48. Upon the recommendation of the Division of Health, on or about August 2, 2000, CORC upheld the Superintendent's determination.  Dkt. #65, p.0409; Dkt. #83, ¶ 48.  In so finding, CORC noted that plaintiff had been issued skin cream on June 5, 2000 and that his allegations against the staff had not been substantiated.  *Id*.


### c.      Grievance No. SPT-20137-00

The third grievance filed by plaintiff against defendant Brandt during the time period relevant to the allegations in the amended complaint was filed on or about December 11, 2000 (Grievance No. SPT-20137-00).  A thorough discussion of Grievance No. SPT-20137-00 is set forth in the preceding section at pp.24-26 and is incorporated by reference herein.


### C.      Due Process Claims - Hearing Officers

The amended complaint alleges several causes of action against

defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan premised on the

theory that the defendants denied plaintiff his due process rights during ten disciplinary

hearings under the Eighth and Fourteenth Amendments to the United States

Constitution.


       **1.**    **Defendant Lieutenant Donahue**

      During the relevant time period alleged in the amended complaint, plaintiff

claims that defendant Lt. Donahue conducted six Tier 2 disciplinary hearings

concerning plaintiff: January 11, 2000 (December 31, 1999 Misbehavior Report);

January 25, 2000 (this disciplinary hearing was in fact conducted by defendant Ryan,

see pp.59-62 *infra*.); November 20, 2000 (November 12, 2000 Misbehavior Report);

December 21, 2000 (December 12, 2000 Misbehavior Report); January 29, 2001

(January 23, 2001 Misbehavior Report); and, March 7, 2001 (February 29, 2001

Misbehavior Report).  Dkt. #9.


      As against defendant Donahue, the amended complaint states as follows:

> This defendant [Donahue], on the dates of 3-7-01, 1-29-01,
> 12-21-00, 11-29-00, 1-25-00, and 1-21-00, inside of this
> Southport Prison, while acting under state color [sic], in his
> individual and official[17] capacities, had <u>violated</u> my 'due
> process' rights <u>in each one</u> of these separate tier hearing
> [sic] by 'denying' me <u>all</u> witnesses in each hearing stated
> above.  Additionally, my 'requested' need for 'assistance'
> during and prior to these separate hearings, had been
> <u>denied</u> by this defendant, <u>and each</u> separate <u>disposition</u> had
> [sic] sentenced me to 30-days cell confinement (30 x 6 =

---

[17] *See* footnote 2 *supra*.

180 days cell confinement), after knowingly and intentionally [sic]

* * *

I suffered more 'extended' SHU-punative [sic] segregation time (see para #5), for ticket, I <u>never</u> received but [sic] a hearing I attended with my right to due process <u>violated</u> due to deliberate indifference, and racism.  Finally, I had appealed each disposition (stated), in bias - partiality, however, <u>each</u> <u>one</u> of my appeals were 'ignored' and these 'retaliatory' dispositions affirmed (by defendant W. Wilcox - see para #9).

Dkt. #9, pp.6-D to 6-E (emphasis in original).

Additionally, plaintiff alleges that at the conclusion of the December 21, 2000 Tier 2 disciplinary hearing, defendant Donahue issued a retaliatory Misbehavior Report for conduct that occurred as plaintiff was being transported back to his cell after the hearing.  Dkt. #9.  Defendant Donahue contends that the December 21, 2000 Misbehavior Report was not issued for retaliatory reasons.  Specifically, plaintiff alleges:

Furthermore, on the date of 12-21-00, immediately after conducting a tier hearing against me, after violating my due process rights knowingly and vindictively, this defendant had verbally discriminated against me this date after hearing completion [sic], and proceeded to retaliate against me with another misbehavior ticket on this 12-21-00 date, for alleged verbal threats I had [sic] <u>not</u> been guilty of; as this retaliatory ticket against me, by this defendant had resulted after my contacts in numerous official complaints against this defendant (after his direct orders to SHU escort officers to physically assault me, while I be [sic] in full restraints <u>un</u>able to protect myself and further his referring to me during several separate hearings as a 'piece of shit' and a 'boy') resulting in a <u>nine</u> <u>month</u> Albany investigation by the top DOCS officials <u>and</u> the Inspector Generals [sic] office!.  I have valid official exhibits from Albanys [sic] DOCS top officials to prove this claim.

Dkt. #9, pp.6-D to 6-E (emphasis in original)

Defendant Donahue, a Lieutenant at Southport, has held that position since 1998 and

has been an employee of DOCS since 1984.  Dkt. #84, ¶ 1.  From time to time,

defendant Donahue's duties include conducting inmate disciplinary hearings as the

Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1.  *Id*. at ¶ 3.


        **a.**      **January 11, 2000 Tier 2 Disciplinary Hearing**

        The January 11, 2000 Tier 2 disciplinary hearing was conducted following

the issuance of a Misbehavior Report on December 31, 1999 by Sergeant Kerbein

charging plaintiff with violating Rules 107.11 (harassment) and 102.10 (threats).  Dkt.

#84, ¶ 9.  The Misbehavior Report states:

> DSS Morse received a letter from you dated 12-29-99 and
> addressed to Supt. McGinnis or Deputy Superintendent in
> which you called them/state 'and the vindictiveness of your
> racist, bias and extremely prejudice/rotton [sic] character!!'.
> [sic] Another statement you state 'well, DOCS employee of
> redneck and corrupted character are you satisfied now!".
> [sic] Your final statement was 'I sincerely hope you're just as
> strong after you do [sic] receive your New Years [sic] present
> from me, as I believe it'll be a suitable gift for you and you
> will receive [sic] it in soon [sic] time arriving [sic].'

Dkt. #44, p.0013; Dkt. #84, ¶ 9.  According to defendant Donahue, the regulations (7

N.Y.C.R.R. §§ 251-2.2(2); 251-4.1(a) and (b); 253.4) provide that where, as here, an

inmate is charged with a violation warranting a Tier 2 disciplinary hearing, the inmate is

not entitled to an employee assistant for purposes of that hearing.  Dkt. #84, ¶ 10.

Rather, the hearing officer, in his discretion, may offer an inmate the opportunity to

select an inmate assistant, where such assistance would enable the inmate to

comprehend the case in order to respond to the charges.  *Id*. at ¶ 11.

According to the Tier Assistance Selection Form, plaintiff was served with a copy of the December 31, 1999 Misbehavior Report and on January 2, 2000, plaintiff requested and received a copy of DOCS Directive No. 4932, Chapter V, Standards, Behavior & Allowances (7 N.Y.C.R.R. Part 251C).  Dkt. #44, p.0016; Dkt. #84, ¶ 13. The Tier Assistance Selection Form also indicates that no assistance is required for the hearing and further that plaintiff refused to sign the form.  *Id*.  At the outset of the hearing, plaintiff objected stating that he had not been served with a copy of the Misbehavior Report.  Dkt. #44, pp.0002-0007; Dkt. #84, ¶ 14.  After defendant Donahue read the Misbehavior Report, defendant Donahue asked plaintiff to enter his plea to the charges; plaintiff refused, stating, "I told you I never received the ticket.  I don't have anymore to say here."  Dkt. #44, p.0003.  Accordingly, defendant Donahue entered a plea of not guilty on plaintiff's behalf and proceeded with the hearing.  Dkt. #44, p.0003; Dkt. #84, ¶ 14.

In response to plaintiff's objection, defendant Donahue indicated that he was going to attempt to locate Officer Comfort who served plaintiff with a copy of the Misbehavior Report.  Dkt. #44, p.0003.  Plaintiff objected to Officer Comfort's anticipated testimony.  *Id*.  Due to Officer Comfort's unavailability, the disciplinary hearing was adjourned and continued on January 21, 2000.  *Id*.  Over plaintiff's objections, Officer Comfort did in fact testify that he served plaintiff with a copy of the Misbehavior Report.  *Id*. at p.0005; Dkt. #84, ¶ 16.  Thereafter, plaintiff indicated that he did not have any questions for Officer Comfort.  *Id*.  Plaintiff further objected to the hearing on the grounds that he was not provided with any assistance.  Dkt. #44, p.0005;

Dkt. #84, ¶ 17.  Defendant Donahue explained to plaintiff that pursuant to the

applicable regulations, plaintiff was not entitled to any assistance on a Tier 2

disciplinary hearing.  *Id*.  Plaintiff continued to object to the hearing, insisting that he did

not receive the Misbehavior Report and further, that defendant Donahue had previously

threatened his life and health.  Dkt. #44, p.0006; Dkt. #84, ¶ 19. Specifically, plaintiff

stated, "Let the record reflect that at, that at uh, uh at a previous time my life and health

was threatened by this Lt. Donahue here.  After he had flipper [sic] off the cassette he

ordered the escort officer to uh escort this piece of shit back to his cell and bounce him

on his head."  Dkt. #44, p.0006.


            Thereafter, defendant Donahue asked whether plaintiff had any evidence

to present related to the Misbehavior Report and plaintiff responded, "I don't know what

you are talking about."  Dkt. #44, p.0006.  Stating that plaintiff was being uncooperative,

defendant Donahue concluded the hearing to consider his decision.  *Id*.  Defendant

Donahue based his decision on the Misbehavior Report which he found to be credible

and on plaintiff's December 28, 1999 letter (the basis for the December 31, 1999

Misbehavior Report).  Dkt. #44, p.0014; Dkt. #84, ¶ 20.  As reflected on the Disciplinary

Hearing Disposition Rendered form, defendant Donahue relied upon "[t]he written

report of Sgt Kerbein which I find to be credible.  Also the threatening letter written by

inmate Chavis which I have examined.  This inmate makes harassing and threatening

statements in a letter sent to the Supt or DSS."  Dkt. #44, pp.0008-0009; Dkt. #84, ¶ 21.

In addition, defendant Donahue noted that the reasons for his disposition were to serve

as a deterrent of future misconduct by plaintiff and others and further, defendant

Donahue noted that this type of conduct will not be tolerated at Southport.  *Id*.

Defendant Donahue imposed a penalty of 30 days keeplock confinement (7/18/00 -

8/17/00) which was modified to run from January 21, 2000 through February 20, 2000.

*Id*.  Plaintiff did not appeal defendant Donahue's determination.  Dkt. #84, ¶ 23; Dkt.

#86, Exhibit A.


### b.    November 29, 2000 Tier 2 Disciplinary Hearing

Defendant Donahue conducted a Tier 2 disciplinary hearing on November

29, 2000 in relation to a Misbehavior Report issued on November 12, 2000.  Dkt. #84,

¶ 26.  The November 12, 2000 Misbehavior Report charged plaintiff with violating Rule

107.10 (interference with employee) and Rule 102.10 (threats).  Dkt. #44, p.0072.  The

Misbehavior Report prepared by Sergeant ("Sgt.") Cleveland states:

> On the above date and time [11/12/00 6:45 a.m.], I received
> a copy of a letter that was authored by the above inmate
> (Chavis 91A3261 D-5-21) from Lt. Sheehan [sic].  Upon my
> review of this letter I identified that it had been sent from
> inmate Chavis to Dep. Commissioner L. LeClaire on
> 10/3/00.  The content of this letter was harassing in nature
> and contained insolent and abusive language directed
> towards Mr. LeClaire and Commissioner Goord.  Inmate
> Chavis also stated in his letter, "you respect me, and I'll
> respect you, because after release <u>you and whoever else
> WILL</u> be respecting me". [sic]  I interpreted this comment to
> be an implied threat to Mr. LeClaire.  A copy of this letter
> was placed in the Captains [sic] office contraband file as
> evidence.

Dkt. #44, p.0072; Dkt. #84, ¶ 27.  At the outset of the hearing, plaintiff was advised by

defendant Donahue that he had the right to present witnesses on his own behalf and

that he should present any oral or documentary evidence he wished to be considered

during the hearing.  Dkt. #44, p.0064-0068.  Plaintiff responded that he understood his

rights.  *Id*.  With respect to the service of the charges, plaintiff stated that he didn't know

if he was served with a copy because he was asleep and when he woke up there was a

Misbehavior Report on his gate.  *Id*.  Thereafter, defendant Donahue noted that there

had been an extension granted to complete the hearing because plaintiff had been out

to court and the extension was granted to complete the hearing within twelve days of

plaintiff's return from court and plaintiff returned from court on November 27, 2000.  *Id*.


        In response to defendant Donahue's inquiry as to how he intended to

plead to the charges, plaintiff stated "[a]t this particular time I'm going to object to the

hearing." Dkt. #44, p.0066.  Plaintiff objected on the following grounds, "[t]he fact that

on the date of September 8th I had sent the letter to uh Commissioner Gord [sic] with a

complaint against you and uh Lt. Ryan, for your misconduct during the tier hearing

process while I been in the facility here."  *Id*.  Accordingly, defendant Donahue entered

a plea of not guilty to the charges on plaintiff's behalf.  *Id*.  Plaintiff also voiced an

objection to the entry of a plea of not guilty and requested that the hearing be adjourned

and another hearing officer be assigned.  *Id*. at pp.0066-0067.  Plaintiff's objections to

the hearing and the hearing officer were noted on the record and plaintiff did not offer

any evidence or any statement with respect to the Misbehavior Report.  *Id*.


        Thereafter, defendant Donahue concluded the hearing and contemplated

his decision.  The plaintiff chose to return to his cell before defendant Donahue read his

decision.  *Id*.  Defendant Donahue found plaintiff guilty of charge 107.10 (interference) and guilty of 102.10 (threats).  *Id*. at p.0068.  Defendant Donahue imposed a penalty of 30 days keeplock confinement to run from September 5, 2001 to October 5, 2001.  *Id*. In his statement of evidence relied upon, defendant Donahue stated that he relied upon the written report of Sgt. Cleveland and his examination of the letter in evidence and further that he found Sgt. Cleveland's report to be credible.  Dkt. #44, p.0070. Defendant Donahue stated that the reasons for his disposition were to serve as a deterrent for future misconduct by the plaintiff and that "threats towards employees of this department will not be tolerated."  *Id*.  On or about December 11, 2000, Captain Wilcox affirmed defendant Donahue's determination.  Dkt. #86, Exhibit A.

### c.  December 21, 2000 Tier 2 Disciplinary Hearing

Defendant Donahue conducted a Tier 2 disciplinary hearing involving plaintiff on December 21, 2000.  Dkt. #44, pp.0081-0100; Dkt. #84, ¶ 41.  The December 21, 2000 disciplinary hearing related to a Misbehavior Report issued on December 12, 2000 by Correction Officer Gary Morse and charged plaintiff with a violation of Rule 102.10 (threats).  Dkt. #44, p.0090; Dkt. #84, ¶ 42.  The December 12, 2000 Misbehavior Report states:

> On the above date [12-12-00], inmate Chavis, George 91A3261 sent a grievance to the Inmate Grievance office. This grievance contained a number of threatening statements.  These statements include: 'However, if he attempts to disregard my handicap again, I'll exit my cell and compel him to regard me the next shower time so he had better be prepared next shower.  Sgt. Mulvern had been informed of this and P. Jayne needs to seriously beware.'

> Chavis goes on to state, 'Emergency ambulance after P. Jayne disregards my handicap again on scheduled shower day.  The ambulance will be for him not me'. [sic] 'I have surgical scars on my right wrist, and P. Jayne better realize it or suffer a penalty.'  These threats are aimed at C.O. P. Jayne who is a shower officer.

Dkt. #44, pp.0090 and 0092.


At the outset of the hearing, defendant Donahue advised plaintiff that he had the right to have witnesses testify on his behalf, that plaintiff should present any oral or documentary evidence that he wishes to have considered at the hearing and that plaintiff should raise any procedural objections during the hearing.  Dkt. #44, pp.0081-0086.  Thereafter, plaintiff indicated that he understood his rights and that he had received a copy of the charges.  *Id*.  After defendant Donahue read the charges and asked plaintiff how he plead to the charges, plaintiff objected to defendant Donahue serving as the hearing officer on the grounds that there was a pending investigation into defendant Donahue's conduct as it related to plaintiff.[18]  *Id*.; Dkt. #44, ¶ 43.  Moreover, plaintiff objected stating, "[l]et the record also reflect that uh that's a grievance.  And uh Section uh 6 Letter B states that no inmate shall, shall suffer deprivals [sic] because of a grievance." Dkt. #44, p.0083; Dkt. #84, ¶ 45.

---

[18] With the exception of plaintiff's self-serving statements made throughout plaintiff's opposition to defendants' motion for summary judgment concerning "an investigation" into defendant Donahue, plaintiff offers no independent evidence (e.g. grievances or letters) to corroborate this assertion.  Accordingly, this Court will not separately address these assertions.

Defendant Donahue entered a plea of not guilty on plaintiff's behalf and asked whether plaintiff had any testimony or evidence to present.  Dkt. #44, p.0084; Dkt. #84, ¶ 46.   Plaintiff indicated that he wished to call Thomas C. Egan, CORC Director and Commissioner "Gordon" [Goord] as witnesses.  Dkt. #44, p.0084; Dkt. #84, ¶ 47.  On the grounds that neither Director Egan nor Commissioner Goord had  any knowledge of the Misbehavior Report or of plaintiff's grievance, defendant Donahue denied plaintiff's request to call them as witnesses during the disciplinary hearing.  Dkt. #44, pp.0084-0085; Dkt. #84, ¶ 48.  In response to this denial, plaintiff objected stating that defendant Donahue's denial illustrated that he is biased and racist.  Dkt. #44, p.0084; Dkt. #84, ¶ 43.

Defendant Donahue noted that plaintiff was returned to his cell because he was being disruptive and for making threats.   Dkt. #44, p.0085; Dkt. #84, ¶ 52.  Thereafter, defendant Donahue found plaintiff guilty of violating Rule 102.10 (threats) and imposed 30 days keeplock confinement as the penalty to run from October 5, 2001 to November 4, 2001.  Dkt. #44, p.0085; Dkt. #84, ¶ 53.  According to the transcript of the hearing and the disposition record, in reaching his determination, defendant Donahue relied on the written report of Correction Officer Morse which he found to be credible and his examination of the threatening letter written by plaintiff to the Inmate Grievance Office.  Dkt. #44, pp.0085 and 0088; Dkt. #84, ¶ 53.  Defendant Donahue stated the following as his reasons for the disposition, "[t]he disposition is given to serve as a deterrent of future misconduct for this inmate as well as others.  Threats toward

staff will not be tolerated at the facility, including in the form of written grievances." Dkt. #44, p.0088; Dkt. #84, ¶ 53.

### d.      December 21, 2000 Misbehavior Report

Following the December 21, 2000 disciplinary hearing (*see* pp.37-40 *supra*), defendant Donahue issued a Misbehavior Report based on plaintiff's threatening and harassing language as he was being escorted back to his cell after the hearing.  Dkt. #84, ¶ 89.  As discussed above, plaintiff was returned to his cell prior to hearing defendant Donahue's determination because he was being disruptive and was making threats.  *Id*. at ¶ 90.  A Tier 3 disciplinary hearing was held on January 4, 2001 concerning the December 21, 2000 Misbehavior Report and was conducted by defendant Irizarry.  *Id*. at ¶ 91.  A complete discussion of plaintiff's claims against defendant Irizarry concerning the January 4, 2001 disciplinary hearing, including a discussion of the charges, is set forth below.  *See* pp.49-53 *infra*.

### e.      January 29, 2001 Tier 2 Disciplinary Hearing

On January 29, 2001, defendant Donahue conducted a Tier 2 disciplinary hearing arising from a Misbehavior Report dated January 23, 2001.  Dkt. #84, ¶ 61.  In the January 23, 2001 Misbehavior Report, Nurse Brandt charged plaintiff with violating Rule 102.10 (threats) stating, "[w]hile conducting sick call rounds this writer stopped at Inmate Chavis 91A3261 cell to deliver medication.  He asked what it was I told him hydrocortisone cream.  He got up slid it back under the door stated [sic] 'I want ointment

and the next time you do this I'll spit on you + then throw shit on you.'" Dkt. #44, p.0115;

Dkt. #84, ¶ 62.  Plaintiff refused to sign the Tier Assistance Selection Form, however,

as discussed above, because this was a Tier 2 disciplinary hearing, plaintiff was not

entitled to any assistance.  Dkt. #44, p.0116; Dkt. #84, ¶ 63.  In addition, a review of the

hearing transcript reveals that plaintiff did not request any assistance during the

hearing.  Dkt. #44, pp.0124-0128; Dkt. #84, ¶ 64.


        As reflected in the hearing transcript, defendant Donahue advised plaintiff

that he was entitled to have witnesses testify on his behalf, that he should present any

oral or documentary evidence that he wished to be considered during the hearing and

that he should raise any procedural questions during the hearing so that they may be

considered.  Dkt. #44, pp.0124-0128; Dkt. #84, ¶ 65.  Thereafter, plaintiff indicated that

he understood his rights and plaintiff entered a plea of not guilty to the charges.  *Id*.

During the hearing, plaintiff did not request to have any witnesses testify on his behalf.

Dkt. #84, ¶ 66.  Plaintiff testified during the hearing that the incident did not occur as

recited in the Misbehavior Report.  Dkt. #44, pp.0124-0128; Dkt. #84, ¶ 67.  Specifically,

plaintiff stated,

> Uh everything is totally uh different from what he has on the
> ticket.  Uh I [sic] been down [sic] for thirteen years already
> and I've never done anything hy, unhygienic to anybody,
> whether officer or inmate, so he is basically lying there.  I
> wrote up a grievance against him on um the 22nd.  And on
> three prior separate occasions that grievance [sic], that
> recent grievance, I had uh written to Albany in complaint [sic]
> about the, the type of improper medical care that I'm
> receiving here.  And uh D. [sic] Brandt came to my cell and
> he brought me the wrong medication.  I suffer with uh, a
> severe uh psoriasis skin condition from my stem to uh my

> body.  The reason why you don't see it too clear is because I
> have uh creams all over my head and all over my body and
> stuff like that.  And uh this guy is just, is constantly not giving
> me what, what I need you know. ... So this is a thing where
> they constantly [sic] not giving me what I need and, and my
> skin is just messing up.  It it's just one ticket after another.

Dkt. #44, p.0126, Dkt. #84, ¶ 67.  Plaintiff further stated that he took the medication and

shoved it through the door and that "he [Nurse Brandt] had me active a little bit but

rather than take it and throw [sic] out to react this time, I just took it and shoved it under

the door.  I didn't want him to uh talk about [sic] I tried to attack him and stuff like that,

so I just took it and slid it underneath the door."  Dkt. #44, p.0126; Dkt. #84, ¶ 68.  In

addition, plaintiff stated that he had copies of the complaint letter that he had sent to

Albany in his cell, defendant Donahue stated that he would accept plaintiff's testimony

that he had filed several complaints against Nurse Brandt.  Dkt. #84, ¶ 69.


Plaintiff chose to return to his cell before defendant Donahue read his

determination.  Dkt. #84, ¶ 70.  Thereafter, defendant Donahue found plaintiff guilty of

violating Rule 102.10 (threats) and imposed the penalty of 30 days keeplock

confinement to begin February 4, 2003 through March 6, 2003.  Dkt. #44, p.0127.  As

set forth in the hearing transcript and the Hearing Disposition Sheet, defendant

Donahue relied on the Misbehavior Report of Nurse Brandt which he found to be

credible.  Dkt. #44, pp.0113, 0125-0128; Dkt. #84, ¶ 71.  Defendant Donahue noted

that the penalty imposed, 30 days keeplock confinement, was imposed to serve as a

deterrent for future misconduct by plaintiff and other inmates.  *Id.*  Finally, defendant

Donahue noted that plaintiff had been found guilty of threats on many previous

occasions.  *Id*.


### f.      March 7, 2001 Tier 2 Disciplinary Hearing

On March 7, 2001, defendant Donahue conducted a Tier 2 disciplinary

hearing in relation to a February 28, 2001 Misbehavior Report.  Dkt. #44, pp.0129-0131;

Dkt. #84, ¶ 78.  The February 28, 2001 Misbehavior Report charged plaintiff with

violating Rules 118.33 (flooding) and 106.10 (refusing a direct order) stating:

> On the above date and approximate time [2-28-01 7:15 p.m.]
> while making rounds I observed water on B-1 Gallery.  As I
> continued the rounds I observed Chavis #91A3261
> repeatedly flushing his toilet.  I ordered Chavis to stop and
> he refused by continuing to flush his toilet.  I then left the
> gallery and went to the pipe chase to turn his water off.  I
> then contact [sic] the area sergeant.

Dkt. #44, pp.0129-0131.  Defendant Chavis refused to attend the March 7, 2001

disciplinary hearing and refused to sign the Waiver Form.  Accordingly, the disciplinary

hearing was conducted in his absence and at the outset of the hearing, defendant

Donahue entered a plea of not guilty on plaintiff's behalf.  *Id*.; Dkt. #84, ¶¶ 80 and 83.

According to the hearing transcript, when Sgt. Gagliardi went to plaintiff's cell to bring

him to the hearing, plaintiff was sleeping and when Sgt. Gagliardi woke him and

informed him that he had a disciplinary hearing and that defendant Donahue was

conducting the hearing, plaintiff said "I'm not going, I'm not going to attend the hearing

with him [defendant Donahue]."  Dkt. #44, pp.0129-0131.  Defendant Donahue

conducted the hearing, considered the evidence (the Misbehavior Report of Correction

Officer Kamas) and determined that plaintiff had indeed violated Rules 118.33

(flooding) and 106.10 (refusing a direct order).  Dkt. #44, pp.0129-0131; Dkt. #84, ¶ 84.

Defendant Donahue imposed a penalty of 30 days keeplock confinement as a deterrent

of future misconduct on the part of plaintiff and other inmates.  *Id*.  Plaintiff did not

appeal defendant Donahue's determination.  Dkt. #86, Exhibit A.


### 2.      Defendant Lieutenant Gilmore

Plaintiff claims that defendant Lt. Gilmore conducted a Tier 2 disciplinary

hearing on July 18, 2000 with respect to a July 9, 2000 Misbehavior Report and during

the course of that hearing, Lt. Gilmore denied plaintiff due process.  Dkt. #9.

Specifically, in the amended complaint, plaintiff alleges against defendant Gilmore:

> This defendant [Gilmore], on the date of 7-18-00, inside of
> this Southport Prison, while acting under state color in his
> individual and official[19] capacities, had conducted a hearing,
> and in his doing so had intentionally, knowingly, and wilfully
> <u>violated</u> my due process rights by finding me guilty [sic] for a
> violation that I had not been charged with on the retaliatory
> ticket.  Additionally, <u>no</u> other officer had endorsed the
> retaliatory ticket <u>nor</u> had any testified against me of the
> several SHU-officers present at the incident of which I had
> <u>not</u> been the aggressor (my two eye witness'es [sic] had
> confirmed my defense however, this defendant had found
> me guilty anyway, than [sic] sentenced me to a 10-day
> sentenced [sic].  Soon after, I did appeal on 7-18-00.
> However, the defendant W. Wilcox (para - #9), had affirmed
> the sentence in bias against me.

Dkt. #9, pp.6-F to 6-G.    During the time period alleged in the amended complaint,

defendant Gilmore was a Lieutenant at Southport and had held that position from June

1999 to June 2001.  Dkt. #86, ¶ 1.  As part of his duties, defendant Gilmore conducted

---

[19] *See* footnote 2 *supra*.

inmate disciplinary hearings as the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1.  Dkt. #85, ¶ 3.

The July 9, 2000 Misbehavior Report, authored by Correction Officer Burgett and endorsed by Sgt. Parish, charged plaintiff with violating Rule 107.10 (interference), Rule 107.11 (harassment) and Rule 106.10 (refusal to obey a direct order).  Dkt. #85, ¶ 6.  In the Misbehavior Report, Officer Burgett described that plaintiff aggressively questioned the duration of his shower at the two minute warning and again at the termination of his shower.  Dkt. #44, p.0042; Dkt. #85, ¶ 6.  Officer Burgett further stated that he informed plaintiff that his shower was the required duration, plus one minute and that plaintiff accused Officer Burgett of lying.  *Id*.  As Officer Burgett began to counsel plaintiff about harassing employees, plaintiff became extremely loud and verbally aggressive, stating "you aint [sic] telling me nothing [sic] because youre [sic] an asshole, I'll have you in a penitentiary wearing handcuffs in a week, bet that, you aint [sic] scaring nobody with your ticket."  *Id.*  Thereafter, Officer Burgett stated that he issued a direct order for wrist restraints to be applied in order to escort plaintiff and plaintiff refused to come out of the shower.  *Id*. Officer Burgett then issued two more orders for plaintiff to put out his hands for wrist restraints and plaintiff again refused and stated he would not come out of the shower.  *Id*.  After Sgt. Parish responded to the scene, plaintiff complied with the wrist restraints and was escorted to his cell.  *Id*.

According to the Tier Assistance Selection Form, plaintiff was served with a copy of the Misbehavior Report on July 10, 2000 and did not request a copy of DOCS

Directive No. 4932, Chapter V, Standards, Behavior & Allowances and that plaintiff refused to sign the form.  Dkt. #44, p.0043; Dkt. #85, ¶ 7.  Notwithstanding the foregoing, at the disciplinary hearing, plaintiff claimed that he had requested and never received a copy of DOCS Directive No. 4932, Chapter V.  Dkt. #44, pp.0045-0063; Dkt. #85, ¶ 8.  Defendant Gilmore immediately gave plaintiff a copy of DOCS Directive No. 4932, Chapter V.  However, plaintiff declined defendant Gilmore's offer of a few minutes to review the document.  *Id*.  Plaintiff was advised at the outset of the hearing that he may have witnesses testify on his behalf, that nothing said by plaintiff would be used against him in a criminal proceeding, that plaintiff should present any oral or documentary evidence he wished defendant Gilmore to consider during the hearing and that any procedural objection or claims should be made during the hearing.  Dkt. #44, pp.0045-0063; Dkt. #85, ¶ 9.  Plaintiff indicated that he understood his rights.  *Id*.  Thereafter, plaintiff plead not guilty to the charges and requested to have inmates Lopez and Wilson testify as witnesses.  Dkt. #44, pp.0045-0063; Dkt. #85, ¶ 10.

As a threshold matter, plaintiff objected to the Misbehavior Report on the grounds that the copy he had received had not been endorsed by Sgt. Parish.  Dkt. #44, pp.0045-0063; Dkt. #85, ¶ 11.  Defendant Gilmore showed plaintiff the original July 9, 2000 Misbehavior Report which contained the endorsement by Sgt. Parish and noted plaintiff's objection for the record.  *Id*.  Thereafter, plaintiff further objected to the Misbehavior Report on the grounds that it was fabricated by Officer Burgett. Dkt. #44, pp.0045-0063; Dkt. 85, ¶ 12.  Plaintiff denied calling Officer Burgett an asshole and stated that it was Officer Burgett who called him an asshole.  *Id*.  Plaintiff further

asserted that he had requested the presence of Sgt. Parish because Officer Burgett threatened him and that he had refused to come out of the shower because of Officer Burgett's threatening behavior, including brandishing a night stick.  *Id*.  Plaintiff admitted that he told Officer Burgett that if he hit him with a baton, plaintiff would have Officer Burgett arrested.  Dkt. #44, pp.0045-0063; Dkt. #85, ¶ 13.  Plaintiff further admitted to calling Officer Burgett a scumbag.  Dkt. #44, pp.0045-0063; Dkt. #85, ¶ 14.  Finally, plaintiff stated that after Sgt. Parish came to the shower, he cooperated with the wrist restraints and was escorted back to his cell.  Dkt. #44, pp.0045-0063; Dkt. #85, ¶ 15.

Since plaintiff's requested witnesses Lopez and Wilson were confined to SHU, they could not be in the same room as plaintiff.  Dkt. #44, pp.0045-0063; Dkt. #85, ¶ 16.  Accordingly, defendant Gilmore advised plaintiff that plaintiff could instruct defendant Gilmore as to what questions to ask each witness and that he, Gilmore, would question the witnesses and then play the testimony back for plaintiff.  *Id*.  Plaintiff requested that defendant Gilmore ask inmates Lopez and Wilson whether plaintiff called Officer Burgett an asshole?, how long plaintiff was in the shower?, and why plaintiff requested Sgt. Parish to come to the shower area?.  Dkt. #44, pp.0045-0063; Dkt. #85, ¶ 17.  Thereafter, both inmates Lopez and Wilson testified outside the presence of plaintiff, stating, in part, that Officer Burgett had called plaintiff an asshole, that the shower had lasted less than ten minutes and that plaintiff had requested the Sergeant because the officers were brandishing their night sticks/holding their batons in their hands.  Dkt. #44, pp.0045-0063; Dkt. #85, ¶¶ 19-26.  Following the testimony of inmates Lopez and Wilson, the recorded testimony was played for plaintiff and plaintiff

stated that he was satisfied with their testimony and that he could hear and understand their testimony.  Dkt. #44, pp.0045-0063; Dkt. #85, ¶ 28.

Plaintiff then presented a copy of a grievance he filed against Officer Burgett and stated that there were numerous other grievances that had been filed by other inmates against Officer Burgett.  Dkt. #44, pp.0045-0063; Dkt. #85, ¶ 29. Defendant Gilmore reviewed the consolidated grievance written on July 9, 2000 by plaintiff and filed on July 10, 2000 listing problems with the shower officer.  At plaintiff's request, defendant Gilmore read the grievance into the record.  *Id*.  Thereafter, plaintiff reiterated his objection to the Misbehavior Report and stated that he had nothing further to offer in response to the charges.  Dkt. #44, pp.0045-0063; Dkt. #85, ¶ 30.  Defendant Gilmore, relying on the Misbehavior Report authored by Officer Burgett, as well as plaintiff's testimony, found plaintiff not guilty of violating Rule 107.10 (interference) and not guilty of violating Rule 106.10 (refusing a direct order).  Dkt. #44, pp.0045-0063; Dkt. #85, ¶ 31.  Defendant Gilmore did, however, find plaintiff guilty of violating Rule 107.11 (harassment) because he concluded that the plaintiff had participated in a verbal confrontation with Officer Burgett (plaintiff admitted to calling Officer Burgett a scumbag) and imposed a penalty of 10 days keeplock confinement.  *Id*.  Plaintiff appealed defendant Gilmore's determination and Captain Wilcox affirmed the determination on or about July 30, 2000.  Dkt. #85, ¶ 33; Dkt. #86, Exhibit A.

### 3.    Defendant Hearing Officer Irizarry

Defendant Hearing Officer Irizarry conducted a Tier 3 disciplinary hearing

on January 4, 2001 with respect to a December 21, 2000 Misbehavior Report issued by

defendant Donahue following a Tier 2 disciplinary hearing conducted by defendant

Donahue on December 21, 2000.  Dkt. #9.  Plaintiff claims that defendant Irizarry

denied him due process by denying him assistance prior to the hearing, denying plaintiff

his right to call expert witnesses during the hearing, denying plaintiff the right to present

evidence during the hearing and threatening to reprimand plaintiff during the hearing for

making objections.  Dkt. #9, pp.6-B to 6-D.  Moreover, plaintiff claims that because

defendant Selsky modified the hearing determination, that his due process rights were

violated.[20]  *Id*.  In addition, plaintiff claims that he never received a copy of the

December 21, 2000 Misbehavior Report.  *Id*.  Specifically, as against defendant Irizarry,

the amended complaint states, in part,

> This defendant [Irizarry], on the date of 12-21-00 (note: this
> defendant had <u>personally</u> <u>dated</u> his hearing disposition 1-4-
> 00), inside of this Southport Prison, while acting under state
> color, in his individual and official[21] capacities, had
> knowingly, wilfully, and intentionally <u>violated</u> my right to due
> process, by denying me 'assistance' prior to himself
> conducting the hearing, by also denying my right to call
> expert witness'es [sic] of which I had only two, and verbally
> threatening to reprimand me, due to my <u>un</u>ceasing
> 'objections' [sic] to this defendants [sic] misconduct durring [sic]
> this hearing, and <u>no</u> threat to institutional safety or
> correctional goals, had been stated in this defendants [sic]

---

[20] Director Selsky is a named defendant in this action and the claims against
defendant Selsky will be separately discussed in greater detail below.  *See* pp.66-74
*infra*.

[21] *See* footnote 2 *supra*.

> disposition of 1-4-00.  I 'suffered' a finding in [sic] guilt, and
> sentenced to nine (9) months extended SHU-punative [sic]
> segregation. . .

Dkt. #9, pp.6-B to 6-C (emphasis in original).  Defendant Irizarry (incorrectly identified

as Irrizarry in the amended complaint) is the Food Service Administrator at Southport

and has held that position since 1990.  Dkt. #86, ¶ 1.  From time to time, defendant

Irizarry's duties included conducting inmate disciplinary hearings as the

Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1.


On December 21, 2000, following a Tier 2 disciplinary hearing, defendant

Donahue issued a Misbehavior Report charging plaintiff with violating Rules 102.10

(threats) and 107.11 (harassment).  Dkt. #65, p.0664; Dkt. #86, ¶ 6.  The Misbehavior

Report states:

> While exiting B-block first floor hearing room from a Tier 2
> hearing on the above date and time, inmate Chavis,
> 91A3261 became verbally abusive.  Chavis stated, 'you're a
> bitch Lt. Donahue.  I'll have you in handcuffs and leg irons
> and I'll fuck you up, you bitch.'  Inmate Chavis continued to
> yell obscenities and make threats as he was escorted back
> to his cell.  These threats included Chavis stating, 'I'll murder
> your ass, you punk ass mother fucker.'  Inmate Chavis was
> secured in his cell without further incident.

Dkt. #65, p.0664.  As a threshold matter, plaintiff claims that defendant Irizarry denied

him an assistant to prepare for the hearing.  Dkt. #9.  On December 23, 2000, plaintiff

was served with a copy of the Misbehavior Report and indicated on the Tier Assistance

Selection Form that he waived his right to an assistant and plaintiff refused to sign the

Tier Assistance Selection Form.  Dkt. #65, p.0667; Dkt. #98, pp.5-18.  During the

hearing, plaintiff claimed that despite what is reflected on the Tier Assistance Selection

Form, he did not refuse an assistant.  Rather, plaintiff stated during the hearing that he

was sleeping when the Misbehavior Report was delivered to him.  Dkt. #98, pp.5-18.

Defendant Irizarry found plaintiff's claim not to be true because the officer who served

plaintiff with a copy of the Misbehavior Report, Officer McIntosh, testified that plaintiff

was awake when he was served and simply refused to sign or pick an assistant.  *Id*;

Dkt. #86, ¶ 12.


          Plaintiff further alleges that defendant Irizarry refused to allow him to call

witnesses to testify during the hearing.  Dkt. #9.  During the hearing, plaintiff requested

that DOCS' Commissioner Goord and Associate Commissioner W. Chapman testify as

witnesses on his behalf.  Dkt. #65, p.0666; Dkt. #98, pp.5-18.  In response to defendant

Irizarry's question concerning why plaintiff requested Commissioner Goord and

Associate Commissioner Chapman as witnesses, plaintiff stated, "[b]ecause they have

everything to do with this ticket.  And they have everything to do with the conduction of

that [sic] hearing."  Dkt. #98, p.16.  Plaintiff's request was denied by defendant Irizarry

on the grounds that their testimony was not relevant to the hearing as neither

Commissioner Goord nor Associate Commissioner W. Chapman were present or in the

facility at the time of the alleged incident.  Dkt. #65, p.0666; Dkt. #86, ¶ 15; Dkt. #98,

p.16.  Defendant Irizarry maintains that according to policy, an inmate's request for

administrative, supervisory or staff personnel to testify does not mean that the staff

member is automatically called to testify.  Dkt. #86, ¶ 16.  If, according to defendant

Irizarry, every inmate was granted the right to call every staff member selected, it would

be extremely disruptive of facility operations, especially where, as here, an inmate

requests Commissioner Goord and Associate Commissioner Chapman to testify.  *Id*.  In addition, 7 N.Y.C.R.R. § 254.5(a) provides that where the testimony of a requested witness would be immaterial, duplicative or unnecessary, as defendant Irizarry determined Commissioner Goord's and Associate Commissioner Chapman's testimony would be, the hearing officer may exercise his/her discretion to deny the request.  *Id*.

After hearing the testimony and based on the Misbehavior Report, defendant Irizarry found plaintiff guilty of violating Rules 102.10 (threats) and 107.11 (harassment).  Dkt. #65, pp.0661-0662; Dkt. #86, ¶ 19.  Defendant Irizarry imposed a penalty of nine months confinement in SHU commencing June 27, 2001 through March 23, 2002.  *Id*.  In reaching the determination, defendant Irizarry noted on the Hearing Disposition Sheet that he had relied upon the written Misbehavior Report of Lt. Donahue and the testimony of Officer Bennett who was present at the time of the incident.  Dkt. #65, p.0662; Dkt. #86, ¶ 20.  Defendant Irizarry further noted that a review of plaintiff's disciplinary record revealed that plaintiff had been charged and found guilty of sixteen charges of threats and twelve charges of harassment.  Dkt. #65, p.0662; Dkt. #86, ¶ 22.  In addition, defendant Irizarry noted that none of the previous sanctions imposed upon plaintiff as a result of those determinations had helped to modify plaintiff's behavior.  *Id*.  Thus, defendant Irizarry noted that the penalty of nine months confinement in SHU was a just disposition.  Dkt. #65, p.0662; Dkt. #86, ¶ 23.  Thereafter, defendant Selsky modified the penalty to six months SHU confinement.  Dkt. #86, ¶ 24 and Exhibit A.  As will be discussed in greater detail below, plaintiff

contends that because defendant Selsky modified the penalty imposed, defendant

Irizarry denied plaintiff due process.  Dkt. #86, ¶ 18.


### 4.      Defendant Lieutenant Quinn

In the amended complaint, plaintiff alleges that on February 5, 2001,

defendant Lt. Donald Quinn violated his due process rights by denying him assistance

prior to a Tier 3 disciplinary hearing, denied him the right to have witnesses testify on

his behalf and denied plaintiff the right to attend the hearing to its conclusion.  Dkt. #9.

Specifically, plaintiff's claim against defendant Quinn states, in part:

> This defendant - Quinn, on the date of February 5, 2001,
> while acting under state color, inside of this Southport
> Prison, in his individual and official[22] capacities, had
> knowingly violated my right to due process, intentionally and
> wilfully by denying me assistance prior to this hearing, and
> furthermore my witness'es [sic].  Also, I was denied my right
> to attend this hearing upon [sic] it's [sic] conclusion, and the
> right to [sic] disposition.  I was found guilty, sentenced to 12-
> months SHU punative [sic] segregation suffering [sic] ...

Dkt. #9, p.6.  At all times relevant to the allegations in the amended complaint,

defendant Quinn was a Lieutenant at Southport and held that position from December

14, 2000 to February 8, 2001.  Dkt. #87, ¶ 1.  From time to time, defendant Quinn's

responsibilities included conducting disciplinary hearings as the Superintendent's

designee pursuant to 7 N.Y.C.R.R. § 254.1.

---

[22] *See* footnote 2 *supra*.

Defendant Quinn conducted a disciplinary hearing beginning on January 31, 2001 and continuing on February 5, 2001, arising from a January 27, 2001 Misbehavior Report charging plaintiff with violating Rules 107.11 (harassment) and 102.10 (threats).  Dkt. #87, ¶ 6.  The Misbehavior Report, authored by Officer Hodge stated,

> I was given a letter by Lt. Sheahan, the watch commander to review.  This letter, dated January 8, 2001, was written to Mr. Anthony Annucci, Deputy Commissioner, by Inmate George Chavis 91A3261.  In this letter, Inmate Chavis uses several obscene words and phrases, calling several staff members, including but not limited to Supt. McGinniss [sic], Lt. Donahue, and RN S. VonHagn, 'KKK bitches."  He also takes Mr. Annucci to task for 'believing all the lying bullshit your prison staff feeds you.'  He also complains that Mr. McGinnis 'doesn't do a gatdamn (sic) things,' and promises to 'sue all you KKK asses.'  He closes with a statement that he is 'tired of the KKK bullshit, and sooner or later I'll terminate all of it.'  Inmate Chavis also states that 'then, the personal retaliation occurs ... no one is getting away with violating me in life (?) and assume I'll be your good ole nigger.  I'll teach a lot of the KKK in uniform here respect.'

Dkt. #68, p.0710.  According to the Tier Assistance Selection Form, plaintiff was served with a copy of the Misbehavior Report on January 17, 2001 and indicated on the form that he requested an employee assistant for the Tier 3 disciplinary hearing.  Dkt. #68, p.0712; Dkt. #87, ¶ 7.  The form reveals that plaintiff identified G. Powers as his first choice for an assistant and J. Morton and P. Nardi as his second and third choices respectively.  Dkt. #68, p.0712.  It appears, however, that plaintiff refused to sign the form.  Dkt. #68, p.0712; Dkt. #87, ¶ 8.

The disciplinary hearing began on January 31, 2001 at which time plaintiff objected to the hearing claiming that he had not received assistance.  Dkt. #87, ¶ 9.  At the outset of the hearing, plaintiff stated that he had chosen G. Powers as his assistant and that despite the fact that G. Powers was available, Sgt. Morton was assigned to serve as his assistant.  Dkt. #98, pp.20-33.  During the hearing, plaintiff insisted that notwithstanding what is indicated on the Tier Assistance Selection Form, he did not select J. Morton and P. Nardi as his second and third choices for an assistant, plaintiff claimed that he chose only G. Powers.  Dkt. #68, p.0712; Dkt. #98, pp.20-33.  Indeed, plaintiff stated during the hearing that he had witnesses who would testify concerning G. Powers' availability to serve as his assistant.  Dkt. #98, pp.20-33.  Defendant Quinn advised plaintiff during the hearing that G. Powers was not available to serve as his assistant.  Id.  In fact, there is a notation on the Tier Assistance Selection Form next to G. Powers' name stating, "off list".  Dkt. #68, p.0712.  Thereafter, plaintiff and defendant Quinn discussed at length whether plaintiff had in fact refused J. Morton's assistance to prepare for the hearing.  Dkt. #98, pp.20-33.

Plaintiff requested to have Sgt. Morton and Deputy Commissioner Annucci called as witnesses.  Id.  Plaintiff continuously objected to the hearing because he claimed he had not received assistance.  Dkt. #98, pp.20-33.  Thereafter, defendant Quinn adjourned the hearing so that he could verify with Sgt. Morton that plaintiff had been offered assistance and that plaintiff had refused that assistance.  Id.  The hearing

was reconvened on February 5, 2001 and plaintiff refused to attend the hearing.[23]  Dkt. #87, ¶ 10.  The hearing was conducted outside of plaintiff's presence.  Dkt. #98, pp.20-33.  Moreover, Sgt. Morton testified telephonically that plaintiff had refused his assistance.  Dkt. #68, p.0711; Dkt. #87, ¶ 15.  Defendant Quinn denied plaintiff's request to have Deputy Commissioner Annucci testify, finding that Deputy Commissioner Annucci's testimony would have no bearing on the outcome of the hearing.  Dkt. #68, p.0711; Dkt. #87, ¶ 11.  As with previous administrative, supervisory or staff personnel witnesses identified by plaintiff to testify at other disciplinary hearings, Deputy Commissioner Annucci is located in Albany, New York and to have Deputy Commissioner Annucci testify in every hearing as requested would be extremely disruptive.  Dkt. #87, ¶ 12.  Moreover, because defendant Quinn reviewed the January 8, 2001 letter to Deputy Commissioner Annucci during the hearing, he was able to make a determination as to the threatening, obscene and abusive language therein.  *Id*. at ¶ 14.  Based on the foregoing, defendant Quinn determined that Deputy Commissioner Annucci's testimony was not necessary.  *Id*.  Accordingly, defendant Quinn maintains that it was in the exercise of his discretion that he denied plaintiff's request to have Deputy Commissioner Annucci testify at the hearing.  *Id*. at ¶ 13.

---

[23] In opposition to defendants' motion for summary judgment, plaintiff claims that he did not refuse to attend the hearing, rather, plaintiff claims that no one came to escort him to the hearing.  Dkt. #96, p.9.  The hearing transcript, Dkt. #98, pp.20-33, reflects the testimony of Sgt. Mulhearn and Correction Officer Manzo who testified that they attempted to escort plaintiff to the February 5, 2001 continuation of his disciplinary hearing and plaintiff refused.  Moreover, Sgt. Mulhearn testified that he requested plaintiff to sign the Waiver of Right to Attend Disciplinary Hearing advising plaintiff that a disposition of the charges would be made in his absence and plaintiff refused.  Dkt. #68, p.0713; Dkt. #87, ¶ 10; Dkt. #98, pp.20-33.

Notwithstanding the fact that plaintiff refused to attend the hearing and did not avail himself of the opportunity to present a defense at the hearing, plaintiff claims that Deputy Commissioner Annucci would have testified that "no such letter of alleged threat existed" and further, that no letter was physically produced during the hearing.  Dkt. #96, p.8.  It should be noted that at no time when plaintiff was present at the January 31, 2001 commencement of the disciplinary hearing did he deny that he wrote the January 8, 2001 letter to Deputy Commissioner Annucci.  Dkt. #98, pp.20-33.

At the conclusion of the hearing, defendant Quinn rendered his determination and found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of twelve months keeplock confinement in SHU beginning September 27, 2002 and continuing through September 27, 2003.  *Id*. at ¶ 16.  In reaching this determination, defendant Quinn noted that he relied on the Misbehavior Report and the handwritten letter from plaintiff, wherein plaintiff made harassing statements to Deputy Commissioner Annucci.  *Id*. at ¶ 17.  Defendant Quinn further noted that the penalty was imposed to serve as a deterrent to plaintiff and others and to reinforce that threatening and harassing employees will not be tolerated.  *Id*.

Thereafter, plaintiff alleged that he never received a copy of the hearing disposition and he commenced an Article 78 proceeding in New York State Supreme Court, Chemung County challenging the February 5, 2001 disposition.  Dkt. #87, ¶ 18. In his petition, plaintiff admitted that he did not attend the February 5, 2001 hearing, but maintained that he did not refuse to attend the hearing.  *Id*.  Plaintiff further claimed that

he did not learn of the disposition until June 26, 2001 when he reviewed a copy of the SHU readout sheet. *Id*. On February 25, 2002, Justice Castellino determined that plaintiff never received a copy of the February 5, 2001 determination and granted plaintiff leave to file an administrative appeal. *Id*. at ¶ 19.

By letter dated March 8, 2002, plaintiff submitted an administrative appeal of defendant Quinn's February 5, 2001 determination to defendant Selsky. *Id*. at ¶ 20. Plaintiff argued in his appeal that defendant Quinn denied him an employee assistant, denied him the right to attend the hearing and refused to call Deputy Commissioner Annucci as a witness. *Id*. Plaintiff further alleged that defendant Quinn was biased, refused to let plaintiff see the January 8, 2001 correspondence (the letter authored by plaintiff that formed the basis for the January 27, 2001 Misbehavior Report) and that because he never received a copy of the disposition, he was unaware of the penalty imposed. *Id*. On April 26, 2002, defendant Selsky reversed defendant Quinn's February 5, 2001 determination because the record did not clearly establish that plaintiff received a copy of the disposition within 24 hours and because defendant Quinn failed to interview a requested witness who may have provided relevant testimony. *Id*. at ¶ 21. Notably, defendant Selsky reversed defendant Quinn's determination several months before plaintiff was ordered to serve his penalty. *Id*. at ¶ 22. As discussed above, the penalty of twelve months confinement in SHU was to commence on September 27, 2002 and continue through September 27, 2003. *Id*. at ¶ 23.

### 5.     Defendant Lieutenant Ryan

Plaintiff alleges that defendant Lieutenant Ryan denied him due process

during a Tier 2 disciplinary hearing held on January 25, 2000 with respect to a January

14, 2000 Misbehavior Report.  Specifically, plaintiff alleges that:

> This defendant [Ryan], on the date of 1-25-00, inside of this
> Southport State Prison, while acting under state color, in his
> individual and official[24] capacities, had knowingly, wilfully,
> and intentionally <u>violated</u> my due process, while his [sic]
> conducting a hearing.  This defendant had personally used
> his own ink pen (<u>prior</u> to turn on the recorder), for 'signing'
> (endorsing), the retaliatory ticket against me (forgery), on
> behalf of the medical escort officer who showed 'reluctance'
> to sign the ticket himself, and further had <u>never</u> cared to
> appear at the hearing personally - <u>no</u> assistance [sic] been
> issued [sic] me prior to the hearing though I stated the ticket
> was <u>not</u> understood by me on several occasions.
> Furthermore, a voice phone had been used, over my
> <u>un</u>ceasing 'objections'.  I had been forced from the partial
> hearing and than [sic] found guilty, and sentenced to 30-
> days keeplock cell confinement.  Soon after, I did appeal on
> 1-25-00, however, the defendant W. Wilcox (para - #9), had
> affirmed the due process violation against me, of a charge
> <u>not</u> even part of the incident and clearly <u>not</u> written in the
> retaliatory ticket!

Dkt. #9, pp.6-G to 6-H (emphasis in original).  At all times relevant to the allegations in

the amended complaint, defendant Ryan was a Lieutenant at Southport and held that

position from 1987 to 2000.  Dkt. #93, ¶ 1.  From time to time, defendant Ryan's duties

included conducting disciplinary hearings as the Superintendent's designee pursuant to

7 N.Y.C.R.R. § 254.1.  *Id.* at ¶ 3.

---

[24] *See* footnote 2 *supra*.

The Tier 2 disciplinary hearing conducted by defendant Ryan was held on January 25, 2000 and was in relation to a January 14, 2000 Misbehavior Report which charged plaintiff with violating Rules 107.10 (verbal interference) and 107.11 (verbal harassment).  Dkt. #44, p.0026.  The Misbehavior Report was written by defendant Nurse vonHagn for an incident that took place when she attempted to deliver eyeglasses to plaintiff.  A complete discussion of the incident that gave rise to the Misbehavior Report is set forth at pp.19-21 *supra*.

At the outset of the hearing, defendant Ryan advised plaintiff that he may have witnesses testify on his behalf and that nothing he said during the course of the hearing could be used against him in a criminal proceeding.  Dkt. #44, pp.0032-0038; Dkt. #93, ¶ 11.  Plaintiff indicated that he understood his rights.  *Id*.  Thereafter, plaintiff objected to the Misbehavior Report as retaliatory and noted for the record that he had, at that time, approximately fifteen grievances filed against defendant vonHagn, as well as an Article 78 pending against her.  Dkt. #44, pp.0032-0038; Dkt. #93, ¶ 17.  Plaintiff did not, however, contrary to the claims made in the amended complaint, claim during the hearing that defendant Ryan denied him an assistant or denied him the ability to have witnesses testify on his behalf.  *Id*.; Dkt. #93, ¶ 7.  Moreover, as is reflected in the hearing transcript, over plaintiff's objection, Officer Martino, who endorsed the Misbehavior Report, testified by telephone at the hearing and unequivocally stated that he had witnessed the incident involving defendant vonHagn and plaintiff.  Dkt. #44, pp.0032-0038.

Just prior to Officer Martino's testimony, plaintiff became increasingly disruptive, objecting to the hearing because it was "bias and partial." *Id*. Accordingly, plaintiff requested to return to his cell for the balance of the hearing and was, therefore, not present for the remainder of the hearing. *Id*. Following Officer Martino's testimony, defendant Ryan found plaintiff guilty of violating Rules 107.10 (interference) and 107.11 (harassment) and imposed a penalty of 30 days keeplock confinement beginning July 18, 2000 and continuing until August 17, 2000. *Id*. In reaching his determination, defendant Ryan relied on the January 14, 2000 Misbehavior Report and the testimony of Officer Martino who witnessed the incident. Dkt. #93, ¶ 29. Defendant Ryan further stated that he imposed the penalty to serve as a reminder that the type of behavior exhibited towards defendant vonHagn will not be tolerated. *Id*. Plaintiff appealed defendant Ryan's determination and Captain Wilcox affirmed defendant Ryan's determination finding that there was no evidence of retaliatory acts committed by defendant vonHagn, that defendant Ryan properly called Officer Martino to testify, that plaintiff was not confined pending the hearing, that there was no evidence of partiality, bias, racism, vindictiveness, threats or misconduct on the part of defendant Ryan and that a witness may testify by telephone. Dkt. #44, p.0024; Dkt. #92, ¶ 31. Following plaintiff' appeal, defendant Ryan's determination was affirmed by defendant Wilcox on or about January 28, 2000. Dkt. #86, Exhibit A.

### 6.    Defendant Captain Sheahan

Finally, plaintiff alleges in the amended complaint that defendant Captain

Sheahan denied plaintiff due process in connection with a Tier 3 disciplinary hearing

that began on December 26, 2000 and was continued on December 29, 2000

concerning a December 13, 2000 Misbehavior Report.  Dkt. #9.  In short, plaintiff

alleges that defendant Sheahan denied plaintiff his right to witnesses, improperly found

him guilty at the conclusion of the hearing, and was biased against plaintiff.  *Id*.  As

against defendant Sheahan, plaintiff specifically alleges:

> This defendant [Sheahan], on the date of 12-29-00, inside of
> this Southport prison, while acting under state color in his
> individual and official[25] capacities, had conducted a hearing,
> and knowingly, intentionally, and wilfully violated my due
> process rights repeatedly by 'denying' my right [sic]
> witness'es [sic] (only one expert witness having a full indepth
> [sic] and personal knowledge of my situations [sic] in [sic]
> suffering with the defendant - author of the retaliatory ticket -
> para #1), over my repeated 'objections'. [sic] Additionally,
> this defendant (Shehan [sic]), had stated no valid reason on
> [sic] disposition, in [sic] respect to the threat of any
> institutional or correctional goals as is necessary to deny
> witness'es [sic].  I suffered a finding in [sic] guilt, and
> sentenced to six (6) months further SHU-punative [sic]
> segregation, an [sic] I appealed on 12-31-00, however, the
> defendant (D. Selskey [sic]), affirmed the bias, partial
> disposition against me, in further violation of my due process
> rights.

Dkt. #9, pp.6-A to 6-B (emphasis in original).  During the time period relevant to the

allegations in the amended complaint, defendant Michael Sheahan was a Captain at

Southport and has held that position since June 2003.  Dkt. #88, ¶ 1.  As with the other

---

[25] *See* footnote 2 *supra*.

hearing officers named as defendants, defendant Sheahan's duties included conducting inmate disciplinary hearings as the Superintendent's designee. Dkt. #88, ¶ 3.  The underlying facts relating to the December 13, 2000 Misbehavior Report issued by defendant vonHagn are discussed at length above.  *See* pp.23-27 *supra*.

Plaintiff was advised at the outset of the hearing that he had the right to have witnesses testify on his behalf, that nothing plaintiff said would be used against him in a criminal proceeding, that plaintiff should present any oral or documentary evidence during the hearing and that any procedural objections or claims should be made promptly during the hearing.  Dkt. #44, pp. 00160-0199; Dkt. #88, ¶ 7.  Plaintiff responded that he understood his rights.  *Id*.  Plaintiff objected that he did not receive the employee assistant that he had requested and had not received copies of the grievances he requested to support his claim that defendant vonHagn issued the December 13, 2000 Misbehavior Report in retaliation for complaints plaintiff filed against her.  Dkt. #88, ¶ 8.  After considerable discussion concerning plaintiff's selections for an employee assistant, defendant Sheahan adjourned the hearing to further investigate plaintiff's assertions.  *Id*. at ¶ 9.  The Tier 3 disciplinary hearing reconvened on December 29, 2000.  *Id*.  During the continuation of the hearing, plaintiff agreed that he had been provided with an assistant, Officer Carpenter, that Officer Carpenter had met with plaintiff on December 26, 2000 and further, that the assistance he had received was acceptable.  *Id*.  Although plaintiff testified that he had not received all of the grievances that he had requested, plaintiff stated that the data he

had received was satisfactory for the hearing.  *Id*. at ¶ 10.  Finally, although plaintiff

agreed that when he met with Officer Carpenter he had not requested any witnesses,

plaintiff advised defendant Sheahan that he did want Thomas Egan, Director of CORC

to testify with respect to "certain verifications concerning the grievances."  *Id*. at ¶ 11.


Plaintiff plead not guilty to the charges in the Misbehavior Report and

objected to the Misbehavior Report on the grounds that: it was retaliatory; he had

written at least twenty to twenty-five complaints against defendant vonHagn; he had

one witness who would testify that plaintiff never threatened defendant vonHagn;

Officer Stamp threatened plaintiff; defendant vonHagn had been violating plaintiff's right

to medical care since March 1999; defendant vonHagn is racist, biased and

unprofessional; and defendant vonHagn had written retaliatory Misbehavior Reports

against plaintiff on prior occasions.  *Id*. at ¶ 12.  In support of some of his objections,

plaintiff submitted copies of the grievances for defendant Sheahan's consideration.  *Id*.

Defendant Sheahan advised plaintiff that he accepted the grievances as evidence of his

claim that defendant vonHagn had submitted the December 13, 2000 Misbehavior

Report in retaliation for plaintiff's grievances.  *Id*. at

¶ 13.


As noted above, plaintiff requested that Director Egan testify that the

grievances submitted by plaintiff were "exhausted."  *Id*. at ¶ 14.  Defendant Sheahan

denied plaintiff's request to have Director Egan testify because, as noted above, he

accepted the grievances submitted by plaintiff and determined that any testimony by

Director Egan would have been redundant. *Id*. Following defendant Sheahan's denial

of plaintiff's request to have Director Egan testify, plaintiff's objection was noted for the

record and plaintiff indicated that he had nothing further to submit with respect to the

Misbehavior Report. *Id*. at ¶ 17. Thereafter, defendant Sheahan rendered his

determination. *Id*.

 

Defendant Sheahan found plaintiff guilty of violating Rules 107.11

(harassment) and 102.10 (threats) and imposed a penalty of six months confinement in

SHU. *Id*. at ¶ 18. In reaching this determination, defendant Sheahan relied upon the

December 13, 2000 Misbehavior Report and stated that in his opinion, the evidence of

past grievances submitted by plaintiff did not establish that the Misbehavior Report

issued by defendant vonHagn was retaliatory in nature. *Id*. Further, defendant

Sheahan stated that the disposition was rendered to impress upon plaintiff that threats

to staff would not be tolerated. *Id*. Plaintiff appealed defendant Sheahan's

determination and defendant Selsky affirmed the determination on or about February 9,

2001. *Id*. at ¶ 20.

 

**D.     Due Process Claims - Appeals**

The amended complaint alleges a cause of action against defendants

Selsky and Wilcox premised on the theory that the defendants denied plaintiff his due

process rights in connection with plaintiff's appeals of certain disciplinary hearing

determinations.  Dkt. #9.  According to plaintiff, because the hearing officers violated plaintiff's constitutional rights, defendants Wilcox and Selsky must also be liable for violating plaintiff's constitutional rights because they affirmed the determinations of the hearing officers.  Dkt. #9, pp.6-H to 6-I.  Similarly, plaintiff claims that where defendant Selsky modified a hearing officer's determination, such modification also constituted a violation of plaintiff's constitutional rights.  *Id*. at p.6-I.

Against defendant Wilcox, plaintiff alleges, "on the separate date'<u>s</u> [sic] of 1-21-00, 1-25-00, 7-18-00, 7-30-00, 11-29-00, 12-31-00, 12-22-00, 3-8-01, 1-30-01[26], inside of this Southport State Prison, while acting under state color in his individual and official[27] capacities, had intentionally, knowingly, and wilfully <u>violated</u> my right to 'due process' ..."  Dkt. #9, p.6-H (emphasis in original).  Based on a review of plaintiff's disciplinary history, a copy of which is attached as Exhibit A to defendant Irizarry's affidavit (Dkt. #86), defendant Wilcox decided appeals involving plaintiff on the following

_____

[26] It is unclear from the language in the amended complaint whether the dates alleged are the dates when plaintiff's appeals were decided, the dates of the hearing determinations, or some other unknown date.  Notwithstanding the dates enumerated in plaintiff's amended complaint, in support of their motion for summary judgment, defendants addressed the following determination/appeal dates:  January 11, 2000 determination (December 29, 1999 Misbehavior Report); November 20, 2000 determination; December 21, 2000 determination; January 29, 2001 determination; March 7, 2001 determination; July 18, 2000 determination; January 4, 2001 determination; February 5, 2001 determination; January 25, 2000 determination; and December 29, 2000 determination.  In those instances where the dates alleged in the amended complaint do not match with either the hearing date, the appeal date, or the date addressed by defendants, the Court will note the discrepancy and identify the approximate date.

[27] *See* footnote 2 *supra*.

dates: January 28, 2000 (January 25, 2000 determination); July 30, 2000 (July 18, 2000

determination); December 11, 2000 (November 29, 2000 determination); December 28,

2000 (December 21, 2000 determination) and February 5, 2001 (January 29, 2001

determination).  Dkt. #86, Exhibit A.

Similarly, as against defendant Selsky, plaintiff claims on February 21,

2001, defendant Selsky "knowingly, intentionally, and wilfully violated my right under

[sic] 'due process' by "modifying a disposition dated 1-4-00 (not 1-4-01), and I suffered

a 6-month SHU-punative [sic] segregation sentence ..."  Dkt. #9, p.6-I (emphasis in

original).  Additionally, plaintiff claims that on February 9, 2001, defendant Selsky

violated his due process rights by "affirming a bias [sic] disposition, where I suffered no

witnesses, nor had all of my evidence been allowed at the partial unfair hearing.  I

suffered another 6-months SHU-punative [sic] segregation sentence."  Dkt. #9, p.6-I

(emphasis in original).  At all times relevant to the allegation in the amended complaint,

Donald Selsky was the Director of the Special Housing/Inmate Disciplinary Program

(Dkt. #80, ¶123) and defendant Wilcox was a Captain at Southport.

### 1.     "1-21-00" - Defendant Wilcox

As discussed at length above, a disciplinary hearing was held on January

11, 2000 concerning an incident that occurred on December 31, 1999.  *See* pp.32-35

*supra*.  Defendant Lt. Donahue presided over the January 21, 2000 Tier 2 disciplinary

hearing wherein he found plaintiff guilty of violating Rules 107.11 (harassment) and

102.10 (threats) and imposed a penalty of 30 days keeplock confinement.  *Id*.  Contrary

to plaintiff's allegations, plaintiff did not appeal defendant Lt. Donahue's January 21,

2000 determination.  Dkt. #86, Exhibit A.


   **2.**  **"1-25-00" - Defendant Wilcox**

    On January 25, 2000, defendant Lt. Ryan presided over a Tier 2

disciplinary hearing concerning a January 14, 2000 Misbehavior Report by defendant

vonHagn alleging that plaintiff violated Rules 107.10 (interference) and 107.11

(harassment).  As discussed above, defendant Ryan found plaintiff guilty and imposed

a penalty of 30 days keeplock confinement and 30 days loss of packages, commissary

and phone privileges.  *See* pp.59-62 *supra*.  Plaintiff appealed Lt. Ryan's determination

alleging that:  the Misbehavior Report was retaliatory in nature; defendant Ryan

"manipulated" the Misbehavior Report by endorsing it; plaintiff was improperly confined

in connection with the Misbehavior Report for eleven days without an extension;

defendant Ryan exhibited "partiality, bias, racism, vindictiveness and Klu [sic] Klux Klan

mentality" in the conduct of the disciplinary hearing; and, defendant Ryan improperly

received testimony over the telephone.  Dkt. #44, p.0025.  On January 28, 2000,

defendant Wilcox affirmed defendant Ryan's determination stating,

> 1. There is no evidence of any retaliatory acts committed by
> RN VonHagn [sic].  2. Hearing Officer properly called the
> Escort Officer to the Hearing as a witness.  3. You were not
> confined pending this Hearing.  4. There is no evidence of
> any partiality, biasness [sic], racism, vindictiveness, threats,
> or official misconduct by the Hearing Officer at this Hearing.
> The Hearing Officer may receive testimony from a witness

via speaker phone when that person cannot report to the
Hearing to testify in person.

Dkt. #44, p.0024.


### 3.    "7-18-00" - Defendant Wilcox

According to plaintiff's disciplinary history, on July 30, 2000, defendant

Wilcox affirmed defendant Gilmore's July 18, 2000 determination.  Dkt. #86, Exhibit A.

As discussed above, on July 18, 2000, defendant Lt. Gilmore found plaintiff not guilty of

violating Rules 107.10 (interference with employee) and 106.10 (refusing direct order)

and guilty of violating Rule 107.11 (harassment) and imposed a penalty of 10 days

keeplock confinement.  *See* pp.44-49 *supra*.


### 4.    "7-30-00" - Defendant Wilcox

A review of plaintiff's disciplinary history (Dkt. #86, Exhibit A) and the

documents produced by defendants during the course of discovery (Dkt. ##44, 65, 68,

and 70), do not reveal a separate disciplinary hearing that occurred on July 30, 2000,

except for the appeal of the July 18, 2000 determination that was decided on July 30,

2000, as discussed above.  Accordingly, for purposes of deciding defendants' motion

for summary judgment, the Court will treat plaintiff's allegations concerning a July 30,

2000 disciplinary hearing as a second, duplicative reference to the July 18, 2000

hearing determination.

### 5.    "11-29-00" - Defendant Wilcox

A Tier 2 disciplinary hearing was conducted by defendant Donahue on November 29, 2000.  Dkt. #44, p.0069; Dkt. #86, Exhibit A.  Following the hearing, defendant Donahue found plaintiff guilty of violating Rules 107.10 (interference) and 102.10 (threats) and imposed a penalty of 30 days keeplock confinement.  *Id*.  Plaintiff filed an appeal of defendant Donahue's determination on November 29, 2000 stating that, (1) he had objected to the hearing being conducted by "this discriminiata [sic]/bias officer due to his previous verbal threats upon me back in January, and also, due to a prior grievance exhaustion [sic] against him for both these valid reasons" and (2) defendant Donahue was the subject of an official complaint by plaintiff to the DOCS Commissioner.  Dkt. #44, pp.0378-0379.  On December 11, 2000, defendant Wilcox affirmed defendant Donahue's determination stating, "No evidence Hearing Officer was bias [sic].  Hearing Officer was appropriately assigned to conduct Hearing."  Dkt. #44, p.0377.

### 6.    "12-31-00" - Defendant Wilcox

A review of plaintiff's disciplinary history (Dkt. #86, Exhibit A) and the documents produced by defendants during the course of discovery (Dkt. ##44, 65, 68, and 70), do not, with respect to defendant Wilcox, reveal a disciplinary hearing or appeal that was held, filed or decided on or about December 31, 2000.  As will be discussed below, the record before the Court does, however, reveal that plaintiff

appealed a December 29, 2000 determination of a Tier 3 disciplinary hearing and that

determination was affirmed by defendant Selsky on February 9, 2001.

### 7.    "12-22-00" - Defendant Wilcox

On December 22, 2000, plaintiff appealed a December 21, 2000

determination by defendant Donahue.  Dkt. #44, pp.0365-0366.  In his December 22,

2000 appeal, plaintiff stated that: (1) he objected to defendant Donahue as the hearing

officer because of plaintiff's prior grievances filed against defendant Donahue; (2) he

objected to defendant Donahue's "misconduct" by entering a plea on plaintiff's behalf

over plaintiff's objections; (3) plaintiff objected to the Misbehavior Report as being

retaliatory in nature; and, (4) defendant Donahue erroneously denied plaintiff's request

for two expert witnesses ("Mr. Glen Goord/Thomas G. Eagen [sic]").  *Id*.  Thereafter, on

December 28, 2000, defendant Wilcox affirmed defendant Donahue's December 21,

2000 determination stating, "Hearing Officer was appropriate.  No evidence Misbehavior

Report was retaliatory in nature.  Witnesses appropriately denied and reasons

documented.  No evidence Hearing Officer acted improperly."  Dkt. #44, p.0364.

### 8.    "3-8-01" - Defendant Wilcox

Plaintiff alleges that defendant Wilcox violated his due process rights on

March 8, 2001.  However, a review of plaintiff's disciplinary history (Dkt. #86, Exhibit A)

and the documents produced by defendants during the course of discovery (Dkt. ##44,

65, 68, and 70), do not, with respect to defendant Wilcox, reveal a disciplinary hearing

or appeal that was held, filed or decided on or about March 8, 2001.  To the contrary, plaintiff's disciplinary history reveals that a Tier 2 disciplinary hearing was conducted on March 7, 2001 by defendant Donahue with respect to a Misbehavior Report issued by Correction Officer Kamas on February 28, 2001.  Dkt. #86, Exhibit A.  Plaintiff did not appeal this determination.

### 9.　　"1-30-01" - Defendant Wilcox

On January 30, 2001, plaintiff appealed the determination of a Tier 2 disciplinary hearing held on January 29, 2001.  The January 29, 2001 disciplinary hearing was conducted by defendant Donahue and at the conclusion of the hearing, defendant Donahue found plaintiff guilty of violating Rule 102.10 (threats) and imposed a penalty of 30 days keeplock.  Dkt. #44, p.0112.  In his appeal, plaintiff stated that: (1) the Misbehavior Report was retaliatory in nature because it was written by defendant Brandt against whom plaintiff had filed a grievance; (2) "the hearing officers [sic] disposition in [sic] bias/partiality, due to no evidence nor endorsement ..."; (3) defendant Donahue had been "under investigation" by DOCS officials; and, (4) defendant Donahue's actions were retaliatory in nature.  Dkt. #44, pp.0121-0123 (emphasis in original).  Defendant Wilcox reviewed the January 29, 2001 determination and affirmed it stating, in part, "HO [Hearing Officer] was appropriate and not biased.  No evidence Misbehavior Report was retaliatory."  Dkt. #44, p.0120.

### 10.   "2-21-01" - Defendant Selsky

On or about February 21, 2001, defendant Selsky modified the penalty imposed by defendant Irizarry following a Tier 3 disciplinary hearing conducted on January 4, 2001.  Dkt. #86, Exhibit A.  Following the January 4, 2001 disciplinary hearing, defendant Irizarry found plaintiff guilty of violating Rules 102.10 (threats) and 107.11 (harassment) and imposed a penalty of nine months confinement in SHU.  Dkt. #65, p.0661.  Defendant Selsky modified the penalty to six months SHU confinement. Dkt. #86, Exhibit A.  Defendant Selsky did not, however, overturn defendant Irizarry's determination nor did defendant Selsky find that the hearing was procedurally improper. Dkt. #80, ¶¶ 246 and 304-306.

### 11.   "2-9-01" - Defendant Selsky

Following the disciplinary hearing which commenced on December 26, 2000 and concluded on December 29, 2000, defendant Sheahan found plaintiff guilty of violating Rules 107.11 (interference) and 102.10 (threats) and imposed a penalty of six months SHU confinement.  Dkt. #44, p.101.  On February 9, 2001, defendant Selsky affirmed the December 29, 2000 hearing determination of defendant Lt. Sheahan.[28] Dkt. #44, p.100; Dkt. #86, Exhibit A.

---

[28] Plaintiff's disciplinary record (Dkt. #86, Exhibit A) erroneously indicates that the hearing officer who presided over the hearing was defendant Donahue.  According to all other documents relating to the December 26 and 29, 2000 hearing, it was defendant Sheahan who presided over the Tier 3 disciplinary hearing.

**E.       Denial of Religious Correspondence Course Claim**

          In his amended complaint, plaintiff alleges that in or about November and

December 1999, defendant, Deane M. Gardner, "knowingly and intentionally <u>violated</u>

my legal right to study religeon [sic] from a Christian order in my own Catholic faith.

However, after deliberately violating my right, soon after, this very same bible study

course in [sic] correspondence is now implemented here in Southport prison, and still I

have been denied a right to take this correspondence course in Christian belief."  Dkt.

#9, p.5-C (emphasis in original).   At all times relevant to the allegations in the amended

complaint, defendant Gardner was employed as the Senior Mail and Supply Clerk at

Southport.  Dkt. #94, ¶ 1.


          In connection with his claim that defendant Gardner denied him his right to

take a religious correspondence course, plaintiff filed Grievance No. SPT-17423-99 on

or about November 16, 1999.  Dkt. #44, p.0250.  In this grievance, plaintiff states in

part, "on the date of Nov. 2nd, I received an information packet concerning religeous [sic]

training or studies, however, the senior mailroom clerk - D. Gardner, informed me that I

could not take any correspondences [sic] courses either religeous [sic] or college!"  Dkt.

#44, p.0250.  Moreover, plaintiff alleges that an item paid for by plaintiff and sent to

plaintiff by an outside vendor had been stolen by the mail room staff.  *Id*.  Finally,

plaintiff claims that he had been denied level 3 phone call privileges.  *Id*.  In response to

the grievance, the IGRC recommended,

> [p]er recent CORC decisions, the grievant may not
> participate in any correspondance [sic] courses/programs
> while at Southport.  Grievant is advised to contact the

> educational supervisor once he is transferred to a general
> confinement facility.  Regarding the item from an outside
> vendor which the grievant alleges was stolen by mailroom
> staff, no facts have been submitted.  The grievant needs to
> provide proof of this claim.  Finally regarding his telephone
> call, he is advised to address this issue with his area
> supervisor.

Dkt. #44, p.0251.  As noted above, Southport is an all SHU facility and all inmates

housed at Southport are assigned to SHU confinement.  Dkt. #94, ¶ 9.

On December 1, 1999, the Superintendent concurred with the

recommendation of the IGRC and stated, in part, "[t]here are no provisions in either the

facility policy or departmental directive #4933 that allows SHU inmates to participate in

any correspondence courses.  Any desire to learn more about religious practices should

be directed to staff in religious services."  Dkt. #44, p.0254.  Thereafter, plaintiff

appealed to CORC on December 6, 1999 stating that he has a constitutional right to

study religion in prison.  Dkt. #44, p.0255.  CORC issued its determination on or about

January 19, 2000 wherein it concurred with the Superintendent's determination.  Dkt.

#44, p.0246.  In support of its determination, CORC cited to its prior decision in SPT-

14519-98 dated August 26, 1998 wherein CORC stated, in part, "[t]here are no outside

correspondence courses allowed in this facility."  *Id*.  Moreover, CORC further cited its

decision in SPT-7594-94 rendered on September 15, 1994, which states, in part,

"CORC concurs with the Superintendent in that the grievant may not participate in any

correspondence course due to the logistical problems related to housing in Southport

C.F."  *Id*.

With respect to plaintiff's claim of stolen property, CORC indicated that it had not been presented with sufficient evidence to support his allegation that staff stole his property.  *Id*.  CORC advised that plaintiff nevertheless retained his right to pursue such a claim through the inmate claims mechanism as set forth in Departmental Directive #2733, Inmate Personal Property Claim.  *Id*.  Finally, with respect to plaintiff's appeal, CORC advised plaintiff to address his concerns regarding religious study to the facility chaplain.  *Id*.

In support of her motion for summary judgment, defendant Gardner claims that in her position as Senior Mail and Supply Clerk, she had no authority to set any policy for DOCS or Southport and further, had no authority to determine whether an inmate may take a correspondence course or otherwise engage in educational or religious activities.  Dkt. #94, ¶ 16.  Defendant Gardner further states that she made no determination with regard to plaintiff's desire to take a religious correspondence course.  *Id*. at ¶ 17.  Moreover, defendant Gardner states that she did not interfere with any of plaintiff's constitutional rights or deny plaintiff the right to exercise any constitutional right.  *Id*.

## F.    Interference with Legal Mail Claim

In addition to his claim that defendant Gardner denied him the right to take a religious correspondence course, plaintiff further claims that defendant Gardner interfered with his legal mail.  Dkt. #9, p.5-B.  Specifically, plaintiff alleges:  "[t]his

defendant [Gardner], in the months of November and December of 1999, inside of this Southport Prison, while acting under state color, in her individual and official[29] capacities, had knowingly, wilfully, and intentionally violated my incoming legal mail ... (my legal mail had been opened, examined and censored out of my presence and had arrived to my SHU-punative [sic] segregation cell opened ...)" Dkt. #9, p.5-B to 5-C.

On or about October 28, 1999, plaintiff filed Grievance No. SPT-17276-99 alleging that his incoming legal mail had been opened by the mail room clerk and censored, despite the fact that, according to plaintiff, the envelope was clearly marked "Legal Mail."  Dkt. #44, p.0262.  In the grievance, plaintiff requested that the following action be taken, "the request is clearly obvious (no employee of D.O.C.S. is supposed to violate federal law by opening a prisoners [sic] incoming legal mail!), and a legal retaliation [sic] will be activated soon enough."  Dkt. #44, p.0262.  On or about October 29, 1999, K. Washburn, Mailroom Clerk, submitted a response to Grievance No. SPT-17276-99 to the IGRC stating,

> Grievant is only partially correct by stating that legal mail which is clearly marked as such, and is from an attorney, is not to be opened by the mailroom.  However, this was not the case.  The letter in question arrived in an envelope which was completely handwritten, unlike normal mail from attorneys.  The senders [sic] name was also illegible.  Since the senders [sic] name could not be verified as a legitimate, legal entity, the mail was opened.  Mailroom staff have also stated that whenever legal mail is opened in error, the enveloped is stamped by the mailroom to let the addressee know it was opened in error.

---

[29] See footnote 2 supra.

Dkt. #44, p.0268.  Thereafter, the IGRC advised plaintiff of the results of the

investigation by reiterating K. Washburn's response.  *Id*. at p.0263.  The Superintendent

concurred with the IGRC recommendation and advised plaintiff that despite his

allegations, facility staff acted within Department policy.  *Id*. at p.0266.  CORC

sustained the Superintendent's determination and concurred with the IGRC

recommendation, stating that facility staff acted within department policy and "[c]ontrary

to the grievant's assertions, CORC has not been presented with sufficient evidence to

substantiate any malfeasance by the employees referenced in this instant complaint."

*Id*. at p.0259.


      As set forth in Grievance No. SPT-17276-99 and as provided in 7

N.Y.C.R.R. §§ 721.2(2) and 721.3(b)(1) and (2), legal mail which is clearly marked as

such and is from an attorney is not to be opened by the mailroom outside the presence

of the inmate.  If privileged correspondence is opened in error outside the presence of

the inmate, documentation of such error should be maintained.  Dkt. #94, ¶ 26; 7

N.Y.C.R.R. §§ 721.2(2) and 721.3(b)(1) and (2).  General correspondence, however,

between an inmate and someone other than a person approved for legal

correspondence, will be opened, outside the presence of the inmate, and inspected for

cash, checks, money orders, printed or photocopied materials or contraband.  Dkt. #94,

¶ 27; 7 N.Y.C.R.R. 720.2(b) and 720.4(a).  Here, because, as described above,

plaintiff's correspondence was not readily identified as legal mail, it was opened and

thereafter stamped as opened in error.  Dkt. #94, ¶ 28.

**G.       Access to the Courts Claims**

Plaintiff claims that on or about September 13, 2000, Superintendent Corcoran violated his constitutional right of access to the courts when he denied plaintiff access to vouchers and certified mailed receipts contained in plaintiff's sealed property bags.  Dkt. #9, p.5-D.  As a result, plaintiff further alleges that Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed on or about December 20, 2000.  *Id*.  During the time period alleged in the amended complaint, Michael P. Corcoran was the Deputy Superintendent for Administrative Services at Southport.  Dkt. #90, ¶ 1.

Plaintiff also claims that on or about June 12, 2001, Deputy Superintendent Weingartner violated his constitutional right of access to the courts when he denied plaintiff's "advanced certified mailing request" for legal mail to the Attorney General in relation to Claim No. 99509 pending before the New York State Court of Claims.  Dkt. #9, p.5-E.  In addition, plaintiff further claims that the manilla envelope containing the material had been kept from him "until the expiration of my time to respond by certified mail - return receipt - requested to the Attorney General."  *Id*.  As a result, plaintiff alleges that his claim was dismissed.  *Id*.  During the time period alleged in the amended complaint, defendant Lawrence W. Weingartner was the Assistant Deputy Superintendent for Program Services at Southport.  Dkt. #91, ¶ 1.

### 1.      Defendant Michael P. Corcoran

As a threshold matter, defendant Corcoran has no recollection of plaintiff's claim that he denied plaintiff access to the Court of Claims by denying plaintiff access to vouchers and/or certified mailing receipts sealed in plaintiff's stored property bags. Dkt. # 90, ¶ 7.  With respect to plaintiff's claim against defendant Corcoran, plaintiff was transferred from Southport to Coxsackie in or about February 2000 and plaintiff remained at Coxsackie until in or about May 2000, at which time he was transferred back to Southport.  Dkt. #90, ¶ 9.  A Personal Property Transferred Form was completed on or about May 16, 2000 listing plaintiff's personal property transferred from Coxsackie to Southport.  Dkt. #90, ¶ 12 and Exhibit A.  As set forth on the Personal Property Transferred Form (which plaintiff refused to sign), plaintiff was advised not to leave active legal case material behind and was instructed to include all active legal material in his 4-bag limit.  *Id*.  Upon transfer to Southport, the property bags of SHU inmates are reviewed with the incoming inmate.  *Id*. at ¶ 17.  The incoming inmate is advised that if he has any active legal matters, he should take all active legal material with him to his cell.  *Id*.  "Due to the restrictions on the amount of property which SHU inmates are allowed to have in their cells, any personal property of SHU inmates that exceeds the SHU cell property limits are placed in storage, to be returned to the inmate upon his release from SHU confinement.  *Id*.

On or about May 25, 2000, plaintiff completed an Inmate Claim Form concerning certain property that plaintiff alleged had been stolen.  Dkt. #90, ¶ 10 and

Exhibit A.  Notably, plaintiff did not claim that any legal documents, vouchers or certified mail receipts were stolen or missing.  *Id*. at ¶ 11.  On or about June 16, 2000, defendant Corcoran advised plaintiff that he had received his claim, that all claims must be supported by purchase invoices or package room receipts to establish proof of ownership and that a failure to establish proof of ownership may result in denial of his claim.  *Id*. at ¶ 13.  Moreover, defendant Corcoran advised plaintiff that his claim would be sent to Security staff for investigation and that he would be notified of a decision upon completion of the investigation.  *Id*. at ¶ 14.  On or about August 3, 2000, defendant Corcoran advised plaintiff that his accusations were without merit and further, that because plaintiff had failed to provide receipts for any of the articles, plaintiff had failed to establish ownership and his claim was rejected.  Dkt. #90, ¶ 16 and Exhibit A.

Thereafter, plaintiff corresponded with defendant Corcoran on or about September 11, 2000 and in response, defendant Corcoran sent plaintiff a memorandum dated September 13, 2000.  Dkt. #90, ¶ 19 and Exhibit B.  Defendant Corcoran's September 13, 2000 memorandum addressed plaintiff's September 11, 2000 note and stated in pertinent part, "I have again received another demeaning and insolent note from you.  This is the last time that I will respond to [sic].  I will not authorize you access to your property bags, since you've already determined that we have broken into your bags to destroy your receipts."  *Id*.

As described above, plaintiff claims that as a result of defendant Corcoran's conduct, Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed on or about December 20, 2000.  Dkt. #9, p.5-D. Contrary to plaintiff's assertions, Claim No. 98329 was dismissed by Judgment dated January 2, 2001.[30]  Dkt. #90, ¶ 21 and Exhibit B.  As set forth in the Judgment, plaintiff filed Claim No. 98329 on May 15, 1998 seeking damages in the amount of $350,000 for mental anguish arising out of events which occurred while he was an inmate at Attica Correctional Facility.  *Id*.  The Judgment further noted that the matter came on to be heard by Honorable Edgar C. NeMoyer, Judge, Court of Claims and that the Court, having heard the "proofs [sic] and allegations of the parties and having duly made and filed its decisions in which it dismissed this claim," Claim No. 98329 was dismissed. *Id*. Thus, in support of his motion for summary judgment, defendant Corcoran argues that "to the extent plaintiff's Claim No. 98329 was dismissed, as established by the Judgment in Claim No. 98329, such dismissal was had after the Court heard the proofs and allegations of the parties, and not, as plaintiff claims, because I prevented him access to receipts or vouchers or otherwise prevented him from accessing the Court of Claims."  Dkt. #90, ¶ 22.

### 2.    Defendant Lawrence W. Weingartner

As a threshold matter, defendant Weingartner states that he has no recollection of plaintiff's claim that he denied him access to the Court of Claims.  Dkt.

---

[30] In opposition to defendants' motion for summary judgment, plaintiff concurs that his claim was dismissed on January 2, 2001.  Dkt. #96, p.63.

#91, ¶ 6.  Defendant Weingartner states that counsel for defendants received a packet of documents from plaintiff in connection with discovery in this matter and that included in those documents was a copy of a letter from Mark C. Davison, Court Clerk Specialist, New York State Supreme Court, Appellate Division, Fourth Department to plaintiff dated July 27, 2001.  *Id*. at ¶ 7.  In his July 27, 2001 letter, Mr. Davison advised plaintiff that in response to plaintiff's July 2, 2001 letter, there was nothing that Mr. Davison could do with respect to the alleged failure of Southport to forward papers to the Attorney General in connection with Claim No. 99509.  *Id*. at ¶ 8.  Mr. Davison advised plaintiff that to obtain permission to file or serve an untimely notice of appeal, plaintiff must make a motion under CPLR 5520.  *Id*.

Also included in the documents supplied by plaintiff was a Notice dated June 18, 2001 to plaintiff from the Southport mailroom.  *Id*. at ¶ 9.  In that Notice, plaintiff was advised that a piece of legal mail was being returned to him pursuant to the Directive governing the inmate correspondence program and that plaintiff should see the item checked on the Notice and where applicable, correct and resubmit the item for processing.  *Id*. at ¶ 10.  In the box designated "other," plaintiff was advised that his request for special handling had been denied by defendant Weingartner because it did not meet the guidelines for special handling as outlined in DOCS Directive No. 4421. *Id*. at ¶ 11.  DOCS Directive Nos. 4421, Privileged Correspondence (7 N.Y.C.R.R. Part 721) and 4422, Inmate Correspondence Program (7 N.Y.C.R.R. Part 720) set forth DOCS policy regarding inmate mail correspondence.  *Id*. at ¶ 12.  DOCS Directive No.

4421 provides that advances for "special handling" (e.g., certified mail, return receipt, express mail, etc.) will not be approved unless required by a statute, court rule or court order.  *Id*. at ¶ 13.  Moreover, on the June 18, 2001 Notice to plaintiff, the box marked "Advances for Special Handling" states that advances for special handling "may not be used to pay for any special handling charges such as for certified, return-receipt, express mail, etc., unless such mail services are required by statute or court order. Advances for special handling for filing a Claim or Notice of Intention on the Attorney General [sic] Office must be specified on the approved Advance Request form for postage.  You must state why you are requesting special handling on the advance form or provide a copy of court order. (4421)."  *Id*. at ¶ 14.


According to defendant Weingartner, because plaintiff's request for special handling did not meet the guidelines for special handling, his request was denied.  *Id*. at ¶ 15.  Indeed, defendant Weingartner further stated that plaintiff's request for special handling for mailing a notice of appeal to the Attorney General did not meet the guidelines for special handling because plaintiff was not filing a Claim or Notice of Intention on the Attorney General's Office.  *Id*.  There is nothing in the record to suggest that after plaintiff received the June 18, 2001 Notice, he submitted to the mailroom staff any court order or statute showing that his correspondence to the Attorney General was required to be mailed by certified mail, return receipt requested.  *Id*. at ¶ 16.  Lastly, in further support of his motion for summary judgment, defendant Weingartner states that to the extent that any appeal concerning Claim No. 99509 was untimely, plaintiff was advised by Mr. Davison that to obtain permission to file or serve

-84-

an untimely notice of appeal, plaintiff must make a motion for leave to file an untimely

notice pursuant to CPLR 5520.  *Id*. at ¶ 17.  There is nothing in the record to suggest

that plaintiff submitted any such motion pursuant to CPLR 5520.  *Id*. at ¶ 18.


## DISCUSSION AND ANALYSIS

Defendants argue that they are entitled to summary judgment because

plaintiff has failed to establish violations of the First, Eighth and Fourteenth

Amendments to the United States Constitution.  Specifically, with respect to his

deliberate indifference claim, plaintiff failed to establish that he suffered from a

sufficiently serious medical condition and that defendants Brandt and vonHagn were

deliberately indifferent to his medical needs.  With respect to plaintiff's retaliation claim

against defendants Brandt and vonHagn, plaintiff is unable to establish retaliatory

motive.  Even if plaintiff could establish such retaliatory motive, the record before the

Court clearly establishes that there were proper, non-retaliatory reasons for the

punishment imposed on plaintiff.

Plaintiff's claims of deprivation of due process against defendants

Donahue, Gilmore, Irizarry, Quinn, Ryan, Sheahan, Wilcox and Selsky fail as a matter

of law because plaintiff received all the process he was due during the course of each

disciplinary hearing and appeal.  With respect to plaintiff's denial of right to take a

religious correspondence course claim against defendant Gardner, that claim must fail

because contrary to plaintiff's assertions, defendant Gardner was not personally

involved in the decision.  Plaintiff's second claim against defendant Gardner,

interference with legal mail, also fails as a matter of law because plaintiff cannot under

any circumstances demonstrate that he suffered actual injury.  Finally, plaintiff's claims

of interference with access to the Courts claims against defendants Corcoran and

Weingartner fail as a matter of law because with respect to defendant Corcoran,

plaintiff cannot demonstrate that he suffered any injury and with respect to defendant

Weingartner, plaintiff cannot establish that any conduct on the part of defendant

Weingartner caused the dismissal of Claim No. 99509 pending before the Court of

Claims.  Because, for the reasons set forth below, the Court agrees that defendants are

entitled to judgment as a matter of law, the Court need not reach the issue of whether

defendants are entitled to qualified immunity.


## Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the

court must assess whether there are any material factual issues to be tried while

resolving ambiguities and drawing reasonable inferences against the moving party, and

must give extra latitude to a *pro se* plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 798

(W.D.N.Y. 1997) (internal citations omitted).


A fact is "material" only if it has some effect on the outcome of the suit.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*,

140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*,

502 U.S. 849 (1991).


   Once the moving party has met its burden of "demonstrating the absence

of a genuine issue of material fact, the nonmoving party must come forward with

enough evidence to support a jury verdict in its favor, and the motion will not be

defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of

conjecture or surmise."  *Bryant*, 923 F.2d at 982 (internal citations omitted).   A party

seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and
> invoke the appropriate statute.  The [party] must also show,
> by affidavits or as otherwise provided in Rule 56 of the
> Federal Rules of Civil Procedure, that there are specific
> factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).


**Deliberate Indifference to Serious Medical Needs**
**Claims Against Defendants vonHagn and Brandt**

   In *Estelle v. Gamble*, the United States Supreme Court determined that

"deliberate indifference to serious medical needs of prisoners constitutes the

'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" to the

United States Constitution.  429 U.S. 97, 104 (1976).  To establish an unconstitutional

denial of medical care that rises to the level of an Eighth Amendment violation, a

plaintiff (prisoner) must prove, beyond mere conclusory allegations, that the defendant

acted with "deliberate indifference to [his] serious medical needs." *Estelle*, 429 U.S. at

104.  More specifically, the prisoner must demonstrate both that the alleged deprivation

is, in objective terms, "sufficiently serious," and that, subjectively, the defendant is

acting with a "sufficiently culpable state of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66

(2d Cir. 1994), *cert. denied*, 513 U.S. 1154 (1995).  Both the objective and subjective

components must be satisfied in order for a plaintiff to prevail on his claim.  *Hathaway*

*v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).


### Objective Component

Under the objective component, in assessing whether a medical condition

is "sufficiently serious," the Court considers all relevant facts and circumstances,

including whether a reasonable doctor or patient would consider the injury worthy of

treatment; the impact of the ailment upon an individual's daily activities; and, the

severity and persistence of pain.  *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.

1998).  A serious medical condition exists where the failure to treat a prisoner's

condition could result in further significant injury or the unnecessary and wanton

infliction of pain.  *Id.*  Indeed, the Second Circuit has held that the alleged deprivation

must be "sufficiently serious, in the sense that a condition of urgency, one that may

produce death, degeneration, or extreme pain exists." *Hemmings v. Gorczyk*, 134 F.3d

104, 108 (2d Cir. 1998).  "[I]n most cases, the actual medical consequences that flow

from the alleged denial of care will be highly relevant to the question of whether the

denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003).

The types of conditions which have been held to meet the constitutional standard of serious medical need include:  the failure to treat a painful and disfiguring facial keloid,  *Brock v. Wright*, 315 F.3d 158, 160 (2d Cir. 2003); refusal to treat a cavity at risk of "acute infection[ ], debilitating pain and tooth loss" unless prisoner consented to extraction of another diseased tooth, *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000); untreated dental problems that resulted in chronic pain for a period of six months resulting in tooth degeneration, *Chance*, 143 F.3d. at 702; failure to treat a ruptured Achilles tendon which resulted in swelling and pain, *Hemmings*, 134 F.3d at 106-07; confiscation of prescription eyeglasses necessary to correct serious vision problem and subsequent denial of medical treatment resulting in loss of vision in one eye, *Koehl v. Dalsheim*, 85 F.3d 86, 87-88 (2d Cir. 1996); failure to remove broken hip pins from prisoner's hip for over three years despite prisoner's complaint of persistent pain, *Hathaway*, 37 F.3d at 64-65; and, loss of an ear where doctor threw away prisoner's ear and stitched up the stump, *Williams v. Vincent*, 508 F.2d 541, 543 (2d Cir. 1974).

Here, plaintiff's chief complaint, that he suffered from an "extremely painful ear infection resulting in my total loss of hearing ability in my ear for a time period of two weeks" is far from resembling the foregoing serious medical problems.

Dkt. #9, p.5.  In opposition to defendants' motion for summary judgment on his deliberate indifference claim, plaintiff offers nothing more than bald, conclusory allegations that he suffered from an extremely painful ear infection and further, that the ear infection resulted in a temporary (two week) loss of hearing.  Dkt. #96.  Plaintiff's claims are belied by the medical records which unmistakably demonstrate that plaintiff was repeatedly seen by defendants Brandt and vonHagn, as well as others on the medical staff and further, that plaintiff received proper and adequate medical treatment. Moreover, there is nothing whatsoever in plaintiff's medical records that supports plaintiff's claim of hearing loss.

Beginning on December 16 and continuing through December 31, 1999, plaintiff was seen by the medical staff at Southport nine times.  Plaintiff was seen by defendant Brandt on December 16, 17, 23, 27 and 29, 1999.  Plaintiff was seen by defendant vonHagn on December 18, 19, 20 and 31, 1999.  On December 16, 1999, defendant Brandt noted some wax in ear and some mild irritation of the canal due to plaintiff inserting foreign objects into his ear.  Dkt. #70, p.0843; Dkt. #81, ¶ 12; Dkt. #82, ¶ 10.  Plaintiff was also seen by defendant Brandt on December 17, 1999, wherein plaintiff again demanded ear drops and defendant Brandt again advised plaintiff against cleaning his ears with foreign objects.  Dkt. #81, ¶ 12; Dkt. #82, ¶ 10.  Plaintiff was seen by defendant vonHagn on December 18, 1999 during morning sick call and plaintiff demanded a second ear check and claimed he could not hear out of both ears.  Dkt. #70, p.0843; Dkt. #81, ¶ 13; Dkt. #83, ¶ 10.   At that time, defendant vonHagn advised plaintiff that she would schedule an ear examination with Dr. Alves.  *Id*.  Although

-90-

plaintiff was seen by defendant vonHagn on December 19, 1999, he did not complain of ear pain at that time.  *Id.*

On December 20, 1999, defendant vonHagn examined plaintiff's left ear and noted "left ear cereum impaction seen, right ear some impaction seen, no visualization of tampanic [sic] membrane seen in either ear."  Dkt. #70, p.0842; Dkt. #81, ¶ 15; Dkt. #83, ¶ 12  Thus, defendant vonHagn saw no signs of infection and provided plaintiff with debrox (ear drops) and ear wash to be used for seven days.  *Id.* Plaintiff's next complaint concerning his ears was not until December 27, 1999, when he requested sick call and he was to be seen by defendant Brandt.  Dkt. #70, p.0841; Dkt. #81, ¶ 17; Dkt. #82, ¶ 12.  When defendant Brandt went to see plaintiff, plaintiff refused and was extremely verbal, nasty and confrontational.  *Id.*  As a result, defendant Brandt terminated the sick call.  *Id.*  Plaintiff again complained of his ears on December 29, 1999 and plaintiff was to be seen by defendant Brandt.  Dkt. #70, p.0841; Dkt. #81, ¶ 18; Dkt. #82, ¶ 13.  Plaintiff refused to have defendant Brandt check his ears, stating, "fuck you white homoboy."  *Id.*  Thereafter, despite his complaints, plaintiff repeatedly refused to allow anyone, including Dr. Alves, to check his ears.  After January 4, 2000 (when plaintiff refused to see Dr. Alves on an MD callout) and continuing until his transfer to Coxsackie in May 2000, plaintiff made no complaints whatsoever about his ears.  Dkt. #81, ¶¶ 21-26.

At most, plaintiff asserts that he suffered from "extreme pain."  However, plaintiff's amended complaint and opposition to defendants' motion for summary judgment fail to offer any specificity with respect to the "extreme pain" that he claims he suffered.  Moreover, the record before the Court is utterly devoid of any mention by plaintiff of any impact on his daily activities, or the severity or persistence of pain.  Indeed, neither plaintiff nor defendants make any mention that plaintiff's alleged hearing loss affected his ability to communicate with the medical staff.  Conversely, defendant vonHagn noted on December 18, 1999 that plaintiff heard her statements.  Dkt. #70, p.0843; Dkt. #81, ¶ 13; Dkt. #83, ¶ 10.  Upon his review of plaintiff's medical records, Dr. Alves concluded that there was nothing to support plaintiff's assertion that he suffered hearing loss.  Dkt. #81, ¶ 79.  Absent any evidence to support a conclusion that plaintiff suffered a serious medical condition as a result of defendant Brandt's and defendant vonHagn's alleged failure to provide medical care and treatment in December 1999, other than plaintiff's allegations that he suffered from extreme pain, plaintiff fails to satisfy the objective element of his deliberate indifference claim.

### Subjective Component

The subjective component for the establishment of a claim of deliberate indifference to a serious medical need requires that the plaintiff establish that the defendant acted with a "sufficiently culpable state of mind" so as to violate the Eighth Amendment's cruel and unusual punishment clause.  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  "[A] prison official does not act in a deliberately indifferent manner unless

that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hathaway*, 37 F.3d at 66, *quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  In *Estelle*, the Supreme Court ruled that deliberate indifference may manifest itself in a doctor's refusal to administer needed treatment, a prison guard's intentional denial or delay in granting an inmate access to medical care, or intentional interference with prescribed treatment.  *Estelle*, 429 U.S. at 104-05.

"The subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Hathaway*, 99 F.3d at 553, *citing Farmer v. Brennan*, 511 U.S. 825 (1994); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003), *cert. denied*, 543 U.S. 1093 (2005). The Supreme Court further stated in *Estelle* that, "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'"  *Estelle*, 429 U.S. at 105-06.  Thus, the Supreme Court added,

> [a] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id*. at 106; *see also Chance*, 143 F.3d at 703 (stating "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation").

Where, as here, the prisoner has received some (extensive) medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgment.  Rather, "[p]rison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates [and] courts have repeatedly held that a prisoner does not have the right to the treatment of his choice."  *Ross v. Kelly*, 784 F.Supp. 35, 44-45 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir.1992) (internal citations omitted).

In their motion for summary judgment, defendants Brandt and vonHagn assert that, "[p]laintiff's allegations ... is [sic] at most negligence or malpractice and does [sic] not rise to the level of a constitutional violation."  Dkt. #92, p.15. Nevertheless, defendants Brandt and vonHagn maintain that the record establishes that they were neither negligent nor that their conduct could be characterized as medical malpractice.  *Id*.  Accordingly, they ask this Court to find, as a matter of law, that plaintiff is unable to establish that, (1) he suffered from a serious medical condition and (2) that defendants Brandt and vonHagn were deliberately indifferent to plaintiff's medical needs.  The Court agrees with the defendants that the record is devoid of any evidence to support a finding that plaintiff suffered from a serious medical condition as a result of the care and treatment he received in or about December 1999.  Moreover, the Court

agrees with the defendants that plaintiff also fails to satisfy the subjective component of the deliberate indifference standard.

Plaintiff claims that defendant vonHagn "knowingly, intentionally, and wilfully denied [plaintiff] 'emergency' medical care ..." and that defendant Brandt "knowingly, wilfully and intentionally 'aided' in the denial of [plaintiff's] 'emergency' medical care...."  Dkt. #9.  However, there is nothing in the record to establish any intent on the part of either defendant vonHagn or defendant Brandt.  To the contrary, the undisputed record unequivocally establishes that defendant vonHagn and Brandt made every effort to comply with plaintiff's requests and to provide plaintiff with appropriate treatment, medications and examinations.  Moreover, Dr. Alves, the Facility Health Services Director of the Medical Services Unit at Southport, concluded that defendants properly treated plaintiff's complaints with the appropriate medication and referred plaintiff to Dr. Alves for examination and further, that defendant vonHagn appropriately scheduled and performed ear examinations on plaintiff.  In addition, Dr. Alves' review of plaintiff's medical records indicates that plaintiff did not suffer any hearing loss in December 1999 or at anytime related to the treatment of his complaints of ear pain during December 1999.  Finally, Dr. Alves calculates that during the period, December 1999 through January 2001, plaintiff had approximately 92 encounters with medical staff concerning a multitude of complaints, including, ear pain.  Notably, however, plaintiff made no complaints of ear pain after January 2000.

The record clearly establishes that defendants vonHagn and Brandt made every effort to treat plaintiff's complaints of ear pain with an appropriate course of treatment and medication, and that despite their efforts, plaintiff refused several of their attempts to examine his ears and refused to be seen by Dr. Alves.  Additionally, there is nothing in the record to support plaintiff's claim that he suffered from a total loss of hearing for a period of two weeks or that the care and treatment provided to plaintiff by defendants was in any way related to plaintiff's claim of hearing loss.  Finally, the Court agrees with the defendants that plaintiff's allegations are, at most, claims of negligence or medical malpractice and thus, do not create a cause of action that rises to the level of a constitutional violation.  Therefore, the Court finds that plaintiff's claim of deliberate indifference by the defendants is without merit.

**Retaliation Claims Against Defendants vonHagn and Brandt**

In support of their motion for judgment as a matter of law on plaintiff's retaliation claim, defendants vonHagn and Brandt argue that plaintiff cannot satisfy his burden and establish that the actions of defendants vonHagn and Brandt were the result of a retaliatory motive.  Dkt. #92, p.18.  In response to defendants' motion, plaintiff summarily states, without elaboration, that "defense counsel continually makes claims of undisputed facts pge #6, no. #22, however, plaintiff notes that no undisputed facts, can be evident by counsel when what [sic] no truth is in them such as the case here in 90 to 95% of counsels [sic] compilation."  Dkt. #96, p.75 (emphasis in original).  Moreover, plaintiff asserts in conclusory fashion that defendants vonHagn and Brandt retaliated against him by issuing Misbehavior Reports following the filing of plaintiff's

grievances against them.  Plaintiff's conclusory allegations, without more, are

insufficient to create a material issue of fact.

> An allegation that a prison official filed false disciplinary
> charges in retaliation for the exercise of a constitutionally
> protected right, such as the filing of a grievance, states a
> claim under § 1983.  A plaintiff alleging retaliatory
> punishment bears the burden of showing that the conduct at
> issue was constitutionally protected and that the protected
> conduct was a substantial or motivating factor in the prison
> officials' decision to discipline the plaintiff.  The burden then
> shifts to the defendant to show that the plaintiff would have
> received the same punishment even absent the retaliatory
> motivation.  The defendant can meet this burden by
> demonstrating that there is no dispute that the plaintiff
> committed the most serious, if not all, of the prohibited
> conduct charged in the misbehavior report.

*Gayle v. Gonyea,* 313 F.3d 677 (2d Cir. 2002) (internal quotations and citations

omitted).  For the reasons set forth below, plaintiff cannot meet his heavy burden of

establishing retaliatory motive on the part of defendants vonHagn and Brandt.

However, even assuming retaliatory motive, defendants vonHagn and Brandt are

entitled to summary judgment because there are "proper, non-retaliatory reasons for his

punishment."  *Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996).


Here, plaintiff alleges that defendants vonHagn and Brandt wrote

Misbehavior Reports against him in retaliation for his complaints (grievances) about

them.

**January 23, 2001 Misbehavior Report**

Plaintiff alleges that defendant Brandt, in retaliation for plaintiff's filing of grievances, issued a retaliatory Misbehavior Report on January 23, 2001.  Dkt. #9, p.5-A.  As the undisputed record before the Court demonstrates, defendant Brandt saw plaintiff at sick call on January 23, 2001, at which time plaintiff refused hydrocortisone cream and told defendant Brandt, "next time I'll spit + shit on you."  Thereafter, defendant Brandt issued a Misbehavior Report.  Dkt. #82, ¶¶ 23-25.  A Tier 2 disciplinary hearing was conducted by Lt. Donahue on January 29, 2001.  *See generally*, Dkt. #44, pp.0112-0128.  During the January 29, 2001 disciplinary hearing, plaintiff advised Lt. Donahue that he believed that the Misbehavior Report was written by defendant Brandt in retaliation for complaints plaintiff filed and defendant Brandt and/or the medical staff at Southport.  *Id*.  Notwithstanding plaintiff's claims of retaliation, Lt. Donahue found plaintiff guilty of making threatening statements directed to defendant Brandt.  *Id*.

During the time period relevant to the allegations in the amended complaint, plaintiff filed three grievances against defendant Brandt, Grievance No. SPT-17707-99 (December 30, 1999), Grievance No. SPT-18746-00 (May 24, 2000) and Grievance No. SPT-20137-00 (December 11, 2000).  Thus, the first grievance filed by plaintiff against defendant Brandt was filed over thirteen months <u>before</u> the alleged retaliatory Misbehavior Report was issued on January 23, 2001.  Although, "the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may

serve as circumstantial evidence of retaliation," the significant passage of time between the last grievance filed by plaintiff against Brandt and the allegedly retaliatory Misbehavior Report stretches even the most liberal construction of the applicable case law beyond its limits.  *Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir. 2002), *citing Colon*, 58 F.3d at 872.

In Grievance No. SPT-17707-99, filed on or about December 30, 1999, plaintiff asserted that, (1) on or about December 26, 1999, defendant Brandt denied his request for outside medical treatment for his complaints of ear pain, (2) defendant Brandt indicated that plaintiff refused treatment, (3) on December 14, 1999, defendant Brandt denied him an emergency ear examination and ear drops and (4) from December 14-21, 1999, defendants Brandt and vonHagn denied him medical treatment for an ear infection.  Dkt. #65, p.438; Dkt. #82, ¶ 30; Dkt. #83, ¶ 37.  The Superintendent dismissed plaintiff's grievance finding that medication was delivered to plaintiff for ear pain, but plaintiff began to verbally harass the nurse and thereafter, refused the medication.  Dkt. #65, p.0434; Dkt. #82, ¶ 32; Dkt. #83, ¶ 39.  CORC upheld the Superintendent's determination on or about March 8, 2000 and advised plaintiff to follow the treatment plan outlined by health services staff and noted there was no medical need for an outside consultant at that time.  Dkt. #65, p.0433; Dkt. #82, ¶ 32; Dkt. #83, ¶ 39.

In Grievance No. SPT-18746-00, filed on or about May 24, 2000, plaintiff asserted that, (1) on or about May 21, 2000, defendant Brandt refused to provide him

with medical care, (2) defendants Brandt and vonHagn were racist, (3) defendant Brandt told other nursing staff not to treat plaintiff, (4) plaintiff had previously grieved defendant Brandt's and vonHagn's alleged failure to treat his ear infection in December 1999 and (5) defendant Brandt refused to provide plaintiff with skin cream.  Dkt. #65, p.0415; Dkt. #82, ¶ 36; Dkt. #83, ¶ 46.  The IGRC recommended dismissal of plaintiff's grievance and the Superintendent concurred.  Dkt. #65, pp.0416-0417; Dkt. #82, ¶ 38; Dkt. #83, ¶ 48.  On or about August 2, 2000, based upon the recommendation of Division of Health Services, the Superintendent's determination was upheld by CORC.  Dkt. #65, p.0409; Dkt. #82, ¶ 38; Dkt. #83, ¶ 48.  Indeed, CORC noted that plaintiff was issued skin cream on June 5, 2000 and that his allegations against staff had not been substantiated.  *Id*.

Finally, in Grievance No. SPT-20137-00 filed on or about December 11, 2000, plaintiff asserted that defendants vonHagn and Brandt failed to provide him with a refill of skin cream and were racist and biased towards him.  Dkt. #44, p.0225, Dkt. #82, ¶ 41; Dkt. #83, ¶ 51.  The Superintendent denied plaintiff's grievance and CORC upheld the Superintendent's determination on or about February 14, 2001, finding that the Nurse Administrator indicated that plaintiff had received medication refills on the appropriate dates and had received proper medical care.  Dkt. #44, p.0228-0229; Dkt. #82, ¶ 43; Dkt. #83, ¶ 53.

**"January 25, 2000" Misbehavior Report and**
**December 13, 2000 Misbehavior Report**

Specifically, plaintiff alleges that defendant vonHagn issued a retaliatory

Misbehavior Report on January 25, 2000 because of the grievances plaintiff had filed

against her.  Defendant vonHagn did not issue a Misbehavior Report on January 25,

2000, rather, she issued one on January 14, 2000.  Defendant vonHagn maintains,

however, that the January 14, 2000 Misbehavior Report was issued as a result of

plaintiff's threatening and harassing language.  The Misbehavior Report states in

pertinent part, "[p]atient asked if he wished a copy [receipt for glasses] he could write

the Nurse Adm. Inmate Chavis 91A3261 B-10-20 then said 'you are a stupid asshole.'

'You want 25¢ to give me a fucking copy of my glasses receipt.'  'I'll take your fucking

money in court.  I'll tear you apart in Court.'  'I'm not as fucking stupid as you are.'  "You

stupid fucking asshole.'  'Get the fuck away from my cell you asshole.'" Dkt. #44,

p.0029.


A Tier 2 disciplinary hearing was conducted by Lt. Ryan on January 25,

2000.  Dkt. #44, pp.0024-0038; Dkt. #83, ¶ 22.  Plaintiff advised Lt. Ryan during the

hearing that he believed the January 14, 2000 Misbehavior Report was written by

defendant vonHagn in retaliation for complaints filed by plaintiff.  Dkt. #44, pp.0032-

0038; Dkt. #83, ¶ 23.  Following the hearing, Lt. Ryan found plaintiff guilty of using

harassing language against defendant vonHagn.  Dkt. #44, pp.0024-0038; Dkt. #83,

¶ 24.  On January 28, 2000, the guilty determination was affirmed by Captain Wilcox.

Dkt. #44, p.0024.

On December 13, 2000, defendant vonHagn issued a Misbehavior Report stating,

> While making rounds on B Block Gallery this nurse [defendant vonHagn] stopped to see Inmate Chavis, G. 91A3261 B-3-19 for sick call.  He requested refills.  He was asked about old containers.  He immediately got an attitude and said, 'He wasn't every other inmate and just get him what he wanted.' As this nurse walked away from his cell, inmate Chavis, G. says 'I'm going to hit that white bitch in her head with a baseball bat.'  C.O. Stamp told inmate Chavis, G 91A3261 that statement was not necessary. Inmate Chavis, G. Then said, Shut up you fuck ass white mother fucker, I'll kill you too after I kill her.  Inmate Chavis, G. continued to threaten this nurse and correctional officer until we left gallery area.

Dkt. #44, p.0104; Dkt. #83, ¶ 31.  A Tier 3 disciplinary hearing was conducted on December 26, 2000 by Lt. Sheahan.  During the hearing, plaintiff advised Lt. Sheahan that defendant vonHagn had written the December 13, 2000 Misbehavior Report in retaliation for complaints filed by plaintiff against defendant vonHagn.  Dkt. #83, ¶ 32. Thereafter, Lt. Sheahan found plaintiff guilty of using threatening and harassing language towards defendant vonHagn and Lt. Sheahan's determination was affirmed by defendant Donald Selsky, Director, Special Housing/Inmate Disciplinary Program. Dkt. #44, pp.0100-0111 and 0160-0199.  Indeed, Lt. Sheahan found that the evidence submitted by plaintiff of past grievances against defendant vonHagn and other medical staff did not establish that the December 13, 2000 Misbehavior Report was retaliatory. Moreover, Lt. Sheahan indicated that the disposition was given to plaintiff to impress upon him that threats will not be tolerated.  Dkt. #44, p.0102.

With respect to the "January 25" (January 14), 2000 and December 13, 2000 Misbehavior Reports, during the time period relevant to the allegations in the amended complaint (December 1999 through January 2001), plaintiff filed three grievances against defendant vonHagn, Grievance No. SPT-17707-99 (filed December 30, 1999), Grievance No. SPT-18746-00 (filed May 24, 2000) and Grievance No. SPT-20137-00 (filed December 11, 2000).  Each of the aforementioned grievances were filed against defendants Brandt and vonHagn and have been discussed above in connection with the January 23, 2001 Misbehavior Report.  *See* pp.21-29 *supra*.

The January 23, 2001 Misbehavior Report issued by defendant Brandt allegedly in retaliation for the grievances (Grievance Nos. SPT-17707-99, SPT-18746-00 and SPT-20137-00) filed by plaintiff was issued as a result of plaintiff's threatening language, "next time I'll spit + shit on you," and not in retaliation for any grievance filed by plaintiff.  Significantly, plaintiff was found guilty of the violation charged in the Misbehavior Report.  Moreover, plaintiff's medical record unequivocally establishes that defendant Brandt properly treated all of plaintiff's medical complaints and provided plaintiff with the appropriate care.

The January 14, 2000 and December 13, 2000 Misbehavior Reports issued by defendant vonHagn were likewise issued as a result of plaintiff's harassing and threatening language and not in retaliation for any grievance submitted by plaintiff.  As with the January 23, 2001 Misbehavior Report, plaintiff was found guilty of the violations enumerated in the January 14, 2000 and December 13, 2000 Misbehavior

-103-

Reports.  Moreover, plaintiff's medical records establish that at no time did defendant

vonHagn refuse to treat plaintiff, in fact, the records reveal that defendant vonHagn

treated plaintiff's medical complaints and provided him with proper care and treatment.


Thus, the Court agrees with defendants Brandt and vonHagn that plaintiff

cannot meet his heavy burden of establishing retaliatory motive on the part of

defendants vonHagn and Brandt.  Additionally, even if plaintiff could establish a

retaliatory motive, there is nothing in the record before this Court to suggest that there

was anything improper about the Misbehavior Reports generated by defendants Brandt

and vonHagn.  With respect to each of the Misbehavior Reports, the hearing officer

found that plaintiff engaged in harassing and threatening behavior and each such

determination was later upheld.  Accordingly, there were "proper, non-retaliatory

reasons for his punishment."  *Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996).


**Deprivation of Due Process Claims Against Defendants Donahue,**
**Gilmore, Irizarry, Quinn, Ryan, Sheahan, Wilcox and Selsky**

To state a cognizable § 1983 due process claim, a plaintiff must

demonstrate that he possessed a protected liberty or property interest and that he was

deprived of that interest without due process.  *Bedoya v. Coughlin*, 91 F.3d 349, 351-52

(2d Cir. 1996); *Frazier v. Coughlin*, 81 F.3d 313, 316 (2d Cir. 1996).  Each of the

defendants assert that plaintiff received all the process he was due during the course of

each of the ten disciplinary hearings addressed in the amended complaint.  Dkt. #92,

pp.25-48.

**Liberty Interest**

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004), *quoting Sandin v. Conner*, 515 U.S. 472, 484 (1995).  In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical."  *Id., quoting Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999).  In light of this standard, the Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical."  *Id*. at 64-65.

Notwithstanding the foregoing, courts in this Circuit "generally require that the duration of confinement be at least 100 days" to be categorized as constituting an "atypical and significant hardship."  *Palmer v. Goss*, No. 02 Civ 5804(HB), 2003 WL 22327110, at * 6 (S.D.N.Y. Oct. 10, 2003), *aff'd, Palmer v. Richards*, 364 F.3d 60 (2d Cir. 2004); *Smith v. Taylor*, No. 03-0202, 2005 WL 2019547 (2d Cir. Aug. 23, 2005)

(determining that 45 days disciplinary confinement in SHU, absent evidence of conditions more onerous than those generally present in the SHU, was insufficient to establish a protected property interest); *Sims v. Artuz*, 230 F.3d 14, 24 (2d Cir. 2003) (vacating dismissal of, *inter alia*, procedural due process claims, stating, during little more than a 4½ month period, Sims was sentenced to SHU for a total of nearly 3½ years); *Durran v. Selsky*, 251 F.Supp.2d 1208, 1214 (W.D.N.Y. 2003), *quoting*, *Tookes v. Artuz*, No. 00CIV4969, 2002 WL 1484391, at * 3 (S.D.N.Y. July 11, 2002) ("[c]ourts in this Circuit routinely hold that an inmate's confinement in special housing for 101 days or less, absent additional egregious circumstances, does not implicate a liberty interest."); *Colon v. Howard*, 215 F.3d 227, 232 (2d Cir. 2000) (instructing district courts to develop detailed factual records "in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days"); *cf. Prince v. Edwards*, No. 99CIV8650, 2000 WL 633382 (S.D.N.Y. May 17, 2000) (suggesting that any period of segregation of one year or less affords no protected liberty interest).

### Procedural Safeguards

In *Wolff v. McDonnell*, the Supreme Court enumerated certain procedural safeguards that must be afforded to an inmate during the course of a prison disciplinary proceeding in order to ensure that the minimum requirements of procedural due process are satisfied.  418 U.S. 539 (1974).  Specifically, the Supreme Court identified the following procedures:  advance written notice of the claimed violation or charges; a written statement by the fact finder of the evidence relied upon and the reasons for the

disciplinary action taken; the opportunity for an inmate to call witnesses and present documentary evidence in his/her defense, provided that such a process would not jeopardize institutional safety.  *Id*. at 563-66.  Moreover, although not specifically required by *Wolff*, plaintiff was provided with an opportunity to appeal each determination and he did in fact exercise that right to appeal on several occasions and with respect to each appeal taken, enumerated specific grounds for his appeal.

Plaintiff claims that defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan violated his Fourteenth Amendment right to due process during the disciplinary hearings each conducted with respect to Misbehavior Reports issued against plaintiff.  For each defendant, plaintiff alleges a multitude of reasons why the defendants violated his due process rights.  Plaintiff claims that in connection with the five Tier 2 disciplinary hearings conducted by defendant Donahue, he was:  denied assistance to prepare for the hearings; denied production of certain witnesses to testify at those hearings; erroneously found guilty of the charges; improperly subject to a sentence of 30 days cell confinement at the conclusion of those hearings; and was prejudiced by defendant's bias and issuance of a retaliatory Misbehavior Report following one of the disciplinary hearings.  Dkt. #9, pp.6-D to 6-F.

As against defendant Gilmore, plaintiff claims that at his July 18, 2000 Tier 2 disciplinary hearing, defendant Gilmore improperly found him guilty of a violation for which he had not been charged, the Misbehavior Report was not endorsed by a witness; there was no testimony against plaintiff during the hearing and plaintiff's

witnesses confirmed plaintiff's defense.  Dkt. #9, pp.6-F to 6-G.  Plaintiff claims that at

his Tier 3 disciplinary hearing conducted on January 4, 2001 by defendant Irizarry,

defendant Irizarry denied him assistance to prepare for the hearing, denied his request

to have certain witnesses testify at the hearing, and improperly found him guilty of the

charges since defendant Selsky later modified the hearing determination.  Dkt. #9,

pp.6-B to 6-C.  Plaintiff alleges that defendant Quinn denied him due process at his Tier

3 disciplinary hearing conducted on February 5, 2001 by denying: his request for

assistance to prepare for the hearing; his request to have Deputy Commissioner

Annucci testify at the hearing; his right to attend the hearing; and by failing to provide

plaintiff with a copy of the hearing disposition, and improperly finding him guilty of the

charges following the hearing.  Dkt. #9, pp.6 to 6-A.


        Plaintiff claims that defendant Ryan denied him due process at his

January 25, 2000 Tier 2 disciplinary hearing because he improperly endorsed the

Misbehavior Report; denied plaintiff an assistant to prepare for the hearing; allowed a

witness to testify telephonically; and forced plaintiff to leave the hearing.  Dkt. #9, pp.6-

G to 6-H.  Finally, plaintiff claims that defendant Sheahan denied him due process at

his December 26, 2000 (December 29, 2000) Tier 3 disciplinary hearing because he

denied plaintiff his right to witnesses; incorrectly found him guilty at the conclusion of

the hearing; and was biased against plaintiff.  Dkt. #9, pp.6-A to 6-B.

**Employee Assistance - The Tier 2 and 3 Disciplinary Hearings**

As discussed above, *Wolff* requires that an inmate be provided with at least 24 hours advance written notice before the hearing "to inform [the inmate] of the charges and to enable him to marshal the facts and prepare a defense." *Wolff*, 418 U.S. at 563-64.   Institutional concerns have generally operated as a bar to inmates obtaining  retained or appointed counsel.  *Wolff*, 418 U.S. at 570; *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1999).  Inmates do, however, have a "limited" right to assistance. *Silva*, 992 F.2d at 22.   Indeed, the Second Circuit has held that "in certain circumstances an inmate will be unable to 'marshal evidence and present a defense' without some assistance."  *Id*. (internal citations omitted).  "[A] prison inmate facing a disciplinary hearing is only entitled to assistance from a fellow inmate or a prison employee under certain circumstances.  For example, when the inmate is illiterate or the issues extremely complex."  *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988).


7 N.Y.C.R.R. § 251-4.1 provides that an inmate shall be entitled to employee assistance for purposes of a disciplinary hearing if: "(1) the inmate is either illiterate or non-English speaking; (2) the inmate is sensorially disabled ...; (3) the inmate is charged with drug use as a result of a urinalysis test; or (4) the inmate is confined pending a disciplinary hearing to be conducted pursuant to Part 254 of this Title."  Thus, according to DOCS' disciplinary procedure, an inmate charged with a violation for which a Tier 2 disciplinary hearing is warranted is not entitled to an employee assistant.  7 N.Y.C.R.R. § 251-4.1.  In addition, DOCS' regulations provide

that a hearing officer may, in his or her "absolute discretion," offer an inmate the
opportunity to select an assistant where the assistance would enable the inmate to
adequately comprehend the case in order to respond to the charges.  7 N.Y.C.R.R. §
251-4.1(b).

As a threshold matter, there is no dispute that plaintiff is neither illiterate
nor sensorially disabled.  Moreover, none of the disciplinary hearings that are the
subject of plaintiff's claims charged plaintiff with drug use as a result of a urinalysis test.
Similarly, none of the issues considered at the Tier 2 disciplinary hearings discussed in
plaintiff's amended complaint were so complex that plaintiff was unable to "marshal
evidence and prepare a defense."  To the contrary, the record before the Court
establishes that in each of the Tier 2 disciplinary hearings discussed above, plaintiff
was indeed able to present evidence (and often did), both oral and documentary, in his
own defense.  Accordingly, plaintiff's claims that he was denied an employee assistant
to prepare for any of the aforementioned Tier 2 disciplinary hearings must fail because
such assistance was neither required nor necessary.  *Wolff v. McDonnell*, 418 U.S. 539
(1974).

Both the Second Circuit case law and DOCS' regulations provide for an
inmate to receive employee assistance when that inmate is charged with an offense
warranting SHU confinement.  *Silva*, 992 F.2d at 22; *Eng*, 858 F.2d at 898; 7
N.Y.C.R.R. § 251-4.1(b).  In the amended complaint, plaintiff complains that with
respect to three Tier 3 disciplinary hearings conducted by defendants Sheahan

(December 26 and 29, 2000), Irizarry (January 4, 2001), and Quinn (February 5, 2001) each defendant denied him his right to assistance.  For the following reasons, plaintiff's claims that he was denied assistance in connection with the December 26 and 29, 2000, January 4, 2001 and February 5, 2001 Tier 3 disciplinary hearings must fail as a matter of law.

### Defendant Sheahan - December 26, 2000 Tier 3 Hearing

Plaintiff alleges that defendant Sheahan denied him due process at his December 26, 2000 Tier 3 disciplinary hearing because defendant Sheahan, *inter alia*, denied him an employee assistant and because he did not receive copies of the grievances he had requested.  Dkt. #9, pp.6-A to 6-B.  Plaintiff's claims are wholly unsupported by the record before this Court.  After considerable discussion concerning plaintiff's selections for an employee assistant, defendant Sheahan adjourned the December 26, 2000 hearing to further investigate plaintiff's assertions of denial of an assistant, and the Tier 3 disciplinary hearing reconvened on December 29, 2000.  *Id*. at ¶ 9.  During the continuation of the hearing, plaintiff agreed that he had been provided with an assistant, Officer Carpenter; that Officer Carpenter had met with plaintiff on December 26, 2000; and further that the assistance he had received was acceptable. *Id*.  Although plaintiff testified that he had not received all of the grievances that he had requested, he stated that the data he had received was satisfactory for the hearing.  *Id*. at ¶ 10.  Based on plaintiff's statements, defendant Sheahan proceeded with the disciplinary hearing.  Thus, the undisputed record before this Court reveals that plaintiff

did receive assistance prior to the December 29, 2000 continuation of the Tier 3 disciplinary hearing commenced on December 26, 2000.  Moreover, with respect to plaintiff's claim that he did not receive copies of the grievances he requested for the hearing, the record before the Court is clear.  Although plaintiff did not receive all of the requested grievances, he unequivocally stated during the hearing that the data he did receive was satisfactory.

### Defendant Irizarry - January 4, 2001 Tier 3 Hearing

As part of his claim against defendant Irizarry, plaintiff alleges that defendant Irizarry denied his request for a staff assistant to help him prepare for the January 4, 2001 Tier 3 disciplinary hearing.  Dkt. # 9, pp.6-B to 6-D.  The record before the Court establishes that on December 23, 2000, plaintiff was served with a copy of the Misbehavior Report wherein it was indicated that he waived his right to an assistant and refused to sign the Tier Assistance Selection Form.  Dkt. #65, p.0667.  However, the Superintendent's & Disciplinary Hearings - Witness Interview Sheet dated January 4, 2000 indicates that plaintiff claimed during the hearing that he did not refuse an assistant.  Dkt. #65, p.0665.  Moreover, the hearing transcript reveals that plaintiff claimed that he was sleeping when the Misbehavior Report was served on him and further, that he did not refuse an assistant.  Dkt. #98, pp.5-18.  Defendant Irizarry, found, however, that plaintiff's claims that he was sleeping and that he did not refuse an assistant were not true because the officer who served plaintiff with a copy of the Misbehavior Report (Officer McIntosh) testified during the disciplinary hearing that

plaintiff was awake when he was served and simply refused to sign the form or select

an assistant.  *Id.*; Dkt. #86, ¶ 12.


### Defendant Quinn - January 31, 2001 Tier 3 Hearing

Plaintiff also claims in his amended complaint that defendant Quinn

denied him his right to a staff assistant during his Tier 3 disciplinary hearing that began

on January 31, 2001 and continued on February 5, 2001.  Dkt. #9, pp.6 to 6-A.

According to the Tier Assistance Selection Form, plaintiff was served with a copy of the

Misbehavior Report on January 27, 2001 and indicated on the form that he requested

an employee assistant for the Tier 3 disciplinary hearing.  Dkt. #68, p.0712; Dkt. #87,

¶ 7.  The form reveals that plaintiff identified G. Powers as his first choice for an

assistant and J. Morton and P. Nardi as his second and third choices respectively.  Dkt.

#68, p.0712.  It appears, however, that plaintiff refused to sign the form.  Dkt. #68,

p.0712; Dkt. #87, ¶ 8.  Notwithstanding the foregoing, in support of his motion for

summary judgment, defendant Quinn maintains that the Tier Assistance Selection Form

indicates that plaintiff refused to have Sgt. Morton act as his employee assistant.  Dkt.

#87, ¶ 8.


The disciplinary hearing began on January 31, 2001 at which time plaintiff

objected to the hearing and plead not guilty to both charges.  Dkt. #87, ¶ 9; Dkt. #98,

pp.20-33.  Plaintiff requested to have Sgt. Morton and Deputy Commissioner Annucci to

be called as witnesses.  *Id*.  Thereafter, defendant Quinn adjourned the hearing so that

the witnesses could be located.  *Id*.  The hearing was reconvened on February 5, 2001

and plaintiff refused to attend the hearing.  Dkt. #87, ¶ 10; Dkt. #98, pp.20-33.  Plaintiff

also refused to sign the Waiver of Right to Attend Disciplinary Hearing Form advising

plaintiff that a disposition of the charges would be made in his absence.  Dkt. #68,

p.0713; Dkt. #87, ¶ 10.  The hearing was conducted outside of plaintiff's presence and

Sgt. Morton testified at the hearing.  Dkt. #87, ¶ 15; Dkt. #98, pp.20-33.  Defendant

Quinn denied plaintiff's request to have Deputy Commissioner Annucci testify, finding

that Deputy Commissioner Annucci's testimony would have no bearing on the outcome

of the hearing.  Dkt. #68, p.0711; Dkt. #87, ¶ 11; Dkt. #98, pp.20-33.  Moreover,

because defendant Quinn reviewed the January 8, 2001 letter to Deputy Commissioner

Annucci during the hearing and was able to make a determination as to the threatening,

obscene and abusive language therein, defendant Quinn determined that Deputy

Commissioner Annucci's testimony was not necessary.  Dkt. #87, ¶ 14.  Accordingly,

defendant Quinn maintains that it was in the exercise of his discretion that he denied

plaintiff's request to have Deputy Commissioner testify at the hearing.  *Id*. at ¶ 13.


              In opposition to defendant Quinn's motion for summary judgment, plaintiff

argues that because he was not provided with assistance prior to the Tier 3 disciplinary

hearing, he was unable to obtain evidence from two witnesses prior to the hearing and

therefore unable to prepare a defense to the charges.  Dkt. #96, p.6.  Plaintiff further

insists that he had selected Mr. G. Powers to serve as his assistant, however, according

to plaintiff defendant Quinn "repeatedly badger[ed]" him to select another member of

the prison staff, for example, Sgt. Morton, to serve as his assistant for purposes of the

hearing.  *Id*. at p.7.  Plaintiff's arguments in opposition to defendant Quinn's motion for summary judgment are belied by the clear record before the Court.  Specifically, plaintiff claims that because he was not provided with assistance, he was unable to obtain evidence from the two witnesses he requested at the outset of the hearing, Sgt. Morton, who he allegedly refused to have serve as his assistant, and Deputy Commissioner Annucci.[31]  Despite this claim, defendant Quinn adjourned the hearing on January 31, 2001 in order to locate the witnesses.  When the hearing reconvened on February 5, 2001, plaintiff refused to attend and as a result was not present when Sgt. Morton testified.

Thus, the record before the Court unmistakably establishes that with respect to the Tier 3 disciplinary hearings, plaintiff either received the required assistance, refused the assistance or refused to attend the hearing.  With respect to the Tier 2 hearings, plaintiff was not entitled to assistance and the circumstances presented in the hearings were not so complex that plaintiff was not able to marshal evidence and prepare a defense.  Accordingly, it was unnecessary for the hearing officers in the Tier 2 disciplinary hearings to exercise their discretion and offer plaintiff the opportunity to select an assistant.  For the foregoing reasons, defendants' motion for summary insofar as it relates to plaintiff's claims that he was denied employee assistance during his disciplinary hearings is granted.

---

[31] As discussed above, defendant Quinn exercised his discretion and denied plaintiff's request to have Deputy Commissioner Annucci testify during the hearing.

**Impartiality of Hearing Officer**

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996); *see Wolff v. McDonnell* 418 U.S. 539, 570-71 (1974); *Russell v. Selsky*, 35 F.3d 55, 59 (2d Cir. 1994). An impartial hearing officer "is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir.1990); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen*, 100 F.3d at 259; *see Francis*, 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis*, 891 F.2d at 46. A hearing officer may satisfy the standard of impartiality if there is "some evidence in the record" to support the findings of the hearing. *Superintendent v. Hill*, 472 U.S. 445, 455 (1985).

**Defendant Donahue**

As alleged in the amended complaint, defendant Donahue conducted disciplinary hearings in connection with Misbehavior Reports issued to plaintiff on the following dates: January 11, 2000; November 29, 2000; December 21, 2000; January 29, 2001 and March 7, 2001.  Dkt. #9, pp.6-D to 6-F.  The Court's review of the transcripts of each disciplinary hearing conducted by defendant Donahue does not reveal any evidence of bias.  Dkt. #44, pp.0001-0007 (January 11, 2000); Dkt. #44, pp.0064-0068 (November 29, 2000); Dkt. #44, pp.0081-0086 (December 21, 2000); Dkt. #44, pp.0124-0128 (January 29, 2001); Dkt. #44, pp.0129-0131 (March 7, 2001).  Specifically, with respect to the disciplinary hearing commenced on January 11, 2000 and continued on January 21, 2000, defendant Donahue permitted plaintiff to voice his objections to the hearing, afforded plaintiff the opportunity to testify or to present evidence in his defense, and set forth sufficient evidence in his disposition to support his determination of guilt, including a copy of the letter to Deputy Superintendent Morse from plaintiff.  Dkt. #44, pp.0001-0007.  Defendant Donahue stated that he relied upon the report of Sgt. Kerbein which he found to be credible and on the threatening letter written by plaintiff.  *Id*.  Defendant Donahue further stated that his reasons for the disposition were that it was to serve as a deterrent of future misconduct by plaintiff and others and that the conduct exhibited by plaintiff would not be tolerated.  *Id*.  Plaintiff did not appeal defendant Donahue's determination. Dkt. #86, Exhibit A.

Similarly, during the disciplinary hearing conducted by defendant Donahue on November 29, 2000, defendant Donahue afforded plaintiff the same

opportunity to present testimony or evidence and plaintiff repeatedly exercised his right

to object to the hearing.  Dkt. #44, pp.0064-0068. Plaintiff waived his right to testify or to

present evidence and returned to his cell before defendant Donahue rendered his

determination.  *Id*.   At the close of the hearing, defendant Donahue set forth the

evidence on which he relied to support his determination of guilt.  *Id*.  Specifically, he

relied upon the Misbehavior Report which he found to be credible, as well as the letter

written by plaintiff to Deputy Commissioner LeClaire.  *Id*.  Similar to the January 11,

2000 (continued on January 21, 2000) disciplinary hearing presided over by him,

defendant Donahue stated that his reasons for his disposition were that it was to serve

as a deterrent of future misconduct by plaintiff and others and to reiterate that threats

towards employees would not be tolerated.  *Id*.


              Defendant Donahue conducted a third disciplinary hearing concerning

plaintiff on December 21, 2000.  The Misbehavior Report related to a December 11,

2000 grievance authored by plaintiff and received by the Inmate Grievance Office.  As

set forth in the Misbehavior Report, the grievance contained a number of threatening

statements.  As with the prior two disciplinary hearings conducted by defendant

Donahue, plaintiff was given and did exercise his right to object to the hearing.  Dkt.

#44, pp.0081-0086.  Moreover, defendant Donahue provided plaintiff with the

opportunity to call witnesses to testify during the hearing, other than CORC Director

Egan and DOCS Commissioner Goord.  *Id*.  Defendant Donahue found that neither

Director Egan nor Commissioner Goord would have any information bearing on the

allegations in the Misbehavior Report.  *Id*.  Notably, at no time during the hearing did plaintiff deny that he wrote the December 11, 2000 grievance.  *Id*.  In reaching his determination, defendant Donahue set forth sufficient evidence in his disposition to support his determination of guilt.  *Id*.  Specifically, he relied upon the Misbehavior Report by Officer Morse which he found to be credible and his examination of the grievance containing threats by plaintiff and submitted to the Inmate Grievance Office. *Id*.  Again, defendant Donahue stated, "[t]he disposition is given to serve as a deterrent of future misconduct for this inmate as well as others.  Threats towards staff will not be tolerated at this facility, including in the form of written grievances."  *Id*.

Defendant Donahue next conducted a disciplinary hearing involving plaintiff on January 29, 2001.  Dkt. #44, pp.0124-0128.  During the hearing, he honored plaintiff's request to testify and accepted plaintiff's testimony that he had filed several complaints against Nurse Brandt.  As in previous hearings, plaintiff chose to return to his cell before defendant Donahue rendered his decision.  *Id*.  As set forth in the hearing transcript and on the Hearing Disposition Sheet, defendant Donahue relied on the written report of Nurse Brandt which he found to be credible.  *Id*.  In addition, he noted that during the hearing, plaintiff admitted that he got "active" because Nurse Brandt did not bring him the medication that he wanted.  *Id*.  Defendant Donahue again noted that "[t]he [d]isposition is given to serve as a deterrent of future misconduct for this inmate as well as others.  Inmate Chavis has been found guilty of threats many

times previously."  *Id*.  Defendant Donahue's determination was affirmed by defendant

Wilcox on February 5, 2001.  Dkt. #86, Exhibit A.


          Finally, on March 7, 2001, defendant Donahue conducted a hearing with

respect to a Misbehavior Report issued to plaintiff on February 28, 2001.  Plaintiff

refused to attend the hearing.  Thereafter, defendant Donahue noted that plaintiff

waived his right to attend the hearing, entered a plea of not guilty on plaintiff's behalf

and conducted the hearing in plaintiff's absence.  Dkt. #44, pp.0129-0131.  At the

conclusion of the disciplinary hearing, defendant Donahue found plaintiff guilty of

violating Rules 118.33 (flooding) and 106.10 (refusing a direct order) and imposed the

penalty of 30 days keeplock confinement.  *Id*.  In reaching his determination, he relied

upon the Misbehavior Report of Officer Kamas which he found to be credible and noted

that the disposition was given to serve as a deterrent of future misconduct by plaintiff

and others.  *Id*.  Plaintiff did not appeal defendant Donahue's determination.  Dkt. #86,

Exhibit A.


                         **Defendant Gilmore**

          Defendant Gilmore conducted one Tier 2 disciplinary hearing involving

plaintiff on July 18, 2000.  Plaintiff testified at length during the hearing and defendant

Gilmore honored plaintiff's request to call two inmate witnesses to testify during the

hearing.  Dkt. #44, pp.0045-0063.  In addition, defendant Gilmore honored plaintiff's

request and read into the record a grievance filed by plaintiff against the Correction

Officer involved in the incident that precipitated the Misbehavior Report.  *Id*.  At the

conclusion of the hearing, defendant Gilmore found plaintiff not guilty of violating Rules

107.10 (interference) and Rule 106.10 (refusing a direct order) and guilty of violating

Rule 107.11 (harassment).  *Id*.  Defendant Gilmore imposed a penalty of 10 days

keeplock confinement.  *Id*.


　　　　　Defendant Gilmore noted both on the record and on the Hearing

Disposition Sheet that in reaching his determination, he relied upon the written report of

Officer Burgett as well as the testimony of plaintiff provided during the hearing.  Dkt.

#44, p.0040 and p.0062.  In addition, defendant Gilmore stated among his reasons for

the disposition, that plaintiff deserved credit for "the cooperative spirit he displayed

during [the] hearing."  Dkt. #44, pp.45-63.  Moreover, defendant Gilmore explained to

plaintiff that he found plaintiff not guilty of the charge of disobeying a direct order

because he did not believe that plaintiff disobeyed a direct order without just cause,

since plaintiff felt threatened and chose not to come out of the shower.  *Id*.  Thereafter,

defendant Gilmore noted that plaintiff requested a sergeant and once the sergeant was

present, plaintiff obeyed the direct order and came out of the shower.  *Id*.  In addition,

defendant Gilmore found plaintiff not guilty of the charge of interference because he felt

that plaintiff did what he had to do to protect himself and that he did not interfere with

an employee.  *Id*.  Defendant Gilmore did, however, find plaintiff guilty of harassment

because plaintiff admitted during the hearing that he called Officer Burgett "a scum

bag."  *Id*. at p.0051.

In opposition to defendants' motion for summary judgment, plaintiff argues that defendant Gilmore prejudged the evidence because he found plaintiff guilty of harassment based on a fact that was not alleged in the Misbehavior Report, rather, defendant Gilmore found plaintiff guilty based on an admission plaintiff made during the hearing. Dkt. #96, p.30. Specifically, plaintiff argues that the Misbehavior Report alleges that plaintiff called Officer Burgett "an asshole" whereas during the hearing plaintiff testified that he called Officer Burgett "a scum bag." Dkt. #44, p.0042 and p.0051. Accordingly, plaintiff contends that he should not have been found guilty and that defendant Gilmore's finding of guilt must have been based on "predetermination, bias and undeniably [sic] favoritism for a coworker." Dkt. #96, p.30. As reflected in the disciplinary hearing transcript, defendant Gilmore explained at length the evidence he relied upon and the reasons for his disposition and this Court finds that the record is devoid of any evidence of bias or predetermination. Defendant Gilmore's determination was affirmed by defendant Wilcox on July 30, 2000. Dkt. #86, Exhibit A.

### Defendant Irizarry

Defendant Irizarry conducted a Tier 3 disciplinary hearing on January 4, 2001 concerning a Misbehavior Report issued to plaintiff following the December 21, 2000 disciplinary hearing conducted by defendant Donahue. Dkt. #98, pp.5-18. Defendant Irizarry found plaintiff guilty of violating Rules 102.10 (threats) and 107.11 (harassment) and imposed a penalty of nine months confinement in SHU. Dkt. #65, p.0661; Dkt. #98, pp.5-18. In reaching this determination, defendant Irizarry relied on the Misbehavior Report of defendant Donahue and the testimony of Officer Bennett.

-122-

Dkt. #65, p.0662.  Defendant Irizarry stated that the reason for the disposition was, "[ ] after finding you guilty, I reviewed your Disciplinary Record and found that you have been charged with, and found guilty, of 16 charges of Threats and 12 charges of Harassment.  None of these sanctions helped to modify your behavior.  And [ ] feel this to be a just Disposition."  Dkt. #98, pp.5-18.  Thereafter, on or about February 21, 2001, defendant Selsky modified the penalty imposed to six months SHU confinement.  Dkt. #86, Exhibit A.  In opposition to defendants' motion for summary judgment, plaintiff states, without elaboration, that defendant Irizarry was not impartial.  This Court finds that there is simply nothing in the record before it to support such a conclusion and without more, plaintiff's opposition does not create a material issue of fact for trial.

### Defendant Quinn

Defendant Quinn commenced a Tier 3 disciplinary hearing on January 31, 2001 involving a Misbehavior Report issued to plaintiff by Officer Hodge.  Dkt. #68, p.0710; Dkt. #98, pp.20-33.  The hearing was adjourned and reconvened on February 5, 2001, but plaintiff refused to attend the hearing.  Dkt. #68, p.0709; Dkt. #98, pp.20-33.  Plaintiff also refused to sign the Waiver of Right to Attend Disciplinary Hearing Form advising plaintiff that a disposition of the charges would be made in his absence.  Dkt. #68, p.0713.  Thereafter, the hearing was conducted in plaintiff's absence and as set forth on the Hearing Disposition Sheet, defendant Quinn found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of 12

months SHU confinement.  Dkt. #68, p.0708; Dkt. #98, pp.20-33.  In reaching his

determination, defendant Quinn relied on the written report of Officer Hodge and the

handwritten letter from plaintiff to Deputy Commissioner Annucci wherein defendant

Quinn found that plaintiff made harassing statements.  *Id*.  As his reasons for the

disposition, defendant Quinn stated, "[t]his Disposition is given to serve notice that

threatening employees and harassing them will not be tolerated. This Disposition is

given to punish this inmate for threatening employees and should also act as a

deterrent to others."  Dkt. #98, pp.20-33.  Plaintiff's opposition to defendants' motion for

summary judgment states, in conclusory fashion, that defendant Quinn's failure to

interview witnesses with relevant information is illustrative of defendant Quinn's

undeniable bias, racism and partiality.  Dkt. #96.


             During the disciplinary hearing, plaintiff requested to have inmate Smith

and Deputy Commissioner Anthony J. Annucci testify on his behalf.  Dkt. #98, pp.20-33.

Plaintiff claimed that Inmate Smith would testify concerning his selection of an assistant

and that plaintiff did not refuse an assistant, rather, he did not select J. Morton as his

assistant.  *Id*.  Plaintiff also testified on January 31, 2001 that he requested to have

Deputy Commissioner Anthony J. Annucci as a witness.  Deputy Commissioner

Annucci was the intended recipient of the January 8, 2001 letter authored by plaintiff

that was the subject of the January 27, 2001 Misbehavior Report.  As the hearing

transcript reveals, because plaintiff was being uncooperative at the outset of the

hearing and was insisting on an assistant despite the fact that he had purportedly

refused the assistant prior to the hearing, the hearing was adjourned.  Thereafter,

plaintiff refused to attend the hearing which resumed on February 5, 2001.  During the February 5, 2001 continuation of the hearing, Sgt. Morton testified that he had been assigned to assist plaintiff and plaintiff refused.  Because plaintiff refused to attend the hearing, although he had previously indicated he had two witnesses to testify, there were no other witnesses to interview, thus, plaintiff's claim that defendant Quinn's failure to interview witnesses was illustrative of his bias, racism and partiality is wholly without merit.

### Defendant Ryan

Defendant Ryan conducted a Tier 2 disciplinary hearing on January 25, 2000 in connection with a January 14, 2000 Misbehavior Report issued by defendant vonHagn.  Dkt. #44, p.0026.  At the conclusion of the hearing, defendant Ryan found plaintiff guilty of violating Rules 107.10 (interference) and 107.11 (harassment) and imposed a penalty of 30days keeplock confinement, 30 days loss of packages, commissary and phone privileges.  *Id*.  In reaching his determination, defendant Ryan relied on the Misbehavior Report and the testimony of Officer Martino who witnessed the January 14, 2000 incident.  *Id*. at p.0027.  Defendant Ryan explained that he had imposed the penalty to serve as a reminder that the type of behavior plaintiff exhibited towards defendant vonHagn would not be tolerated.  Dkt. #44, pp.0153-0159.  In support of his motion for summary judgment, defendant Ryan notes that plaintiff did not deny that he used abusive language toward defendant vonHagn or that he threatened defendant vonHagn.  Dkt. #44, pp.0032-0038.  Plaintiff argues in opposition to defendants' motion for summary judgment that defendant Ryan endorsed (forged) the

name of the officer (Officer Martino) on the Misbehavior Report because, plaintiff alleges, Officer Martino refused to do so.  Dkt. #96, pp.30-34.  In stark contrast to plaintiff's allegation, Officer Martino testified via telephone at the disciplinary hearing that he had indeed witnessed the incident and at no time did Officer Martino state that he had refused to endorse the Misbehavior Report.  Dkt. #44, pp.0153-0159. Defendant Captain Wilcox affirmed defendant Ryan's determination, finding that there was no evidence of retaliatory acts committed by defendant vonHagn; that defendant Ryan properly called Officer Martino to testify; that plaintiff was not confined pending the hearing; that a witness may testify by telephone; and most notably, that there was no evidence of partiality, bias, racism, vindictiveness, threats or misconduct on the part of defendant Ryan.  Dkt. #44, p.0024; Dkt. #92, ¶ 31.  Thus, plaintiff's assertions that defendant Ryan was biased or impartial because he had allowed Officer Martino to testify via telephone and that defendant Ryan endorsed the Misbehavior Report because Officer Martino had refused are unsupported by the record before this Court.


### Defendant Sheahan

The Tier 3 disciplinary hearing conducted by defendant Sheahan began on December 26, 2000 and continued on December 29, 2000.  Dkt. #44, pp.0160-0199. At the outset of the hearing, plaintiff plead not guilty and objected to the Misbehavior Report on the ground that it was issued in retaliation for the 20 to 25 grievances he had filed against defendant vonHagn.  *Id*.  During the hearing, plaintiff submitted copies of the grievances he filed against defendant vonHagn, as well as copies of correspondence to Superintendent McGinnis, Deputy Commissioner Annucci and

-126-

Commissioner Goord. *Id*. Defendant Sheahan accepted the grievances as evidence of plaintiff's allegations of retaliation and accordingly, found that the testimony of Director Egan, as requested by plaintiff, would have been redundant. *Id*. At the conclusion of the hearing, defendant Sheahan found plaintiff guilty of violating Rules 107.11 (harassment) and Rule 102.10 (threats) and imposed a penalty of six months SHU confinement. Dkt. #44, p.0101. In reaching this determination, defendant Sheahan relied upon the December 13, 2000 Misbehavior Report and determined that the evidence submitted by plaintiff did not establish that the Misbehavior Report issued by defendant vonHagn was retaliatory. Dkt. #44, pp.0160-0199. Defendant Sheahan imposed a penalty of six months confinement in SHU and stated that the penalty was imposed to impress upon plaintiff that threats to staff would not be tolerated. Dkt. #44, pp.0160-0199. Thereafter, defendant Selsky affirmed defendant Sheahan's determination. Dkt. #86, Exhibit A. In support of his motion for summary judgment, defendant Sheahan states that plaintiff did not deny that he used abusive language toward defendant vonHagn. *Id*. In opposition to defendant's motion for summary judgment, plaintiff claims that defendant Sheahan's denial of his requested witness, CORC Director Egan and defendant Sheahan's finding that the grievances submitted by plaintiff did not establish a retaliatory motive are illustrative of defendant Sheahan's bias. Dkt. #96, pp.18-24. As the record before this Court unmistakably demonstrates, defendant Sheahan accepted the grievances submitted by plaintiff as evidence of his claim of retaliation and found that the proposed testimony of Director Egan, that the grievances submitted by plaintiff were "exhausted," would have been redundant. Thus,

plaintiff's claim that defendant Sheahan's denial of plaintiff's witness demonstrates defendant Sheahan's bias is wholly without any basis in fact.

Here, plaintiff's bare, conclusory allegations of bias and prejudgment, without more, are insufficient to defeat defendants' motion for summary judgment.  As reflected in the Hearing Disposition Sheets and hearing transcripts, each of the hearing officers based their determinations on the Misbehavior Reports, testimony of plaintiff, testimony of witnesses present during the incidents, and the documentary evidence, often including letters written by plaintiff.  Additionally, as noted above, the hearing officers' determinations were frequently based on plaintiff's admissions made during the hearing or plaintiff's failure to deny that he had used the abusive, threatening or harassing language charged in the Misbehavior Reports.

The record before the Court unequivocally establishes that defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan were neither biased nor prejudged the evidence.  To the contrary, each hearing officer based his finding of guilt on the credible evidence presented during the hearing and each made an objectively reasonable determination based on the evidence.  Thus, the Court agrees with defendants that plaintiff has failed to meet his burden of demonstrating that defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan were so partial so as to violate plaintiff's due process rights.  Accordingly, defendants' motion for summary judgment on plaintiff's due process claims based on bias, prejudgment and impartiality is granted.

-128-

**Denial of Witness Testimony**

In *Wolff v. McDonnell*, the Supreme Court of the United States determined

that,

> [an] inmate facing disciplinary proceedings should be
> allowed to call witnesses and present documentary evidence
> in his defense when permitting him to do so will not be
> unduly hazardous to institutional safety or correctional goals.

418 U.S. at 566.  In reaching this conclusion, the Court recognized that,

> [p]rison officials must have the necessary discretion to keep
> the hearing within reasonable limits and to refuse to call
> witnesses that may create a risk of reprisal or undermine
> authority, as well as to limit access to other inmates to
> collect statements or to compile other documentary
> evidence.

*Id.*  In exercising that discretion, prison officials must be able to,

> explain, in a limited manner, the reason why witnesses were
> not allowed to testify, . . . either by making the explanation a
> part of the 'administrative record' in the disciplinary
> proceeding, or by presenting testimony in court if the
> deprivation of a 'liberty' interest is challenged because of
> that claimed defect in the hearing.  In other words, the prison
> officials may choose to explain their decision at the hearing,
> or they may choose to explain it 'later.'

*Ponte v. Real*, 471 U.S. 491, 497 (1985).  A hearing officer may rationally exclude

witnesses or documents when they would be irrelevant or unnecessary to a

determination of the issues in the disciplinary hearing.  *Kalwasinski v. Morse*, 201 F.3d

103, 109 (2d Cir. 1999).  The burden is on the prison official to demonstrate "the

rationality of his position."  *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir. 1990).

During several of the disciplinary hearings discussed above, plaintiff claims that he was denied due process because his requests to have certain witnesses testify during the hearings were denied.  Specifically, plaintiff claims that: (1) defendant Donahue during the December 21, 2000 disciplinary hearing denied plaintiff's requests to have CORC Director Thomas Egan and DOCS' Commissioner Goord testify; (2) during the December 26, 2000 disciplinary hearing, defendant Sheahan denied plaintiff's request to have CORC Director Egan testify; (3) during the January 4, 2001 disciplinary hearing, defendant Irizarry denied plaintiff's requests to have DOCS' Commissioner Goord and Associate Commissioner Chapman testify; and, (4) defendant Quinn denied plaintiff's request to have Deputy Commissioner Annucci testify during a February 5, 2001 disciplinary hearing.

### Defendant Donahue

During plaintiff's December 21, 2000 Tier 2 disciplinary hearing, defendant Donahue denied plaintiff's request to call CORC Director Thomas Egan and DOCS' Commissioner Goord as witnesses.  The hearing transcript does not provide any insight as to why plaintiff requested to have Director Egan and Commissioner Goord testify, because plaintiff refused to elaborate on his statements that both witnesses had "a lot or everything to do with the ticket ."  Dkt. #44, pp.0081-0086.  The gravamen of the Misbehavior Report was statements made in a grievance filed by plaintiff.  Neither Director Egan nor Commissioner Goord were mentioned in the grievance; neither were present at Southport when the grievance was received nor had any knowledge of plaintiff's grievance.  Dkt. #92, p.29.  Accordingly, defendant Donahue denied plaintiff's

request and properly prepared a Witness Interview Sheet noting the reason for denying

the request, "Mr. Egan [and] Commissioner Goord denied as not having material

testimony."  Dkt. #44, p.0091.


### Defendant Sheahan

Defendant Sheahan conducted a Tier 3 disciplinary hearing that began

on December 26, 2000 and continued on December 29, 2000.  During the hearing,

plaintiff requested to have Director Egan testify that the grievances submitted by

plaintiff were "exhausted."  Dkt. #44, p.0105.  Defendant Sheahan denied plaintiff's

request because he had previously accepted the grievances submitted by plaintiff as

evidence and acknowledged that some of the grievances had been exhausted and

based on the foregoing, determined that Director Egan's testimony would be redundant.

*Id*.  Defendant Sheahan properly prepared a Witness Interview Sheet detailing plaintiff's

request and the reasons for his denial.  *Id*.  Specifically, the Witness Interview Sheet

states,

> T. Eagen [sic] IGRC - Albany - (Requested by Inmate).  For
> verification of past submitted Grievances that he he [sic] has
> submitted concerning inadequate medical care by the facility
> and requests to have RN S. VonHagn kept away from [sic].
> This hearing officer accepted the inmates [sic] evidence
> (grievances) that he brought to the hearing as being
> submitted and determined that Mr. Eagans [sic] testimony
> would be redundant as I have already accepted what the
> correlation [sic] that the (illegible) was received in retaliation
> of these grievances.

Dkt. #44, p.0105.

### Defendant Irizarry

During the Tier 3 disciplinary hearing conducted on January 4, 2001, defendant Irizarry denied plaintiff's request to have Commissioner Goord and Associate Commissioner Chapman testify on his behalf.  The hearing resulted from a Misbehavior Report issued by defendant Donahue following the December 21, 2000 disciplinary hearing.  Dkt. #65, p.0664.  Defendant Irizarry denied plaintiff's request because neither Commissioner Goord nor Associate Commissioner Chapman were present at Southport at the time of the incident and accordingly, their testimony was not relevant to the hearing.  *Id*. at p.0666.  Defendant Irizarry properly prepared a Witness Interview Sheet setting forth his reasons for denying plaintiff's request, "[y]our witnesses, G. Goord Commissioner and W. Chapman Asso. Comm. were denied because their testimony is not relevant to this hearing they were neither present nor in this facility at the time of this [sic] charges was [sci] written or when this incident happened."  Dkt. #65, p.0666.

### Defendant Quinn

Defendant Quinn conducted a Tier 3 disciplinary hearing concerning plaintiff on February 5, 2001.  Dkt. #98, pp.20-33.  During the hearing, plaintiff requested to have Sgt. Morton and Deputy Commissioner Annucci testify.  *Id*.  Sgt. Morton testified telephonically.  However, as discussed above, plaintiff refused to attend the hearing.  *Id*.; *see also* pp.55-59 *supra*.  With respect to Deputy Commissioner Annucci, defendant Quinn denied plaintiff's request to have him testify because, according to defendant Quinn, his testimony would have no bearing on the outcome of

the hearing.  Dkt. #68, p.0711.  Prior to rendering his decision, defendant Quinn

reviewed the correspondence from plaintiff to Deputy Commissioner Annucci which was

the subject of the Misbehavior Report.  Dkt. #68, pp.0716-0718.  After reviewing the

letter, defendant Quinn determined that the letter indeed contained threatening,

obscene and abusive language and that testimony from Deputy Commissioner Annucci

was not necessary to determine whether plaintiff's correspondence contained threats,

abusive or harassing language.  Dkt. #87, ¶ 14.


        In the instant case, as detailed above, defendants Donahue, Sheahan,

Irizarry and Quinn informed plaintiff of their respective decisions for denying plaintiff's

requests for testimony. The decisions by defendants Donahue, Sheahan, Irizarry and

Quinn to deny the requested testimony were reasonable.  With respect to defendant

Donahue and defendant Quinn, the issue to be decided at the disciplinary hearing was

whether plaintiff wrote the grievance/letter and whether they contained threats, abusive

and/or harassing language.  Thus, in the case of defendant Donahue, unspecified

testimony from Director Egan and Commissioner Goord, who were neither mentioned in

the grievance nor present at Southport when the grievance was received, is irrelevant.

Similarly, with respect to defendant Quinn, testimony from Deputy Commissioner

Annucci, the intended recipient of the letter, is equally irrelevant.


        Plaintiff's complaint against defendant Sheahan, that his request to have

Director Egan testify that the grievances submitted by plaintiff were exhausted was

improperly denied, must also fail.  As reflected in the Witness Interview Sheet

completed by defendant Sheahan, defendant Sheahan found that such testimony

would be redundant because he had accepted the grievances submitted by plaintiff as

evidence and acknowledged that some of the grievances had been exhausted.  Finally,

defendant Irizarry properly denied plaintiff's request to have Commissioner Goord and

Associate Commissioner Chapman testify because such testimony would not be

relevant.  Neither Commissioner Goord nor Associate Commissioner Chapman were at

Southport at the time of the incident alleged in the Misbehavior Report.  Accordingly,

plaintiff's claim that because defendants Donahue, Sheahan, Irizarry and Quinn

improperly denied his requests to have certain witnesses testify during the disciplinary

hearings, his due process rights were violated must fail as a matter of law.


### Ejection from Hearing

An inmate does not possess a constitutional right to confront or cross-

examine witnesses in prison disciplinary hearings.  *Wolff*, 418 U.S. at 567-68;

*Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir. 1999); *Silva v. Casey*, 992 F.2d 20,

22 (2d Cir. 1993).  Thus, "[p]rison inmates do not possess a constitutional right[32] to be

present during the testimony of witnesses during a disciplinary proceeding." *Francis v.

Coughlin*, 891 F.2d 43, 48 (2d Cir. 1989); *Bogle v. Murphy*, No. 98-CV-6473 CJS, 2003

---

[32] Although N.Y.Comp.Codes R. & Regs. tit. 7, § 254.5 affords inmates the right to "be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals," state rules and regulations do not necessarily support viable due process claims under § 1983. *See Davis v. Scherer*, 468 U.S. 183, 194 (1984); *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995);  *Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir.), *cert. denied,* 484 U.S. 896 (1987); *Dawes v. Leonardo*, 885 F.Supp. 375, 377-78 (N.D.N.Y.), *aff'd* 71 F.3d 406 (1995).

WL 22384792 (W.D.N.Y. Sep. 9, 2003) (plaintiff's ejection from his disciplinary hearing was not a due process violation).  On more than one occasion as discussed above, plaintiff was removed from a disciplinary hearing, voluntarily requested to leave a disciplinary hearing before its conclusion or refused to attend a disciplinary hearing.  To the extent that buried within one of plaintiff's many claims is a claim that his voluntary or involuntary removal from a disciplinary hearing constituted a denial of his due process rights, that claim must fail.  On those occasions when plaintiff was involuntarily removed from the disciplinary hearing by the hearing officer because he was being disruptive and uncooperative during the hearing, such a circumstance does not give rise to a due process claim.  On the other occasions where plaintiff either refused to attend the disciplinary hearing or elected to leave the hearing before its conclusion that likewise does not give rise to a due process claim.  Thus, this Court finds that to the extent plaintiff is claiming that his absence from a disciplinary hearing, whether voluntary or involuntary, violated his right to due process, such a claim must fail as a matter of law.


### Reversal of Determination Not Indicative of Due Process Violation

Plaintiff has alleged that he was denied due process by defendant Quinn at his February 5, 2001 Tier 3 disciplinary hearing because defendant Quinn's determination was later overturned by defendant Selsky.  Dkt. #9, p.6-I.  The February 5, 2001 Tier 3 disciplinary hearing, discussed at length above, *see* pp.55-59 *supra*, was a continuation of a hearing that commenced on January 31, 2001.  Dkt. #87, ¶ 9. After entering a plea of not guilty to both charges, plaintiff requested to have two witnesses testify and the hearing was adjourned to locate one of the witnesses.  *Id*.

When the hearing was reconvened on February 5, 2001, plaintiff refused to attend the hearing and refused to sign the Waiver of Right to Attend Disciplinary Hearing Form which advised him that a disposition of the charges would be made in his absence. *Id*. at ¶ 10.  Thereafter, the hearing was conducted outside of plaintiff's presence. *Id*. at ¶ 11.

Following the hearing, defendant Quinn found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of twelve months SHU confinement to run from September 27, 2002 to September 27, 2003. *Id*. at ¶ 16.  In reaching this determination, defendant Quinn relied on the Misbehavior Report and on the hand-written letter from plaintiff, wherein he made harassing statements to Deputy Commissioner Annucci. *Id*. at ¶ 17.  As discussed above, plaintiff alleged that he never received a copy of the hearing disposition and commenced an Article 78 proceeding in New York Supreme Court, Chemung County challenging the February 5, 2001 disposition. *Id*. ¶ 18.  In his petition, plaintiff admitted that he did not attend the February 5, 2001 hearing, but stated that he did not refuse to attend the hearing and did not learn of the disposition until June 26, 2001. *Id*.  On February 25, 2002, Justice Castellino determined that plaintiff never received a copy of the February 5, 2001 determination and granted plaintiff leave to file an administrative appeal. *Id*. at ¶ 19.

By letter dated March 8, 2002, plaintiff submitted an administrative appeal of defendant Quinn's February 5, 2001 determination to defendant Selsky. *Id*. at ¶ 20. Plaintiff argued in his appeal that defendant Quinn denied him an employee assistant; denied him the right to attend the hearing; and refused to call Deputy Commissioner Annucci as a witness. *Id*. Plaintiff further alleged that defendant Quinn was biased and refused to let plaintiff see the January 8, 2001 correspondence. Since he never received a copy of the disposition, he was unaware of the penalty imposed. *Id*. On April 26, 2002, Defendant Selsky reversed defendant Quinn's February 5, 2001 determination because the record did not clearly establish that plaintiff received a copy of the disposition within 24 hours and because of defendant Quinn's failure to interview a requested witness who may have provided relevant testimony. *Id*. at ¶ 21. Notably, defendant Selsky reversed defendant Quinn's determination several months <u>before</u> plaintiff was ordered to begin serving his penalty. *Id*. at ¶ 22. Thus, plaintiff did not serve a single day of the penalty imposed by defendant Quinn.

It is well-settled that where, as here, a disciplinary determination has been reversed and expunged before an inmate begins to serve the penalty imposed, the inmate's due process rights have not been violated. *Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir. 1992) (*per curiam*), *cert. denied*, 510 U.S. 837 (1993). Following a disciplinary hearing, Young had been found guilty of violating certain prison rules and a penalty of 180 days SHU confinement, suspension of commissary and package privileges was imposed by the hearing officer and the hearing officer further

recommended a loss of six months good time.  Young appealed the hearing officer's

determination and Director Selsky reversed the determination, vacated the penalty and

recommended loss of good time and ordered the hearing records be expunged.

Thereafter, Young commenced a section 1983 suit against the hearing officer alleging a

denial of due process because he was (1) barred from his disciplinary hearing; (2)

prevented from calling witnesses on his behalf; and (3) denied an impartial hearing

officer.  The District Court found that plaintiff had been denied his right to call witnesses

at a disciplinary hearing and awarded plaintiff nominal damages of one dollar.  In

addition, the District Court granted the hearing officer's motion for summary judgment

with respect to Young's claims that he was improperly excluded from the hearing and

that the charges were not heard by an impartial hearing officer.  The Second Circuit

reversed finding that the determination rendered at the disciplinary hearing had been

reversed and expunged before Young had even begun to serve his penalty.  In making

this finding, the Second Circuit reasoned that, "on account of the administrative reversal

of [the hearing officer's] decision, Young was never penalized on the charges ....

Therefore, he suffered no interference with a liberty interest and has no valid claim for

relief."  *Id*.


        Accordingly, following the same reasoning set forth in *Young*, because

defendant Quinn's determination was reversed and expunged before plaintiff began

serving the penalty imposed, plaintiff suffered no interference with a liberty interest and

any claim that defendant Quinn denied him due process must fail as a matter of law.

**Administrative Appeal**

In his amended complaint, plaintiff claims that defendants W. Wilcox and D. Selskey [sic], violated his due process rights under the Fourteenth Amendment to the United States Constitution.  Dkt. #9, pp.6-H to 6-I.  Specifically, plaintiff claims that on January 21, 2000, January 25, 2000, July 18, 2000, July 30, 2000, November 29, 2000, December 22, 2000, December 31, 2000, January 30, 2001 and March 8, 2001, defendant Wilcox violated his due process rights in connection with his appeal of each of the hearing officer's determinations.  Plaintiff claims that as a result he suffered 270 days of cell confinement and a loss of $45 ($5 each for each finding of guilt).  Similarly, as against defendant Selsky, plaintiff alleges that on February 21, 2001, defendant Selsky violated his due process rights by "modifying a disposition dated 1-4-00 (not 1-4-01)" and as a result, plaintiff suffered "a 6-month SHU-punative [sic] segregation sentence."  Dkt. #9, pp.6-H to 6-I.  In addition, plaintiff alleges that defendant Selsky violated his due process rights on February 9, 2001 because he affirmed a "bias [sic] disposition, where [plaintiff] suffered no witnesses, nor had all of my evidence been allowed at partial (unfair) hearing." Id.


In the amended complaint, plaintiff alleges that in connection with his administrative appeals of eleven hearing determinations, defendants Wilcox and Selsky violated his federal constitutional right to due process.  Specifically, plaintiff alleges that on January 21, 2000, January 25, 2000, July 18, 2000, July 30, 2000, November 29, 2000, December 31, 2000, December 22, 2000, March 8, 2001 and January 30, 2001, defendant Wilcox violated his due process rights.  As discussed above, a review of

plaintiff's disciplinary history (Dkt. #86, Exhibit A) and the documents produced by

defendants during the course of discovery (Dkt. ## 44, 65, 68, and 70), do not reveal a

disciplinary hearing or appeal that was held, filed or decided on July 30, 2000,

December 31, 2000, and March 8, 2001[33].  Each of the other dates correspond to either

a hearing date or an appeal date, January 21, 2000 (hearing date) (hearing

commenced on January 11, 2000), (defendant Donahue); January 25, 2000 (hearing

date, defendant Ryan); July 18, 2000 (hearing date, defendant Gilmore); November 29,

2000 (hearing date, defendant Donahue); December 22, 2000 (appeal date),

(December 21, 2000 hearing date, defendant Donahue); and January 30, 2001 (appeal

date), (January 29, 2001 hearing date, Donahue).  Each of the aforementioned

hearings was discussed at length above and none of the defendant hearing officers

violated plaintiff's constitutionally protected due process rights.  Accordingly, because

none of the hearing officers violated plaintiff's due process rights in conducting the Tier

2 and Tier 3 disciplinary hearings, the Court agrees with defendants that there can be

no basis for concluding that defendant Wilcox violated plaintiff's due process rights by

affirming the hearing determinations.


        With respect to defendant Selsky, plaintiff claims that on February 9,

2001, defendant Selsky violated his due process rights by affirming a December 29,

2000 determination by defendant Sheahan.  Dkt. #9, p.6-I.  For the reasons stated

above concerning plaintiff's claims against defendant Wilcox and because there is

---

        [33] As discussed above, a disciplinary hearing did take place on March 7, 2001,
however, plaintiff did not appeal that determination.

nothing in the record to support the conclusion that defendant Sheahan violated

plaintiff's due process rights in conducting the December 26 and 29, 2000 disciplinary

hearing, plaintiff's claim against defendant Selsky simply because he affirmed the

determination issued by defendant Sheahan fails as a matter of law.  Similarly,

plaintiff's claim against defendant Selsky because he modified the penalty imposed

following a January 4, 2001 disciplinary hearing conducted by defendant Irizarry must

also fail.  The disciplinary hearings conducted by defendants Sheahan and Irizarry have

been discussed at length above.  There is nothing in the record before this Court to

support the conclusion that either defendant Sheahan or defendant Irizarry violated

plaintiff's due process rights.  Accordingly, defendant Wilcox's decisions affirming the

hearing officers' determinations and defendant Selsky's decisions affirming or modifying

the results of the disciplinary hearings do not, standing alone, establish a federal

constitutional violation.  *See Hameed v. Mann*, 57 F.3d 217, 224 (2d Cir. 1995) (Selsky

entitled to dismissal of claims where plaintiff failed to establish constitutional violations

at disciplinary hearing).


**Denial of Right to Take Religious Correspondence Course Claim**

It is well settled that the personal involvement of defendants in an alleged

constitutional deprivation is a prerequisite to an award of damages under § 1983.

*Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)*; Colon v. Coughlin*, 58 F.3d 865,

873 (2d Cir. 1995); *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060,1065 (2d Cir.

1989).  Personal involvement may be shown by evidence that: (1) the defendant

participated directly in the alleged constitutional violation; (2) was informed of the

violation and failed to remedy the wrong; (3) created or permitted the continuation of a

policy or custom under which unconstitutional practices occurred; (4) was grossly

negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited

deliberate indifference to the rights of inmates by failing to act on information indicating

unconstitutional acts were occurring.  *Colon*, 58 F.3d at 873, *citing Wright v. Smith*, 21

F.3d 496, 501 (2d Cir. 1994).


In the instant case, plaintiff alleges that on or about November 2, 1999, he

received an information packet concerning religious training and that defendant

Gardner informed him that he could not take any correspondence courses.  Dkt. #9,

pp.5-B to 5-C; Dkt. #94, ¶ 7.  As a result, plaintiff filed Grievance No. SPT-17423-99 on

or about November 16, 1999.  Dkt. #44, p.0250.  In response to the Grievance, the

IGRC advised plaintiff that pursuant to recent decisions by CORC, plaintiff may not

participate in any correspondence courses/programs while at Southport and further

advised plaintiff to contact the education supervisor once he is transferred to a general

confinement facility.  Dkt. #94, ¶ 8; Dkt. #44, p.0251.  Thereafter, the Superintendent

concurred with the IGRC recommendation stating that there are no provisions in either

the facility policy or DOCS Directive No. 4933 that allow SHU inmates to participate in

any correspondence courses.  Dkt. #44, p.0254; Dkt. #94, ¶ 10.  Plaintiff appealed to

CORC which issued its decision concurring with the Superintendent on or about

January 19, 2000.  Dkt. #44, p.0246; Dkt. #94, ¶ 11.  In its determination, CORC cited

its prior decision in SPT-14519-98 dated August 26, 1998 which stated in part, "[t]he

present policy will remain [sic] effect. There are no outside correspondence courses allowed in this facility." Dkt. #44, p.0254; Dkt. #94, ¶ 12. CORC also cited its decision in SPT-7594-94 issued September 15, 1994, which states in part, "CORC concurs with the Superintendent in that the grievant may not participate in any correspondence course due to the logistical problems related to housing in Southport C.F." *Id.*

Thus, defendant Gardner did not deny plaintiff the right to take a religious correspondence course. Rather, any such denial was the result of DOCS policy as set forth by the Superintendent and CORC. As the Senior Mail and Supply Clerk, defendant Gardner "had no authority to set any policy for DOCS or Southport and no authority to determine whether an inmate may take any correspondence course or otherwise engage in educational or religious activities." Dkt. #92, p.53. Accordingly, because defendant Gardner did not make any policy preventing plaintiff from taking a religious correspondence course, plaintiff's claim against her must fail as a matter of law.

**Interference with Legal Mail Claim**

DOCS Directive Nos. 4421 (Privileged Correspondence), 7 N.Y.C.R.R. Part 721 and 4422 (Inmate Correspondence Program), 7 N.Y.C.R.R. Part 720, set forth DOCS' policy regarding inmate mail correspondence. Dkt. #94, ¶ 25. Legal mail which is clearly marked as such and is from an attorney is not to be opened by the mailroom outside the presence of the inmate. If, however, privileged correspondence is opened

in error outside the presence of the inmate, documentation of the error should be

maintained.  7 N.Y.C.R.R. §§ 721.2(2), 721.3(b)(1) and (2).  Pursuant to 7 N.Y.C.R.R.

§§ 720.2(b), 720.4(a), general correspondence between an inmate and someone other

than a person approved for legal correspondence will be opened and inspected for

cash, checks, money orders, printed or photocopied materials or contraband.  An

inmate is not required to be present during the inspection of incoming general mail.  7

N.Y.C.R.R. §§ 720.2(b), 720.4(a).

> It is accepted that a prisoner must be present when, for
> whatever reason, legal mail (clearly marked as such) is
> opened by prison officials ... and th[e] Constitution
> guarantees a prisoner [ ] 'reasonable access to the courts.'
> *Standley v. Lyder*, 99 Civ 4711, 2001 WL 225035, at *2
> (S.D.N.Y. March 6, 2001) (internal citation omitted) *(citing
> Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986))
> (*citing Bounds v. Smith*, 430 U.S. 817, 821-23, 97 S. Ct.
> 1491, 52 L.Ed.2d 72 (1977).  In order '[t]o prevail on a claim
> of interference with legal mail, a plaintiff must show that a
> pending or anticipated legal action was prejudiced by the
> alleged interference.' *Standley*, 2001 WL 225035, at *2
> (*quoting Morgan v. Montanye*, 516 F.2d 1367, 372 (2d Cir.
> 1975) and *Herrera v. Scully*, 815 F.Supp 713, 725 (S.D.N.Y.
> 1993)).

*Govan v. Campbell*, 289 F.Supp.2d 289, 297 (N.D.N.Y. 2003).  Moreover, the Second

Circuit has dismissed claims where only sporadic interference with mail was alleged

and further, where a plaintiff does not allege actual prejudice to his ability to vindicate

his legal claim.  *Standley v. Lyder*, 99 Civ 4711, 2001 WL 225035, at *2 (S.D.N.Y. Mar.

7, 2001); *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986).

Plaintiff claims that in or about November 1999 and December 1999, defendant Gardner interfered with and opened his legal mail.  Dkt. #9, pp/5-B to 5-C. Plaintiff filed Grievance No. SPT-17276-99 alleging that his incoming legal mail was censored and opened by the mail room clerk even though the envelope was marked "Legal Mail."  Dkt. #44, p.0262.  In response, K. Washburn, Mailroom Clerk, informed the IGRC that legal mail which is clearly marked and from an attorney, is not to be opened by the mailroom.  Dkt. #44, p.0268; Dkt. #94, ¶ 20.  As explained by Ms. Washburn, the letter that is the subject of Grievance No. SPT-17276-99 was in an envelope that was completely handwritten (unlike mail from attorneys), the sender's name was illegible and that because the sender's name could not be verified as a legitimate legal entity, the mail was opened.  *Id*.  Ms. Washburn further stated that whenever legal mail is opened in error, the envelope is stamped by the mailroom to let the inmate know that it was opened in error.  *Id*.  The Superintendent denied plaintiff's grievance and CORC concurred with the Superintendent's determination, stating that contrary to plaintiff's allegations, facility staff had acted consistent with department policy.  Dkt. #44, p.0259; Dkt. #94, ¶ 23.

Plaintiff's amended complaint is devoid of any claim that he suffered actual injury as a result of alleged interference with his legal mail.  Thus, in the absence of any facts to demonstrate that his access to the courts was impaired or that he was otherwise prejudiced by the opening of a single envelope, plaintiff's claim against defendant Gardner must fail as a matter of law.

-145-

## Interference with Access to the Courts Claim

Although prisoners retain the constitutional right to meaningful access to the courts, prisoners alleging a violation of this right in the context of a section 1983 action must demonstrate actual harm, e.g., that a "nonfrivolous legal claim had been frustrated or was being impeded."  *Lewis v. Casey*, 518 U.S. 343, 353, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (footnotes omitted); *see Bounds v. Smith*, 430 U.S. 817, 823, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).  Here, plaintiff claims that on September 13, 2000 and June 12, 2001, defendants Corcoran and Weingartner respectively, violated his constitutional right of access to the courts.  Dkt. #9, pp.5-D to 5-E.  Plaintiff alleges that defendant Corcoran denied plaintiff access to vouchers and certified mail receipts contained in plaintiff's sealed property bags.  *Id*. at p.5-D.  As a result, plaintiff alleges that Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed.  *Id*.  As against defendant Weingartner, plaintiff alleges that he was denied an "advanced certified mailing request" for legal mail to the Attorney General in relation to Claim No. 99509 pending before the New York State Court of Claims.  *Id*. at p.5-E.  Plaintiff further claims that a "manilla envelope containing the material" had been kept from him "until the expiration of my time to respond by certified mail - return receipt - requested to the Attorney General."  Dkt. #9, p.5-E.

### Defendant Michael P. Corcoran

As a threshold matter, defendant Corcoran has no recollection of plaintiff's claim that he denied plaintiff access to the Court of Claims by denying plaintiff access to

vouchers and/or certified mailing receipts sealed in plaintiff's stored property bags.  Dkt. # 90, ¶ 7.  In his affidavit in support of his motion for summary judgment, defendant Corcoran recounts an incident where, after plaintiff's transfer to Southport from Coxsackie in May 2000, plaintiff submitted a claim concerning certain property that was missing.  Dkt. #90, ¶¶ 8-19.  On or about May 25, 2000, plaintiff submitted a claim that certain property had been stolen.  Dkt. # 90, ¶ 10 and Exhibit A.  The record before this Court establishes that plaintiff made no claim that any legal papers or receipts were missing from his property bags when plaintiff was transferred to Southport from Coxsackie in or about May 2000.  *Id*. at ¶ 11.  Notably, however, plaintiff did not claim that any legal documents, vouchers or certified mail receipts were stolen or missing.  *Id*. at ¶ 11.  Defendant Corcoran advised plaintiff that all claims must be supported by purchase invoices or package room receipts to establish proof of ownership and that failure to establish proof of ownership may result in denial of his claim.  *Id*. at ¶ 13.


On or about August 3, 2000, defendant Corcoran advised plaintiff that his accusations were without merit and further, that because plaintiff had failed to provide receipts for any of the articles, plaintiff had failed to establish ownership and his claim was rejected.  *Id*. at ¶ 16.  Thereafter, plaintiff corresponded with defendant Corcoran on or about September 11, 2000 and in response, defendant Corcoran sent plaintiff a memorandum dated September 13, 2000.  Dkt. #90, ¶ 19 and Exhibit B.  Defendant Corcoran's September 13, 2000 memorandum addressed plaintiff's September 11, 2000 note and stated, in pertinent part, "I have again received another demeaning and insolent note from you.  This is the last time that I will respond to [sic].  I will not

authorize you access to your property bags, since you've already determined that we have broken into your bags to destroy your receipts." *Id*.

At the time of plaintiff's transfer, plaintiff was advised not to leave active case material behind and plaintiff was further instructed to include all active legal material in his 4-bag limit. Dkt. #90, ¶ 12 and Exhibit A. Plaintiff refused to sign the Personal Property Transferred Form. *Id*. Plaintiff claims that as a result of defendant Corcoran's conduct, Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed on or about December 20, 2000. Dkt. #9, p.5-D. Contrary to plaintiff's assertions, Claim No. 98329 was dismissed by Judgment dated January 2, 2001. Dkt. #90, ¶ 21 and Exhibit B. As set forth in the Judgment, plaintiff filed Claim No. 98329 on May 15, 1998 seeking damages in the amount of $350,000 for mental anguish arising out of events which occurred while he was an inmate at Attica Correctional Facility. *Id*. The Judgment further notes that the matter came on to be heard by the Honorable Edgar C. NeMoyer, Judge, Court of Claims and that the Court, having heard the "proofs and allegations of the parties and having duly made and filed its decisions in which it dismissed this claim", Claim No. 98329 was dismissed. *Id*. Thus, the Judgment dismissing Claim No. 98329 makes clear that the matter was dismissed after the parties had submitted "proofs and allegations" and makes no mention whatsoever of dismissal because of plaintiff's failure to submit certain vouchers or receipts. Accordingly, because plaintiff has failed to establish that he suffered any injury, his claim against defendant Corcoran must fail as a matter of law.

**Defendant Lawrence W. Weingartner**

Similar to defendant Corcoran, defendant Weingartner, in support of his motion for summary judgment, states that he has no recollection of plaintiff's claim that he denied him access to the Court of Claims.  Dkt. #91, ¶ 6.  Based on a review of the documents produced by plaintiff in connection with this action, defendant Weingartner has concluded that plaintiff's claim relates to a June 18, 2001 Notice advising plaintiff that a piece of legal mail was being returned to him pursuant to the Directive governing the inmate correspondence program.  *Id*. at ¶ 10.  The Notice directed plaintiff's attention to the item checked and where applicable, advised plaintiff to correct and resubmit the item for processing.  *Id*.  In the box designated "other", plaintiff was advised that his request for special handling had been denied by defendant Weingartner because it did not meet the guidelines for special handling as outlined in DOCS Directive No. 4421.  *Id*. at ¶ 11.  DOCS Directive Nos. 4421, Privileged Correspondence (7 N.Y.C.R.R. Part 721) and 4422, Inmate Correspondence Program (7 N.Y.C.R.R. Part 720) set forth DOCS policy regarding inmate mail correspondence. *Id*. at ¶ 12.  DOCS Directive No. 4421 provides that advances for "special Handling" (e.g., certified mail, return receipt, express mail, etc.) will not be approved unless required by a statute, court rule or court order.  7 N.Y.C.R.R. 3(a)(3)(v).  Moreover, on the June 18, 2001 Notice to plaintiff, the box marked "Advances for Special Handling" states that advances for special handling,

> may not be used to pay for any special handling charges
> such as for certified, return-receipt, express mail, etc.,
> unless such mail services are required by statute or court
> order.  Advances for special handling for filing a Claim or

> Notice of Intention on the Attorney General [sic] Office must be specified on the approved Advance Request form for postage.  You must state why you are requesting special handling on the advance form or provide a copy of court order. (4421).

*Id*. at ¶ 14.

According to defendant Weingartner, because plaintiff's request for special handling did not meet the applicable guidelines, his request was denied.  *Id*. at ¶ 15.  Indeed, defendant Weingartner further states that a request for special handling for mailing a notice of appeal to the Attorney General does not meet the guidelines for special handling because plaintiff was not filing a Claim or Notice of Intention on the Attorney General's Office.  *Id*.  In addition, there is nothing in the record to suggest that after he received the June 18, 2001 Notice, that plaintiff submitted any court order or statute to the mailroom showing that his correspondence to the Attorney General was required to be mailed by certified mail, return receipt requested.  *Id*. at ¶ 16.  Lastly, in further support of his motion for summary judgment, defendant Weingartner states that to the extent that any appeal concerning Claim No. 99509 was untimely, plaintiff was advised by the Court (Mr. Davison) that to obtain permission to file or serve an untimely notice of appeal, plaintiff must make a motion for leave to file an untimely notice pursuant to CPLR 5520.  *Id*. at ¶ 17.  There is nothing in the record to suggest plaintiff submitted any such motion pursuant to CPLR 5520.  *Id*. at ¶ 18.  Thus, because plaintiff cannot establish that defendant Weingartner interfered with his right of access to the Court of Claims or that any conduct on the part of defendant Weingartner caused the

dismissal of Claim No. 99509 or prevented plaintiff from appealing the dismissal of Claim No. 99509, plaintiff's claim against defendant Weingartner must fail as a matter of law.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Dkt. #79) is in all respects **GRANTED.**

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied.  *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

DATED:      Buffalo, New York
            January 29, 2009

**s/ H. Kenneth Schroeder, Jr**
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**